**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE PHILADELPHIA REGIONAL | : | |
| PORT AUTHORITY, | : | |
| | : | |
| Plaintiff, | : | No. 2:24-cv-1008 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES ARMY CORPS | : | |
| OF ENGINEERS, the DISTRICT | : | |
| COMMANDER FOR THE | : | |
| PHILADELPHIA DISTRICT OF THE | : | |
| ARMY CORPS OF ENGINEERS, | : | |
| JEFFREY BEEMAN (in his | : | |
| Official Capacity), and the CHIEF OF THE | : | |
| REGULATORY BRANCH FOR THE | : | |
| PHILADELPHIA DISTRICT OF THE | : | |
| ARMY CORPS OF ENGINEERS, | : | |
| TODD A. SCHAIBLE | : | |
| (in his Official Capacity), | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## I.     INTRODUCTION AND SUMMARY OF ALLEGATIONS

1.      This Complaint challenges approvals issued pursuant to the Administrative

Procedures Act by the United States Army Corps of Engineers and certain personnel from the

Philadelphia District of the Army Corps to Diamond State Port Corporation for the proposed

construction of a new container port in Edgemoor, Delaware, to be located adjacent to the newly

deepened Main Navigation Channel of the Delaware River.

### A.      The History of the Deepening Project

2.      The Main Navigation Channel ("MNC")  is the 45-foot deep channel within the

Delaware River that has been specifically dredged to that depth in order to accommodate Post-

Panamax vessels, which can ship up to approximately 14,000 TEUs with drafts up to 44.5 feet.[1] Before the recent expansion of the capacity at the Panama Canal, Panamax vessels more typically handled about 5000 TEUs and had drafts up to 39.5 feet.

3.      Though the State of Delaware fought the deepening of the MNC at every turn, now that the project is completed at no cost to Delaware, it suddenly sees value in usurping the value of Pennsylvania's investment, which was for over one-third of the cost of that project. Delaware has placed its new harbor, the Edgemoor Expansion Site ("Edgemoor") right next to the MNC, with its turning basin entirely within the bounds of the MNC to nearly guarantee obstruction to river traffic heading upriver unless there are enforceable operational conditions (i.e., permit conditions).

4.      Because the United States Army Corps of Engineers and certain personnel from the Philadelphia District of the Army Corps (collectively, the "Army Corps") performed such a perfunctory and inadequate review of Diamond State Port Corporation's ("DSPC") permit applications, PhilaPort is compelled to file this Complaint given the clear disparity in the level of intense review afforded PhilaPort's applications to the Army Corps versus its review of DSPC's applications for the Edgemoor Expansion of the Port of Wilmington ("Edgemoor").

5.      Congress authorized the Delaware River Main Channel Deepening Project (the "Deepening Project") in 1992 and appropriated funds to support the Army Corps' work after many years of review.[2]  The Army Corps spearheaded numerous environmental studies, and in 1998 published its Record of Decision authorizing the Deepening Project.

---

[1] TEUs stands for twenty-foot equivalents, representing the dimensions of a standard shipping container.
[2] The project was authorized for construction by Public Law 102-580, Section 101 (6) of WRDA 1992; modified by Public Law 106-53, Section 308 of WRDA 1999 and further modified by Public Law 106-541, Section 306 of WRDA 2000.

6.     The Deepening Project required both federal and state approvals and permits to dredge the MNC from 40 feet to 45 feet.  Under the Water Resource Development Act, for the Army Corps to be able to spend funds and commence construction on a water resources project, there must be a "non-Federal sponsor" that has entered into a written agreement to furnish a specified portion of the Project costs.  33 U.S.C. §2232.

7.     The Delaware River Port Authority ("DRPA"), a multi-state entity, was the original local sponsor, but because DRPA member states Delaware and New Jersey opposed the Deepening Project, Pennsylvania became the sole Non-Federal sponsor through its Philadelphia Regional Port Authority ("PhilaPort").  In 2008, PhilaPort entered into a Project Partnership Agreement ("PPA") with the Department of the Army requiring it to contribute 35% of the total cost of the Deepening Project, which has cost a total of approximately $400 million. PhilaPort contributed 35% of that amount, or approximately $140 million.  Because PhilaPort is an independent agency of the Commonwealth of Pennsylvania, that money for the Deepening Project came from the citizens of Pennsylvania.

8.     Although today it appears Delaware embraces the Deepening Project, in fact the State of Delaware litigated most every aspect of the Deepening Project to thwart its development.  To stop the dredging, Delaware filed a complaint in the District Court of Delaware.  The Third Circuit Court of Appeals eventually resolved the meritless litigation, noting that Delaware's delay tactics impaired the federal government's ability to maintain navigability on the Delaware River:

> The Corps applied for subaqueous lands and wetlands permits in 2001. **For eight years, Delaware stalled on its application.**  In light of Sections 313 and 404(t) of the CWA, which obligate federal agencies to follow states' environmental laws, the Corps was at an impasse. Accordingly, it invoked the exemption set forth in Section 404(t) in the spring of 2009. That provision

> provides: 'This section shall not be construed as affecting or
> impairing the authority of the Secretary to maintain navigation."
> CWA §404(t) (codified at 33 U.S.C. § 1344(t)). On April 30, 2009,
> the Assistant Secretary of the Army for Civil Works signed a
> Memorandum of Record declaring the "failure to construct the 45'
> Project as authorized by Congress in 1992 has . . . impaired the
> Secretary of the Army's authority to maintain navigation …'

<u>State of Delaware vs. United States Army Corps of Engineers</u>, 685 F.3d 259, 283 (3d Cir. 2012)

(emphasis added).

9.      Thus, in large part due to Delaware's protracted resistance, it took 20 years from

Congress's authorization of the Deepening Project for it to truly begin, as the Third Circuit

noted:

> For over twenty years, the Corps has devoted substantial
> efforts to evaluating the proposed five-foot deepening project for the
> Delaware River. It has published three comprehensive NEPA
> reports, received multiple rounds of public comments, and had
> immeasurable communications with the relevant state and federal
> agencies. Its decision in 2009 to proceed with the project was
> consistent with NEPA, the CWA, and the CZMA. Accordingly, we
> will affirm the judgments of the District Courts of New Jersey and
> Delaware.

<u>Id.</u> at 287.

10.     This significant delay resulted in an increase to the cost of the Deepening Project,

as well as with respect to the Non-Federal share shouldered exclusively by Pennsylvania.  After

decades, the Deepening Project was recently completed.  The Port of Philadelphia is now able to

service larger shipping vessels, which was one of the justifications for PhilaPort's significant

contribution to the Deepening Project, and PhilaPort is finally receiving a return on its sizable

investment.

11.     Pennsylvania will finally see the benefit of its $140 million investment to deepen

the Delaware River, after years of delay—due in no small part to Delaware's years-long

resistance—and now Delaware has seen the light and is attempting to develop a port to attract

business away from Philadelphia and Pennsylvania, business that is only possible because of Pennsylvania's investment.

12.     If Edgemoor is developed, despite there being no valid demonstration of economic need or benefit as required by Amry Corps regulations, it will undoubtedly pull business from the Port of Philadelphia; but more importantly, Edgemoor creates new navigational impediments for vessels heading to and from PhilaPort by developing a sprawling new turning basin in front of Edgemoor consuming the entire breadth of the MNC in that location.

### B.     The Proposed Edgemoor Expansion

13.     Edgemoor involves the construction of a new 2600-foot-long container port on the Delaware River in the Edgemoor section of New Castle County, Delaware.  In order to make the proposed port available to deep draft container cargo vessels, the applicant, DSPC, intends to dredge a new access channel and new ship berth to a depth of 45 feet below mean lower low water (which involves dredging almost 100 acres of riverbed and more than 3.3 million cubic yards of river sediments and underlying soil), which will tie into a turning basin in the MNC. Following initial dredging, the access channel, turning basin (defined below as "Turning Basin"), and berth site would require extraordinary volumes of annual maintenance dredging, according to estimates prepared by DSPC's consultants.

14.     At present, ships heading up the Delaware River to PhilaPort do not have to contend with a massive port structure and Turning Basin at one of the most critical and congested bends of the river.  DSPC's plans place the critical Turning Basin structure allegedly essential for Edgemoor's ingress and egress right in the middle of the Main Navigation Channel, consuming its entire breadth at the Edgemoor location.  In essence, no vessel can now pass by

Edgemoor without encountering the palpable risk of delay as a vessel turns in the basin, essentially closing down the MNC, or creating new risks of delay and collision that do not currently exist.  Thus, not only would Delaware usurp Pennsylvania's rights with respect to the MNC, having contributed no funds toward the Deepening Project and creating excessive cost and delay, it would likely create a new impediment to navigation up- and down-river from Edgemoor.

15.     PhilaPort's suspicions concerning Edgemoor's Turning Basin design were confirmed during a formal hearing before the Delaware Environmental Appeals Board on February 13, 2024, during which the attorney representing the State of Delaware, Department of Natural Resources and Environmental Control conclusively stated and conceded that Edgmoor's use of the Turning Basin would shut down all reiver traffic at that location, including any vessel heading to or from PhilaPort's facilities:

> But the one that I want to focus on in particular is this speculation about the impact on other vessels when the turning basin is being used. And when the turning basin is being used, just to be clear, no vessels can pass. When I talked about the passing of --- the passing distances, that assumes that they're --- the turning basin is not being used. When the turning basin is being used, passing is not occurring.[3]

16.     PhilaPort asserts the claims in this Complaint because the Army Corps of Engineers failed on many different occasions to implement the rigorous review and seek the required concurrences appropriate for the massive permitting requests filed by DSPC, and which had been specifically noted by the Third Circuit.  The Administrative Record makes clear that the Army Corps failed:

> **a.  To perform any meaningful or detailed navigation studies to support the construction and use of Edgemoor, failing even to test**

---

[3] Transcript, Environmental Appeals Board for the State of Delaware, *In re: Department of Natural Resources and Environment Control vs. Philadelphia Regional Port Authority, et al.*, Appeal No. 2021-08, 09 and 10 at pp. 169-170 (Feb. 13, 2024). A true and correct excerpt of the transcript with the quoted testimony is attached as **Exhibit 1**.

> how a vessel would turn in the Turning Basin itself, and failing to evaluate how large Post-Panamax vessels could use Edgemoor;
>
> b.  To conduct any substantive economic study of how Edgemoor could impact the regional economy as well as the nearby Ports from which it would seek to usurp business;
>
> c.  To seek the concurrence of PhilaPort, its Non-Federal partner, with respect to the modifications to the MNC required by Edgemoor, when PhilaPort has ongoing operation and maintenance responsibilities at that location.

All of these elements were required for approval of the various applications filed by DSPC, and the Army Corp's cursory review of DSPC's submissions, as detailed below, warrant a recission of all permits, and such further relief as detailed below.

**C.   DSPC's Various Applications:**

17.    The Army Corps was required to review and approve Edgemoor under several regulatory programs before Edgemoor could be constructed.  The relevant statutes and regulatory programs at issue are the federal Clean Water Act and the Rivers and Harbors Act of 1899 and their implementing regulations, including 33 C.F.R. Parts 320 and 325.

18.    The Clean Water Act review under Section 404 relates to the discharge of fill for Edgemoor's construction, as well as discharges from the upland disposal of dredged material into waters of the United States.  33 U.S.C. §1344.

19.    Section 10 of the Rivers and Harbors Act of 1899 applies because the project requires a pile-supported wharf, retaining wall, and dredging and turning basin in navigable waters of the United States.  33 U.S.C.§403.

20.    Section 14 of the Rivers and Harbors Act of 1899, also known as a Section 408 Approval, is applicable because Edgemoor will impact the Deepening Project by placing Edgemoor's Turning Basin directly in the route of all navigation heading up or down river from Edgemoor, and the Turning Basin will tie into an access channel to facilitate the deep draft

vessels from the MNC to the terminal at Edgemoor.  Critically, PhilaPort is the sole Non-Federal sponsor with continuing operation and maintenance responsibilities with respect to the Deepening Project.  33 U.S.C. §408.

21.     The cost of maintaining the Turning Basin and access channel typically fall (at least in part) on the Non-Federal sponsor of the work subject to the Section 408 approval. Delaware apparently lacks the funding to maintain access to Edgemoor, and therefore seeks to shift its financial responsibility under Section 204(f) of the Water Resources Development Act of 1986 (the "Section 204(f) Request"), which grants the Army Corps the ability to absorb Delaware's costs at federal taxpayer expense, but only after rigorous review.  §33 U.S.C. §2232(f).

22.     On or around March 10, 2020, DSPC applied and provided supporting documents to the Army Corps for a permit for the Edgemoor Project pursuant to Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403) and Section 404 of the Clean Water Act (33 U.S.C. § 1344) (hereinafter, the "Section 10/404 Permit").  At or around the same time, it also submitted what is known as a "Section 408 Request" to the Army Corps, seeking permission "to use a section of the Main Navigation Channel of the Delaware River, Philadelphia to Sea Federal Navigation Project as a cargo ship turning basin," pursuant to Section 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408 (hereinafter, the "Section 408 Request" and corresponding "Section 408 Permission").

23.     Following the approvals of these permits, DSPC filed the Section 204(f) Request.

24.     The Army Corps' issuance of the Section 10/404 Permit, the Section 408 Permission, and the Section 204(f) Request (together, the "Project Approvals") for Edgemoor are the subjects of this permitting challenge.

25.     The Army Corps "is responsible for maintaining . . . the nation's waterways for navigation."  *TDM Am, LLC v. U.S.*, 83 Fed. Cl. 780 (U.S. Ct. Fed. Claims 2008); *see also* 33 U.S.C. § 1344(t).  In issuing the Project Approvals, the Army Corps failed in fulfilling this responsibility and acted arbitrarily and capriciously and not in accordance with the law.  As described below, the Army Corps failed to adequately evaluate, study, consider, and mitigate Edgemoor's negative impacts on navigation, safety, economics, and the Deepening Project.

## II.     <u>**JURISDICTION AND VENUE**</u>

26.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"); the Clean Water Act, 33 U.S.C. § 1251 et seq.; and the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 et seq.  This Court may pay provide declaratory and injunctive relief pursuant to U.S.C. §§ 2201 and 2202.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1), "actions where defendant is officer or employee of the United States," because Defendants reside within the Eastern District of Pennsylvania.  *Lamont v. Haig*, 590 F.2d 1124, 1128 n.19 (D.C. Cir. 1978) (explaining that "reside" in this context means "official residence of the federal defendant where the official duties are performed and not the personal residence of an individual who is a defendant").  The Project Approvals were reviewed and issued by the District Commander and Chief of the Regulatory Branch for the Philadelphia District of the Army Corps, which conducts its official business within this district.

28.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because a substantial portion of the events or omissions giving rise to the claim occurred in this District and because PhilaPort resides in this District.

III.   **PARTIES AND STANDING**

A.      **Plaintiff/PhilaPort**

29.     The Plaintiff's interests in Edgemoor are:

a.   to ensure that the proposed Edgemoor project does not prevent ships from being able to navigate safely and unimpeded up and down the Delaware River in order to reach the Plaintiff's' facilities. The anticipated impediments to navigation resulting from Edgemoor are detailed below.  It is substantially likely that Edgemoor, including the Turning Basin structure, will cause delays, travel restrictions, safety concerns, and other impediments to ship traffic moving to and from PhilaPort's facilities;

b.   as the Non-Federal partner in the Deepening Project, to ensure that PhilaPort's concerns were incorporated into the Army Corp's review of the 408 Request by the Army Corps obtaining a Letter of No Objection from PhilaPort with respect to Edgemoor;

c.   to ensure that the Army Corps has appropriately evaluated the economic benefits and costs associated with the development of Edgemoor by reviewing its commercial operations in the context of the regional port system operating along the Delaware River both with respect to the Environmental Assessment and the Section 204(f) Request.

30.     Edgemoor's development as currently contemplated together with its Turning Basin also increase the substantial likelihood of a collision or blockage in the MNC, which

would have devastating consequences for PhilaPort, for which passage through Edgemoor's

Turning Basin will be a requirement to in order to access PhilaPort's facilities.

31.     Edgemoor's development is designed to usurp commerce directly from PhilaPort,

and the economic studies underlying the Environmental Assessment and the Section 204(f)

Request go to great lengths to avoid any discussion whatsoever of any potential regional

economic impact that could result from Edgemoor.

32.     Accordingly, the Project Approvals will result in an "injury in fact" to PhilaPort

because, on a regular basis, ships destined for or returning from the Terminals will be blocked

and/or their safety and maneuverability will be hampered due to constraints resulting from

Edgemoor, and much of the commerce to be developed at Edgemoor will be at the direct expense

of PhilaPort, which paid for the access route from which DSPC now seeks to profit.

33.     These consequences, described further below, are concrete, particularized, and are

actual and imminent as they will have a direct effect on PhilaPort's facilities and operations if

Edgemoor is allowed to proceed.

34.     Because the interference with PhilaPort's commerce only results if Edgemoor is

allowed to proceed, there is an actual connection between the injury and the conduct complained

of (i.e., the issuance of the Project Approvals).  This injury will be redressed by the Court's

vacating the issuance of the Section 10/404 Permit, Section 408 Permission and Section 204(f)

Request for Edgemoor.

### B.     Defendants

35.     Defendant United States Army Corps of Engineers is a federal agency located

within the Department of Defense and charged with administering permits under Section 404 of

the Clean Water Act, and Sections 10 and 14 of the Rivers and Harbors Act of 1899.  The Army

Corps is headquartered in Washington, D.C.

36.     Defendant District Commander for the Philadelphia District of the Army Corps,

Jeffrey Beeman's predecessor issued the Project Approvals at issue in this litigation.  The

District Commander performs their official duties at 100 E Penn Square East, Philadelphia,

Pennsylvania 19107.  The District Commander is sued in their official capacity only.

37.     Defendant Chief of the Regulatory Branch for the Philadelphia District of the

Army Corps, Todd A. Schaible, reviewed the permit application and Project Approvals at issue

in this litigation.  The Regulatory Branch for the Philadelphia District is headquartered at 100 E

Penn Square East, Philadelphia, Pennsylvania 19107.  The Chief of the Regulatory Branch is

sued in their official capacity only.

## IV.     FACTUAL BACKGROUND

### A.     The Main Navigation Channel

38.     The Delaware River is a major commercial maritime center of the Eastern

Seaboard of the United States.  The river has been designated by the United States Coast Guard

as a "critical waterway."  According to a 2018 study by the Maritime Exchange for the Delaware

River and Bay, the maritime industry along the Delaware River contributes approximately $85

billion dollars annually to the economy.  The river is home to numerous terminals, including oil,

breakbulk, roll on/roll off, and container, including those facilities operated by or on behalf of

PhilaPort.

39.     Ship traffic moves up and down the Delaware River through the MNC, which is

the only deep draft channel that services the river.  It functions as the one and only "highway"

for the river over which critical economic activity flows.  Approximately 2,400 commercial

cargo vessels traverse the MNC annually to call upon ports and terminals along the Delaware

River, though this estimate does not account for discrete ship movements between facilities along the Delaware.  The MNC handles oil tankers up to the Panamax and Suezmax class, container ships up to 14,000 TEUs, and other large vessel classes.

**B.    The Location of the Proposed Wilmington Port Project and Turning Basin**

40.    DSPC proposes the construction of a container port and turning basin along the Delaware River at Edgemoor, New Castle County, Delaware.  According to DSPC's estimate, the new port is expected to increase vessel traffic by 55% over current traffic, forecasting an increase of approximately 244 container vessels calling at Edgemoor.  This estimate does not account for the tugs needed to assist the transport of these vessels or the barges and equipment associated with ongoing dredging that will be needed to maintain the proposed port.

41.    Edgemoor's proposed location is at a critical section of the Delaware River at the base of an already congested bend.  According to the Coast Guard, the area of the river just south of the proposed Project, at the entrance to the Christina River, experiences a heavy traffic mix between deep-draft vessels navigating the MNC and small craft entering and departing the Christina River.  Edgemoor itself is located just north of the Christina River where the MNC is constricted to the west by a shallow area of tidal flats known as the "Cherry Island Flats" over which commercial ships cannot travel.

42.    Edgemoor's wharf directly abuts the MNC, and its Turning Basin projects entirely through it.  The design plans call for the construction of a long pile-supported wharf along the waterfront, as well as dredging the berth and an access channel for the proposed port to 45 feet, which will occur across an 87-acre footprint directly adjacent to the MNC.  A diagram extracted from DSPC's permit applications is attached as **Exhibit 2**.

43.    In addition, DSPC's plans include a Turning Basin to facilitate the movement of large vessels in and out of the proposed terminal.  As designed and proposed by DSPC, the

Turning Basin will occupy the entirety of the MNC, which is an attribute that port designers seek to avoid due to safety and navigational concerns.

      **C.**      **The Proposed Dredging Operation And The Section 204(f) Request**

     44.     Initial dredging will require excavating more than 3.3 million cubic yards of sediment from an 87-acre footprint in the Delaware River.  Following initial construction, according to DSPC's own estimates, "significant" sedimentation will need to be managed in the dredged area on an ongoing basis, as high as 610,000 cubic yards per year.  Edgemoor will require an extraordinary amount of ongoing maintenance dredging operation after initial construction is complete, which is a material cost component of Edgemoor.

     45.     An ongoing dredging operation of the scale anticipated for Edgemoor will add congestion to this section of the Delaware River for significant periods of time, as long as three to four months each year.  The dredging is proposed to be performed by hydraulic dredging, which involves sucking sediments from the river bottom and then pumping them via pipeline to the landside disposal location.  For a project of this magnitude, dredging barges will be required as well as support vessels, pipelines, and booster pump stations.  This equipment will require exclusive use of the areas of the Delaware River they occupy with a reasonable safety radius, including areas directly adjacent to the MNC.[4]

     46.     In order to defray these significant costs, DSPC separately applied to the Army Corps under Section 204(f) of the Water Resources Development Act of 1986, 33 U.S.C. §2232(f) (the "Section 204(f) Request") for the Army Corps to assume the future operations and maintenance dredging and associated costs for the approach channel and turning basin.  In

---

[4] *See* Safety Zones; Delaware River Dredging, Marcus Hook PA, *available at* https://www.federalregister.gov/documents/2023/01/17/2023-00665/safety-zones-delaware-river-dredging-marcus-hook-pa. (last visited March 7, 2024).

essence, when it first submitted the Applications to the Army Corps, the DSPC could not demonstrate that it had the financial ability to fully fund the annual maintenance costs for the access channel and turning basin, and advised the Army Corps of its intent to foist those costs back onto the federal government.

47.     Section 204(f) authorizes the Assistant Secretary of the Army for Civil Works (ASA(CW)) to assume a Non-Federal Sponsor's share of the costs for the O&M of improvements to a federally authorized harbor carried out by a non-Federal interest following a rigorous economic review.

48.     In support of its request for the federal assumption of Delaware's ongoing O&M costs, DSPC submitted a report that purports to justify the request: "Port of Wilmington, Delaware – Edgemoor Port Expansion Section 204(f) – Federal Assumption of Maintenance Report," dated November 2022 (Revised January 2023) (the "204(f) Report").

49.     The 204(f) Report contains a mandatory "Economic Justification" section to address the requirements of Army Corps regulation ER-1165-2-211, which governs Section 204(f) reviews.

50.     Army Corps regulation ER-1165-2-211 requires an economic justification that demonstrates the benefits of the improvements exceed improvement costs, including construction and O&M.  This regulation specifies that benefits are evaluated under Army Corps regulation ER-1105-2-100, Appendix E. Id. at 4(e).

51.     ER1105-2-100, Appendix E, Section II (Navigation), E-10, "National Economic Development Benefit Evaluation Procedures: Transportation, Deep-Draft Navigation" (the "Deep Draft Evaluation") governs the evaluation of benefits associated with large regional ports,

such as Edgemoor, specifically the construction of new harbors and channels and improvements to existing or natural harbors.

52.     In order to satisfy the Deep Draft Evaluation, the 204(f) Report acknowledges the applicability of these provisions:

> Per ER 1165-2-211, which provides Implementation Guidance (IG) for Section 204(f), the costs and benefits of the entire project – initial construction and O&M must be deemed economically justified per the benefits evaluation procedure dictated in ER 1105-2-100, the Planning Guidance Notebook.

53.     It is when the 204(f) Report defines the project to be evaluated that it becomes apparent the DSPC is attempting to limit the scope of any review to just the confines of the turning basin and access channel, rather than acknowledging that those components are essential to the whole of the project, and cannot be segmented off:

> 1.2. Proposed Project Modification [Proposed Project][5]
>
> The proposed project modification is located along the western shore of the Philadelphia to Sea Navigation Project of the Delaware River at river mile 73.2 within New Castle County, Delaware.  The modification consists of the **construction of primary harbor access and a turning basin to provide access to an expansion of the public Port of Wilmington facilities**. The access will be provided from the Delaware River Navigation Channel, similar to the existing Wilmington Harbor Project…  The [DSPC] proposes to construct harbor access on the western side of the channel to create a short access channel and a 1,700 linear foot turning basin. The access channel will be 4,000 feet along the navigation channel and will be 2,600 linear feet at the Port of Wilmington Facilities. The channel is proposed to extend 490 feet to 890 feet from the existing channel limit to the Port of Wilmington berthing line with a total footprint of 56.1 acres. The project would be maintained to a depth of 45 ft mean lower low water . . . .

---

[5] The 204(f) Report refers to the "Proposed Project," which is apparently the approach channel from the MNC to Edgemoor, and is meant to be separate from the entirety of the Edgemoor development.

54.     Because the 204(f) Report carefully segments the access channel and turning basin construction from the rest of the Edgemoor port development, the DSPC fails to provide any context for the Proposed Project with respect to any nearby or regional ports, which runs directly contrary to the policy underlying the Deep Draft Evaluation, which states:

> US ports operate in a system(s). A study that appropriately considers a port in isolation will be rare. In such a case the report shall document why systems considerations are not relevant.

*Id.* at E-50.

55.     Despite the Deep Draft Evaluation's presumption that ports operate in a regional and national economic environment, both the 204(f) Report nor the Administrative Record fail to document why a regional system approach was ignored, and consequently run afoul of the Deep Draft Evaluation.

56.     In essence, Edgemoor as an expansion of the Port of Wilmington cannot be accomplished without the turning basin and access channel at issue, and they are to be constructed in tandem with the entire facility, and thus the economic analysis that depicts only those costs associated with those features is artificially constricted, and the analysis should include the costs of constructing, operating and maintaining all of Edgemoor.

57.      Further, the 204(f) Report incorporates a separate Army Corp's economic analysis entitle, "Wilmington Harbor, Edgemoor Expansion, Wilmington, DE, Economic Analysis (November 2022)" (the "Corps Economic Report").  A true and correct copy of the Corps Economic Report is attached as **Exhibit 3**.)

58.     The Corps Economic Report states that the costs associated with the Section 204(f) Request must include the construction of the Edgemoor facility:

> Per ER 1165-2-211, which provides Implementation Guidance (IG) for Section 204(f), the costs and benefits of the entire project – initial

> construction and O&M must be deemed economically justified per
> the benefits evaluation procedure dictated in ER 1105-2-100, the
> Planning Guidance Notebook… The benefits would be made up of
> the transportation cost savings derived from moving that cargo more
> efficiently to the Edgemoor terminal via the new 45-foot channel.
> The total cost of the effort would be the costs of the channel
> deepening, additional operation, and maintenance cost from the
> Philadelphia to the Sea channel to Edgemoor **as well as the
> associated costs required to make the facility operational (*i.e.*,
> berth dredging and terminal construction).**

*Id.* at 2.

59.     Notwithstanding the dictate from the Deep Draft Evaluation and the fact that the

Army Corps is considering the total cost of construction of Edgemoor in its review, the Corps

Economic Report then fails to undertake any regional analysis with respect to the economic

impact of Edgemoor to other nearby regional ports.  Nor is there any discussion of using those

other regional ports as a destination for any cargo in the event the Edgemoor 204(f) Request was

not approved, which essentially would have meant that Delaware lacked the funding for the

development of Edgemoor.

60.     The lack of any analysis as to the regional impact to nearby ports is especially

glaring in light of the Corps Economic Report's stated central purpose:

> The scope of this effort involves analysis of existing conditions and
> anticipated without-project future conditions, to determine whether
> the DSPC's-proposed extension and maintenance of the Federal
> channel to a newly-built Edgemoor terminal would be economically
> justified under USACE standards. The analysis is based upon
> transportation cost savings associated with increased efficiency of
> container vessel operations in the Port of Wilmington specifically -
> - Accommodation of recent and anticipated future growth in
>   containerized cargo and containership traffic;…
> - Allowing the larger and more efficient container vessels to
>   call on the Port with increased frequency; and
> - Increasing the efficiencies of future service lines to the Port
>   of Wilmington

*Id.* at 3.

61.     The study of future growth, future service lines in the Corps Economic Report necessarily calls into question the origin of such growth and new lines of business, where such lines are currently serviced, whether that port would lose that line service line, and the extent to which that creates a negative economic impact to be factored into the analysis – all of which are regional commercial and economic issues that are notably and unjustifiably absent in the Corps Economic Report.

62.     The Corps Economic Report states that it attempts to " . . . determine whether the DSPC's proposed extension and maintenance of the Federal channel to a newly built Edgemoor terminal would be economically justified under USACE standards . . . ," but at the same time trying to evaluate those standards " . . . based upon transportation cost savings associated with increased efficiency of container vessel operations in the Port of Wilmington," which is the entire Edgemoor development.

63.     The Army Corps' lack of regional analysis is even more confounding in light of its depiction of the Port of Wilmington as " . . . a full service Mid-Atlantic seaport strategically located to provide overnight access to two hundred million North American consumers," and then describing the "Economic Study Area," which it then depicts in a regional if not national setting:

> As the largest fruit distribution hub in the nation, the hinterland for Wilmington Harbor extends to every geographic region of the United States. The Port of Wilmington . . . **is about 25 miles southwest of Philadelphia and about 12 miles southwest of the Port of Camden, NJ.**

*Id.* at 5 (emphasis added).

64.     The Corps Economic Report then discloses that while its study only considers the current projected volume of cargo anticipated at Edgemoor, the facility vastly expands that capacity:

> The current economic analysis considers throughput up to 675,000 TEUs at Edgemoor, which matches the container throughput capacity at the Christina River facility and allows gains in efficiency (i.e., transportation cost savings) of moving container operations from the shallower facility to the deeper facility be clearly measured. While the current analysis does not attempt to forecast beyond 675,000 TEUs, it is acknowledged that the **Edgemoor facility will provide the DSPC . . . the flexibility for future expansion up to ~1.2 million TEUs if desired**.

*Id.* at 16 (emphasis added).

65. The Corps Economic Report at no point attempts to explain why it considers Edgemoor as a facility in isolation, having no relation to nearby ports, yet at the same time acknowledging that Edgemoor will be part of the overall Delaware River Port System, with other significant ports within 12-25 miles of its location.

66. The Corps Economic Report does nothing to analyze the potential for usurpation of commerce from nearby ports despite its acknowledgement that Edgemoor will be constructed to attract nearly double the existing commerce that exists at the Port of Wilmington to be supported by undisclosed future service lines.

67. Instead, the Army Corps arbitrarily and capriciously segmented the portion of Edgemoor that it studied, focusing solely on the access channel and turning basin rather than Edgemoor as a whole (while analyzing economics as a whole), as if the access channel and turning basin would exist but for Edgemoor.  This in turn created the pretext that Edgemoor's business will operate in isolation from any other large-scale nearby regional ports, while providing no justification for such a carefully curtailed review in the Administrative Record, as mandated by the Deep Draft Evaluation.

**D.     DSPC's Preliminary Navigation Study (MITAGS Study)**

68. The sole submission by DSPC relating to navigational safety and protocols is a preliminary study conducted by the Maritime Institute of Technology and Graduate Studies (the

"MITAGS Study").  The MITAGS Study's stated objective was "to determine the impact of the terminal on the ships transiting the deep-draft navigation channel."  A true and correct copy of the MITAGS Study is attached as **Exhibit 4**.

69.     Although the MITAGS Study concluded that the "proposed Edgemoor Terminal would have minimal impact on ships as they transit the existing navigation channel," the conditions for such favorable results depend strictly upon conditions of high tide and with winds below 20 knots.  The Army failed to incorporate any such standards into its approvals.

70.     The Administrative Record is devoid of any information about berthing and transit conditions at Edgemoor, including when the inevitable events of low tide and winds over 20 knots occur, and whether there will by any impact on other vessels in the MNC when they do.

71.     The MITAGS Study also failed to evaluate the impact a turning ship occupying the MNC would have on other ships in this section of the river.

72.     The MITAGS Study similarly noted that future studies were required to evaluate additional critical safety issues, noting "[b]erthing procedures, tug power required, and emergency procedures will be developed in future simulation studies."

73.     Further, although the proposed port and Turning Basin are designed to handle deep draft containerships up to 12,000 TEUs, the study primarily evaluated the performance of smaller containerships which carry only up to 9,300 TEUs.  The Study states that it was intended only to "[p]rovide preliminary feedback regarding the feasibility of a 12,000 TEU vessel," despite the fact that the berthing area of the dock is expressly designed to accommodate two such vessels side-by-side and the express purpose of Edgemoor according to the Army Corps is to develop a modern containerized cargo port to accommodate the New Panamax ships, which are as large as 12,000 TEUs.

74.    The entire premise of the MITAGS Study was vastly overstated by the DSCP and the Army Corps to create the impression that Edgemoor has been fully vetted for enormous 12,000 TEU Post-Panamax vessels.  However, the MITAGS Study itself is clear on the limitations of what it evaluated:

> The navigation channels handle oil tankers up to the Suezmax class, container ships up to 14,000 TEUs, and other vessel classes . . . **Containerships up to 9,300 TEUs are planned for this terminal.** As part of this assessment, . . . DSPC, and the U.S. Army Corps of Engineers (USACOE) desire a full-mission ship navigation study to ensure that containerships are able to transit safely to the Edgemoor Terminal on a regular basis, with minimum impact on existing vessel traffic. The primary focus of the study is to determine the impact of the terminal on the ships transiting the deep-draft navigation channel.

75.    However, the MITAGS Study provided only a "preliminary validation" of Edgemoor's capability to safely handle vessels up to 12,000 TEUs:

- **Validate the terminal turning basin designs for handling containership ships up to 9300 TEUs on a routine basis** under the River's existing environmental operating limits.
- Provide suggestions on ways to facilitate vessel movement in and out of the terminal.
- **Preliminary validation on the feasibility of a 12,000 TEU** vessel to call on the terminal.

76.    In sum, the Army Corps concluded that Edgemoor has full and unrestricted capabilities to receive vessels 30-40% larger than the 9300 TEUs validated by the MITAGS Study (i.e., 12,000 TEUs) based solely on a single study for preliminary validation of the feasibility for servicing such massive vessels.

77.    Further, the Administrative Record contains no information regarding how vessels will be safely managed during the extensive dredging operations that will be taking place directly adjacent, and perhaps within the MNC, including any consideration of safety zones and how they could impact the flow of navigation.

78.     The Administrative Record is otherwise devoid of any technical information that the Army Corps could have used to make the dramatic conclusion that Edgemoor can be safely dredged so close to the MNC, and how it is designed to safely harbor 12,000 TEU vessels.  The Army Corps' conclusion that the DSPC satisfied the regulatory requirement to demonstrate navigational safety is arbitrary, capricious and otherwise not in accordance with law.  *See* 33 C.F.R. § 320.4.

       **E.       The Defective Section 408 Request Process**

79.     In order for the DSPC to make or seek the modifications necessary to connect Edgemoor to the MNC, and to create a Turning Basin that will consume the entire breadth of the MNC, DSPC filed a request for a Section 408 Approval with the Army Corps.

80.     On August 4, 2022, unbeknownst to PhilaPort or other interested members of the public, the Army Corps notified DSPC of the issuance of the Project Approvals, which included the Section 408 Approval, based upon the Army Corps' decision documents.  A true and correct copy of the Army Corps' CE NAP-OPR (File Number, NAP – 2019-00278-23 Memorandum for Record  (the "Decision Documents") is attached as **Exhibit 5**.  A true and correct copy of the Army Corps' June 23, 2022 Summary of Findings regarding its Section 408 Determination for the DSPC Port of Wilmington Edgemoor Expansion (the "Section 408 Determination") is attached as **Exhibit 6**.

81.     The Army Corps did not seek or obtain a Statement of No Objection from PhilaPort, as it was required to do under Section 408.  In fact, the Army Corps completely ignored PhilaPort as the Non-Federal Sponsor in its Section 408 Determination.  (*See generally* Ex. 6.)

23

82.     The Army Corps publishes an elaborate guidance document entitled, *Policy and Procedural Guidance for Processing Requests To Alter US Army Corps of Engineers Civil Works Projects Pursuant to Section 408*, EC 1165-2-220 (September 2018) (the "Guidance").[6]

83.     The Guidance states that the first step in the application processing requires that the Army Corps obtain a "Statement of No Objection" from any Non-Federal sponsor.  The introductory statement gives a strong predilection to include the Non-Federal party:

> a. Statement of No Objection. For USACE projects with a non-federal sponsor, a written "Statement of No Objection" from the non-federal sponsor is required if the requester is not the non-federal sponsor. **Non-federal sponsors typically have operation and maintenance responsibilities; have a cost-share investment in the USACE project; and/or hold the real property for the USACE project. The purpose of the Statement of No Objection is to document that the non-federal sponsor is aware of the scope of the Section 408 request and does not object to the request being submitted to USACE to initiate the evaluation of the request.** Districts must coordinate with non-federal sponsors throughout the review process and ensure feedback from non-federal sponsors is considered prior to USACE rendering a final decision on the Section 408 request. Requesters can ask the USACE district office to facilitate coordination with and seek to obtain the Statement of No Objection from, the non-federal sponsor. If a Statement of No Objection cannot be obtained, the district will not proceed with the Section 408 review **with the following exceptions**:

> > (1) A Statement of No Objection is not required if the requester is the non-federal sponsor.

> > (2) **A Statement of No Objection is not required when USACE has all operation and maintenance responsibilities for the portion of the USACE project proposed to be altered**.

(Emphasis added.)

---

[6] The Guidance itself states that it expires on September 30, 2020, but the Army Corps' website still references the document as the method by which these permits are processed. *See* https://www.spl.usace.army.mil/Missions/Section-408-Permits/ (last visited March 7, 2024).  Further, the Army Corps lists this material in its Summer 2022 listening series on 408 Permits here: https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll11/id/5801 (last visited March 7, 2024).  Consequently, it is clear this is the most pertinent and applicable guidance.

84.     The Decision Documents emphasize that the Guidance must be "adhered to in full" by the Army Corps.  (Ex. 5 at 60).  Specifically, the Decision Documents state that "All Section 408 Standard Terms and Conditions found in the Department of the Army <u>POLICY AND PROCEDURAL GUIDANCE FOR PROCESSING REQUESTS TO ALTER US ARMY CORPS OF ENGINEERS CIVIL WORKS PORJECTS PURSUANT TO 33 USC 408</u>, Appendix K, dated 10 September 2018, **must be adhered to in full**."  (*Id.* (all caps in original; bold underline emphasis added).)

85.     The Section 408 Determination similarly incorporates by reference the Guidance.  (*See* Ex. 6 at 1.)

86.     As already stated, PhilaPort is the sole Non-Federal sponsor of the Deepening Project, which includes the MNC that DSPC seeks to modify in order to accommodate the Turning Basin and the access channel to Edgemoor.

87.     Given that PhilaPort is the sole Non-Federal sponsor and was not the requester itself (Exemption 1), the Army Corps is excused from seeking a Statement of No Objection from PhilaPort **only** it if has **all** operation and maintenance responsibilities for the portion of the Deepening Project that would be impacted by Edgemoor.

88.     Pursuant to the Water Resources Development Act's (the "WRDA") provisions governing harbors, there are two components to the responsibilities for Operation and Maintenance ("O&M"): (1) the cost of O&M, and (2) the cost of constructing dredge material disposal facilities used for O&M, together constituting all O&M responsibilities under the WRDA:

> (b) Operation and maintenance
> (1) In general

The **Federal share of the cost of operation and maintenance** of each navigation project for a harbor or inland harbor constructed by the Secretary pursuant to this Act or any other law approved after November 17, 1986, **shall be 100 percent,** except that in the case of a deep-draft harbor, the non-Federal interests shall be responsible for an amount equal to 50 percent of the excess of the cost of the operation and maintenance of such project over the cost which the Secretary determines would be incurred for operation and maintenance of such project if such project had a depth of 50 feet.

(2) Dredged material disposal facilities

The **Federal share of the cost of constructing land-based and aquatic dredged material disposal facilities that are necessary for the disposal of dredged material required for the operation and maintenance of a project** and for which a contract for construction has not been awarded on or before October 12, 1996, shall be determined in accordance with subsection (a). The Federal share of operating and maintaining such facilities shall be determined in accordance with paragraph (1).

33 U.S.C. §2211(b).

89.     The manner in which these two categories of O&M are allocated between the Army Corps and the -Non-Federal party is set forth in a required Project Partnership Agreement. 33 U.S.C. §2211(e).  PhilaPort and the Army Corps are parties to a Project Partnership Agreement ("PPA") for the Deepening Project.  A true and correct copy of the PPA is attached as **Exhibit 7**.

90.     Section VII.B of the PPA states that the Army Corps is responsible for "all financial obligations" for the operation and maintenance of the General Navigation Features associated with the Deepening Project, consistent with §2211(b).  (Ex. 7 at 30.)

91.     However, pursuant to other provisions in the PPA, and consistent with 33 U.S.C. § 2211(b)(2), PhilaPort shares financial responsibility with the Army Corps for both the construction and the operation and maintenance of dredge disposal facilities as the Non-Federal Sponsor of the Deepening Project.

92.     The PPA defines "General Navigation Features" to include both federal and Non-Federal Sponsor-owned and operated dredge disposal facilities:

> B. The term "general navigation features" shall mean deepening the l02.5-mile-long channel extending from deep water in the Delaware Bay to Philadelphia Harbor, Pennsylvania and to the upstream limit of Beckett Street Terminal, Camden New Jersey, to 45 feet below mean low water; widening 12 of the 16 existing channel bends; deepening a two-space anchorage to a depth of 45 feet at Marcus Hook anchorage; including any overdepth dredging; **and Non-Federal Sponsor dredged material disposal facilities**, including possible dredged material disposal facilities and landbased and aquatic dredged material disposal facilities that are necessary for the disposal of dredged material required for project construction, and existing Federal dredged material disposal facilities (Reedy Point South, Artificial Island, Killcohook, Penns Neck, Pedricktown South, Pedricktown North, Oldmans, and National Park) . . . .

*Id.* at 4 (emphasis added).

93.     Although the PPA does not define the term "Non-Federal Sponsor dredged material disposal facility," the PPA generally defines "dredged or excavated material disposal facility" in a manner consistent with §2211(b)(2):

> The term "dredged or excavated material disposal facility" shall mean the improvements necessary on lands, easements, or rights-of-way to enable the disposal of dredged or excavated material **associated with the <u>construction, operation, or maintenance of the other general navigation features</u>** . . . <u>**The term also includes modifications to a dredged or excavated material disposal facility to** increase capacity beyond that created by regularly recurring operation and maintenance activities</u>.

*Id.* at 6 (emphasis added).

94.     Further, PhilaPort has a continuing obligation under the PPA to provide funding, land, and rights of way with respect to any new or modified dredge disposal facilities as part of its responsibilities associated with a "subsequent period of construction"[7]:

---

[7] PhilaPort has not received any notification from the Army Corps that the initial period of construction is complete under the PPA.

The term "subsequent period of construction" shall mean a period of time after the period of construction beginning with the date that the Government first notifies the Non-Federal Sponsor in writing of the scheduled date for either issuance of the solicitation for the contract or commencement using the Government's own forces of **construction of a dredged or excavated material disposal facility that is part of the general navigation features** as defined in Article I.B of this Agreement and ending with the date that the District Engineer notifies the Non-Federal Sponsor in writing of the Government's determination that construction is complete. **There may be more than one subsequent period of construction**.

*Id.* at 5 (emphasis added).

95.     PhilaPort therefore has an ongoing obligation under the PPA for any "subsequent periods of construction" if the Army Corps identifies a shortfall in dredge disposal capacity as a result of its O&M activities along the MNC.  At that time, the Army Corps could trigger a "subsequent period of construction" under the PPA to create a new dredge disposal area, for which PhilaPort, as the sole Non-Federal sponsor, would have financial and land acquisition responsibilities to support the ongoing O&M.

96.     The purpose of PhilaPort's ongoing obligation for "subsequent periods of construction" under the PPA is to ensure that there is adequate long-term dredge material disposal capability for General Navigation Features for both the MNC and the Deepening Project.

97.     And the purpose of dredged material disposal facilities, which are part of the General Navigation Features, is to provide capacity for construction, operation, and maintenance of both the MNC and the Deepening Project.

98.     As a result, PhilaPort's funding and performance for "subsequent periods of construction" supports the O&M of the General Navigation Features, in addition to construction, the sum of which constitutes PhilaPort's participation in O&M activities as the Non-Federal sponsor, consistent with §2211(b).

99.     PhilaPort therefore has continuing exposure under its PPA with the Army Corps for construction-related costs or ongoing operation and maintenance costs for dredge and dredge disposal facilities under the PPA with the Army Corps in the event there is insufficient dredge disposal capacity anywhere within the scope of the Deepening Project, which includes the portion of the MNC that will become the Turning Basin for Edgemoor.

100.     There is no analysis of this issue in the Army Corps' Decision Documents, which are only concerned with the question of whether or not the Army Corp's costs could escalate. Both the WRDA and the PPA make it clear that with respect to O&M the responsibilities are shared between the federal and Non-Federal parties.  While the PPA reiterates that the federal government covers the cost of O&M, the financial obligations are not the only responsibilities for O&M, as noted in both the PPA with respect to "subsequent periods of construction," and the WRDA, which requires an allocation of such costs to the Non-Federal party.

101.     Consequently, the Army Corps was not excused from seeking and obtaining a Statement of No Objection from PhilaPort under the second exemption in the Guidance for Section 408 approvals.

102.     Further, not surprisingly in the absence of any participation by PhilaPort—the Non-Federal party—and, without any apparent analysis, the Army Corps concluded in the Decision Documents that Edgemoor "will not adversely affect the Philadelphia to the Sea Project because it will not limit the ability of the Philadelphia to the Sea Project to function as authorized, does not impair the Corps' ability to operate and maintain the Philadelphia to the Sea Project to its authorized dimensions, and will not increase the Corps' future O&M costs."  (Ex. 5 at 56-57.)  Further, the Corps found that the Proposed Project is not injurious to the public

interest and will not impair the usefulness of the Philadelphia to the Sea Project." (*Id.* at 57.)
The Army Corps did not provide its rationale for these conclusions in the Decision Documents.

103.    The Army Corps performed a similar scant and unsupported analysis of this issue
in its Section 408 Determination.  Without doing any independent testing or investigation
whatsoever,  the Army Corps concluded that "impacts to future O&M of the [MNC] have been
deemed to be negligible."  (Ex. 6 at 3.)  Instead, the Army Corps based this conclusion solely
upon on DSPC's own "thorough Hydrodynamic Model that was reviewed by USACE Subject
Matter Experts."  (*Id.*)

104.    Similarly, even though—as explained in detail above—the proposed Turning
Basin occupies the *entirety* of the MNC, the Army Corps concluded that "considering impacts to
the [Deepening Project] by vessels using **a portion** of the channel as a turning basin was outside
the scope of the Section 408 review."  (*Id.* (emphasis added).)  The Army Corps justified its
failure to analyze any impact to shipping traffic under its Section 408 obligations because "the
Proposed Project is **adjacent to** and does not **physically alter** the dimensions of the [Deepening
Project].  (*Id.* at 4 (emphasis added).  Again, the Army Corps did no testing whatsoever to reach
these conclusions.  And the Section 408 Determination does not reconcile DSPC's proposed
swallowing of the entire MNC to construct the Turning Basin with its findings that the project is
"adjacent to" the MNC, but only "a portion" of the MNC will be utilized, and utilization of that
"portion" will somehow not "physically alter" the MNC.

105.    Finally, the Army Corps also cursorily concluded that the MNC is "maintained at
100% Federal expense," but, as set forth above, that is not accurate under the PPA.  (*Id.* at 6.)

106.    The Army Corps also abandoned its responsibility to evaluate navigational safety
with respect to the design and operation of the Turning Basin.  In its Section 408 Determination,

the Army Corps stated it must review the "possible impacts to navigation caused by the use of the [MNC] as a turning basin . . . ." as part of its regulatory mandate.  (*Id.* at 2.)

107.    Yet, later in the same document, the Army Corps concluded that its required navigational safety review was "outside the scope of the section 408 review."  (*Id.* at 3.)  The Army Corps determined that it had no responsibility to evaluate the operation and coordination of vessels with the MNC because—according to the Army Corps—that responsibility instead rests exclusively with the U.S. Coast Guard "USCG").  (*Id.* at 3-4.)

108.    Although the Section 408 Determination indicates that the USCG had no specific objections (*id.* at 4) to the project or the Turning Basin's consumption of the entirety of the MNC, neither the administrative record nor any of the Army Corps' documents approving the project reveal any evidence of a consultation between the Army Corps and the USCG with respect to navigational safety.  The only reference to a navigation inquiry in the Section 408 Determination is an undated general letter of support from the Delaware River Pilots Association, which is the same letter from the Pilots Association that appears in the MITAGS Study.  (*See id.* at 16 (Enclosure 2 to Section 408 Determination); *see also* Ex. 4 at 70.)

109.    The Army Corps therefore failed to fulfill its legal responsibility because it provides weak and amorphous support for its conclusions, which state only that (i) other ports throughout the USA have turning basins within Federally authorized navigation channels; and (ii) other ports and terminals use portions of the Federally authorized navigation channel as a turning basin.

110.    This superficial analysis fails to explain how the Army Corps concluded that the Project's Turning Basin would not pose a risk to navigation in the Delaware River.

111.    The Army Corps failed to adhere to its own regulatory standards and mode of analysis, which are dictated in EM 1110-2-1613.  This regulatory standard provides that Turning Basins may occupy *a portion* of a channel and *only when and where* traffic conditions permit and rarely in intermediate points along long channels.

112.    EM 1110-2-1613 never provides for the use of the entire channel: this appears unprecedented in the Army Corps' own guidance, which it then ignored.

113.    In short, the Army Corps' Decision Documents and Section 408 Determination demonstrate that it did not perform the required analysis to determine whether traffic conditions permitted the placement of the Turning Basin in its proposed location, or whether the size of the proposed Turning Basin was a safe and appropriate shape and dimension, apart from the preliminary and incomplete MITAGS Study.

114.    The Army Corps convened an Agency Technical Review panel ("ATR") to assess the Project as part of the 408 review.  The ATR's report also finds the potential for navigational concerns " . . . due to the fact that the construction of the new port proposed in this Section 408 request would occupy a portion of the [MNC] as a ship turning basin."  (Ex. 6 at 25 (Enclosure 4).)

115.    The ATR requested additional information from DSPC at first to address the concern regarding dredging operations during active operations of the MNC.  DSPC responded only that "[c]onsideration for the navigation of the channel would be required for all maintenance dredging."  (*Id.* at 31 (Comment No. 8).)

116.    This was an inadequate response, since the ATR's inquiry was with respect to what those considerations would be in the first place.  That was the entirety of the ATR's inquiry, and then marked the matter as "closed."  (*Id.*)

117.    Further illustrating the inadequacy of the Army Corps' analysis, the ATR made several inquiries to DSPC concerning the rate of sedimentation from dredging operations, which could in theory augment the need for more maintenance dredging at federal—and therefore likely PhilaPort's—expense.

118.    DSPC responded that the rate of sedimentation would be mitigated by the use of sedimentation fans, which appeared to have satisfied the ATR.  (*See id.* at 33-34 (Comment Nos. 26, 27, 28, 36).)   Yet, it escaped the ATR's (and the Army Corps') attention that DSPC completely removed those very same sedimentation fans, thus leaving no means of sediment rate mitigation in the Decision Documents.  (*See* Ex. 5 at 3-4 ("To avoid and minimize impacts to fish and the benthic community from the sedimentation fans, the applicant removed them from their proposal.  In lieu of the fans, maintenance dredging of the birthing areas and access channel will need to occur.").)

119.    Perhaps the most controversial abandonment of the Army Corps' responsibility is seen with respect to the need for a "Safety Assurance Review," to examine the potential hazards to human health and public safety.  In this instance, the Army Corps concluded that since the Project does not physically alter the MNC, no such study was needed.  The fact that the entire operation of the Turning Basin will take place within the MNC—completely altering the operations in the MNC—appears to be of no concern to the Army Corps.

120.    In sum, the Decision Documents and Section 408 Determination stand for the proposition that no federal agency undertook any of the required analysis of navigational safety with respect to the  operation of the Turning Basin within the MNC.  Rather, the Army Corps abandoned its post in that regard, and deferred to the USCG, which also appears to have

conducted no meaningful analysis of this issue based on the contents of the Decision Documents, Section 408 Determination, and the federal administrative record.

### F.        The Army Corps' Decision to Issue the Section 10/404 Permit

121.    The Army Corps concluded that Edgemoor's impact on "navigation" was "neutral (mitigated)," but aside from relying on the preliminary MITAGS Study, the Army Corp's Decision Documents contain no separate evaluation of navigational safety.  The Army Corps reached the summary conclusion that " . . . navigation in the Delaware River will not be impacted by the proposed project . . . " despite noting that Edgemoor is near "portions of the Delaware River that are heavily traveled by large commercial vessels." (Ex. 5 at 37; *id.* at 28.)

122.    As previously noted, the MITAGS Study recommended specific safety measures to mitigate the risk associated with vessels entering and exiting Edgemoor:  travel only at high tide and with winds below 20 knots.  The Army Corps imposes no such restrictions, however, notwithstanding further that the authorized vessels for Edgemoor are up to 50% larger than those evaluated principally in the MITAGS Study.

123.    The Army Corps should have performed or required to be performed additional study into Edgemoor's impacts to navigation besides the preliminary and incomplete MITAGS Study.

124.    Further, the Decision Documents detail the dredging activities that will be associated with Edgemoor's development.  (*See generally* Ex. 5.) The vessels and equipment performing such activities will require some measure of safety radius while dredging is taking place.  *See* 33 CFR Part 165.  Yet the Decision Documents do not specify any such protocols even with respect to dredging work that would be anticipated within or immediately adjacent to the MNC.  (*See generally* Ex. 5.)

125.    The Army Corps also concluded as part of its public interest review that the "safety" public interest factor is inapplicable to Edgemoor, but this ignores the obvious safety risks associated with placing the Turning Basin in an area "heavily traveled by large commercial vessels" so that it occupies the entire MNC, as well as the other safety concerns associated with Edgemoor's impacts on navigation.  (Ex. 5 at 35-37; *id.* at 28.)

126.    The Decision Documents also do not reference any consultation by the Army Corps with the United States Coast Guard regarding Edgemoor's design and anticipated impacts to navigation and safety on the Delaware River.  (*See generally id.*)

## V.    CLAIMS FOR RELIEF

### COUNT I

**The Army Corps violated the Rivers and Harbors Act of 1899, Section 14 (33 U.S.C. § 408), applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 by issuing the Section 408 Permission for Edgemoor Without Obtaining A Letter of No Objection from PhilaPort**

127.    PhilaPort incorporates by reference all preceding paragraphs.

128.    PhilaPort has ongoing operation and maintenance responsibilities for the Deepening Project.

129.    These ongoing operation and maintenance responsibilities include ensuring that there is adequate long-term dredge material disposal capability for the General Navigational Features associated with the Deepening Project under both the parties' PPA and 33 U.S.C. § 2211(b)(2).

130.    The PPA does not exclude PhilaPort's operation and maintenance responsibilities for the portion of the General Navigational Features that includes the Turning Basin for Edgemoor.

131.    To the contrary, the PPA contemplates that PhilaPort undertakes operation and maintenance activities for the entire length of the General Navigational Features of the Deepening Project, including several dredge disposal facilities that are listed within the definitions of General Navigational Features that are near to the Turning Basin for Edgemoor.

132.    The Army Corps' Guidance has a broad mandate to include Non-Federal sponsors like PhilaPort in permitting decisions.  The Army Corps was excused from seeking a Statement of No Objection from PhilaPort **only if** PhilaPort had **no** operation and maintenance responsibilities for "the portion of the USACE project proposed to be altered."

133.    The Decision Documents state that the Army Corps' Guidance "must be adhered to in full."  (Ex. 5 at 60.)

134.    The Army Corps cannot satisfy its burden to apply any exception from seeking from PhilaPort a Statement of No Objection, given PhilaPort's ongoing operation and maintenance obligations for the Deepening Project.

135.    The Army Corps therefore violated its own Guidance in failing to seek and obtain a Statement of No Objection from PhilaPort for Edgemoor.

136.    The Army Corps' decision to ignore its own Guidance with respect to Edgemoor was arbitrary and capricious.

137.    The Army Corps' attempt to shield its permission process for Edgemoor from PhilaPort (and the public) in light of the broad mandate of its own Guidance was arbitrary and capricious.

138.    The Army Corps therefore acted arbitrarily and capriciously, in violation of the law, and without observance of procedure required by law when it issued the Section 408 permission to DSPC for Edgemoor.

139.     For all of these reasons, the Army Corps' issuance of the Section 408 Permission for Edgemoor, which was a final agency action, violated Section 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408, and its implementing regulations and Guidance, and was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law.

## COUNT II

**The Army Corps violated the Rivers and Harbors Act of 1899, Section 14 (33 U.S.C. § 408), applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 by issuing the Section 408 Permission for Edgemoor**

140.     PhilaPort incorporates by reference all preceding paragraphs.

141.     A person cannot "make use of" or "impair the usefulness of" a federal public work created to improve navigable waters unless the Army Corps "grant[s] permission for the alteration or permanent occupation or use of any of the aforementioned public works when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work." 33 U.S.C. § 408(a).

142.     The Deepening Project is a "public work."

143.     The applicable Army Corps Guidance regarding Section 408 approvals (EC 1165-2-220), which the Army Corps relied upon in reviewing and issuing the Section 408 Permission for Edgemoor, requires the Army Corps to consider impacts to navigation, among other public interests, and to consider information received from key stakeholders and interested parties.

144.     The Guidance document also references 33 U.S.C. § 565 ("River and harbor improvement by a private or municipal enterprise"), which states: "[a]ny person or persons, corporations, municipal or private, who desire to improve any navigable river, or any part thereof . . . must conform with the general plan of the Government improvements, ***must not impede navigation***, and no toll shall be imposed on account thereof, and said improvement shall at all

times be under the control and supervision of the Secretary of the Army and Chief of Engineers."

(Emphasis added).

145.    Negative impacts to navigation are an appropriate basis on which to deny a

Section 408 request.  *See* 33 U.S.C. §§ 408 & 565; *see also* EC 1165-2-220.

146.    The Army Corps failed to adequately study, evaluate, consider, and mitigate

Edgemoor's impacts on navigation and safety on the Delaware River.

147.    The Army Corps failed to adequately study, evaluate, consider, and mitigate

Edgemoor's impacts on the Deepening Project.

148.    Edgemoor is injurious to the public interest and is likely to impede navigation in

the Delaware River.

149.    Edgemoor will impair the usefulness of the Deepening Project.

150.    The Army Corps failed to adequately consider the cumulative impacts of

Edgemoor in relation to or in tandem with other impacts to navigation and safety on the

Delaware River.

151.    For all of these reasons, the Army Corps' issuance of the Section 408 Permission

for Edgemoor, which was a final agency action, violated Section 14 of the Rivers and Harbors

Act of 1899, 33 U.S.C. § 408, and its implementing regulations and guidance, and was arbitrary,

capricious, an abuse of discretion, not in accordance with law, and without observance of

procedure required by law.

## <u>COUNT III</u>

**The Army Corps violated the Clean Water Act, 33 U.S.C. § 1344(e), applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 when it issued the Section 10/404 Permit for Edgemoor**

152.    PhilaPort incorporates by reference all preceding paragraphs.

153.    The Army Corps is required to conduct a public interest review when it issues a Section 10/404 permit, per 33 C.F.R. § 320.4(a).  Thus, "[t]he decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest."  *Id.* § 320.4(a)(1).  The regulation lists many "factors which may be relevant," including "navigation . . . safety . . . and, in general, the needs and welfare of the people."  *Id.*  The regulation also notes that "[p]rotection of navigation in all navigable waters of the United States continues to be a primary concern of the federal government."  *Id.* § 320.4(o)(3).

154.    Further the Army Corps must carefully consider the economics of a project to 33 C.F.R. § 320.4(a)(1) as an element of the public interest review.  The Army Corps must consider "the relative extent of the public and private need for the proposed structure or work" measured against any "reasonably foreseeable detriments."  *Id.*  The regulations specify that "in appropriate cases, [the Army Corps] may make an independent review of the need for the project from the perspective of the overall public interest."  *Id.*

155.    The Army Corps' public interest review violated the Clean Water Act because it failed to adequately study, evaluate, and consider Edgemoor's impacts on navigation, safety, the general welfare of the public, and economics.  As a result, the Army Corps' public interest review was arbitrary and capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law.

156.    The Army Corps' conclusion that Edgemoor is not contrary to the public interest was arbitrary and capricious.

157.    The Army Corps' conclusion that Edgemoor's impact on navigation would be "neutral-" -or "mitigated-" was arbitrary and capricious.

158.    The Army Corps' failure to require the implementation of mitigation measures by DSPC to minimize Edgemoor's impact on navigation was arbitrary and capricious, including the Army Corps' failure to incorporate into the Project Approvals special conditions that address the travel restrictions recommended by the MITAGS Study, and to specify safety zones around dredging areas during construction, operation and maintenance.

159.    The Army Corps' conclusion that Edgemoor's impact on economics and general welfare of the public would be beneficial was arbitrary and capricious.

160.    The Army Corps failed to adequately study and evaluate the relative extent of the public and private need for Edgemoor as measured against its reasonably foreseeable detriments, in violation of 33 C.F.R. § 320.4(a)(1).

161.    The Army Corps acted arbitrarily and capriciously, in violation of the law, and without observance of procedure required by law when it segmented its review of the Section 10/404 permit application from DSPC's Section 204(f) request, thereby improperly segmenting the Army Corps' economic evaluation of Edgemoor.

162.    The Army Corps' conclusion that Edgemoor's impact on safety was "not applicable" was arbitrary and capricious.

163.    Under 33 U.S.C. § 322.5, a permit for dredging may also authorize the periodic maintenance dredging of the project, as was the case with the Section 10/404 Permit.  However, such activities may only be authorized in accordance with 33 CFR parts 320 to 325.  *See* 33 U.S.C. § 325.6(e).

164.    The Army Corps acted arbitrarily and capriciously, in violation of the law, and without observance of procedure required by law when it issued the Section 10/404 Permit based on an incomplete and inaccurate permit application that failed to accurately disclose the full

scope of anticipated maintenance dredging or the measures proposed by the applicant to avoid and/or minimize the need for anticipated maintenance dredging.  *See* 33 C.F.R. §§ 332.4(b); 325.3(d)(1)-(3)

165.    The Army Corps failed to adequately consider the cumulative impacts of Edgemoor in relation to or in tandem with other impacts to navigation and safety on the Delaware River.

166.    For all of these reasons, the Army Corps' issuance of the Section 10/404 Permit for Edgemoor, which was a final agency action, violated Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and its implementing regulations, 40 C.F.R. Part 230, and was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law.

<u>COUNT IV</u>

**The Army Corps' violated Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403), applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 by issuing the Section 10/404 Permit for Edgemoor**

167.    PhilaPort incorporates by reference all preceding paragraphs.

168.    Under Section 10 of the Rivers and Harbors Act of 1899, "[t]he creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited."  The Turning Basin, as designed and approved by the Army Corps, is an obstruction to navigation that has not been affirmatively authorized by Congress and is therefore prohibited under Section 10.

169.    Section 10 also provides that it  "shall not be lawful to build . . . structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States . . ." or to "excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge . . . [or] channel of

any navigable water of the United States," except as recommended and authorized by the Army Corps.  33 U.S.C. § 403.

170.    In issuing the Section 10/404 Permit, the Army Corps failed to adequately study, evaluate, consider, and/or mitigate the degree to which Edgemoor would obstruct and impede navigation in the Delaware River, including the Turning Basin and the initial and ongoing dredging operation, in violation of 33 U.S.C. § 403 and § 565.

171.    In addition, as described above, the Army Corps is required to conduct a public interest review when it issues a Section 10/404 permit, per 33 C.F.R. § 320.4(a).

172.    The Army Corps' conclusion that Edgemoor is not contrary to the public interest was arbitrary and capricious.

173.    The Army Corps' public interest review violated Section 10 of the Rivers and Harbors Act of 1899 because it failed to adequately study, evaluate, and consider Edgemoor's impacts on navigation, safety, the general welfare of the public, and economics.  As a result, the Army Corps' public interest review was arbitrary and capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law.

174.    The Army Corps failed to adequately consider the cumulative impacts of Edgemoor in relation to or in tandem with other impacts to navigation and safety on the Delaware River.

175.    For all of these reasons, the Army Corps' issuance of the Section 10/404 Permit for Edgemoor, which was a final agency action, violated Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and its implementing regulations, and was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law.

## COUNT V

**The Army Corps violated the Water Resources Development Act of 2022 (33 U.S.C. §2232(f)), applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 by issuing the Section 10/404 Permit and the Section 408 Permission for Edgemoor**

176.    PhilaPort incorporates by reference all preceding paragraphs.

177.    At the outset of the process, DSPC advised the Army Corps of its intent to file a Section 204(f) request for federal assumption of the Non-Federal Party's responsibilities with respect to operation and maintenance of the access channel to Edgemoor as well as its Turning Basin.

178.    In light of such request at the outset of the permitting and funding process for Edgemoor, there was evidence that the Non-Federal Party lacked the necessary resources to perform all tasks required of the Non-Federal Party pursuant to the Water Resources Development Act.

179.    The elements for which the Non-Federal Party seeks federal assumption are fundamental aspects of Edgemoor, which could not operate without the access channel and turning basin and are therefore integral to the DSPC's ability to construct, operate and maintain Edgemoor, which the Army Corps depicts as a full-service Mid-Atlantic Port.

180.    In performing the economic analysis to support the Section 204(f) Request, the Army Corps segmented just the access channel and the turning basin for economic analysis, and only considered them in the extremely local context of Edgemoor.  The Army Corps failed to analyze the request in the context of the entire regional port system located within just a few miles of Edgemoor.  As a result, the Army Corps' economic study in support of the Section 204(f) request fails to consider the potentially deleterious effects of Edgemoor on neighboring ports, especially where Edgemoor is doubling its commercial capacity, and seeking to add additional lines of business.

181.    The Army Corps failed to follow its own guidance which required either a regional study of Edgemoor in the context of its nearby port neighbors, or a specific justification as to why such analysis was inapplicable.  The Army Corps provided neither.

182.    The Army Corp's approval of the Section 204(f) Request was inappropriately based on its decision to segregate the economic analysis for the Section 204(f) Request from the simultaneous economic analysis it was undertaking in connection with the Section 10/404 Permit, and was therefore arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law.

## VI.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, PhilaPort respectfully requests that the Court:

A.    Declare that the Army Corps acted arbitrarily and capriciously, abused its discretion, failed to adhere to its own Guidance, and otherwise acted not in accordance with the law in violation of the Administrative Procedure Act and applicable regulations when it issued the Section 408 Permission;

B.    Declare that the Army Corps acted arbitrarily and capriciously, abused its discretion, and otherwise acted not in accordance with the law in violation of the Administrative Procedure Act and Clean Water Act and applicable regulations when it issued the Section 10/404 Permit;

C.    Declare that the Army Corps acted arbitrarily and capriciously, abused its discretion, and otherwise acted not in accordance with the law in violation of the Administrative Procedure Act and Section 10 of the Rivers and Harbors Act of 1899 and applicable regulations when it issued the Section 10/404 Permit;

D.    Declare that the Army Corps acted arbitrarily and capriciously, abused its discretion, and otherwise acted not in accordance with the law in violation of the Administrative

Procedure Act and Section 14 of the Rivers and Harbors Act of 1899 and applicable regulations and guidance when it issued the Section 408 Permission;

       E.       Declare that the Army Corps acted arbitrarily and capriciously, abused its discretion, and otherwise acted not in accordance with the law in violation of the Administrative Procedure Act and Section 204(f) of the Water Resources Development Act of 2022 when it issued the Section 10/404 Permit and the Section 408 Permission.

       F.       Vacate the Army Corps' Section 10/404 Permit and Section 408 Permission for Edgemoor;

       G.       Vacate the Army Corps' Decision Document;

       H.       Enjoin any activities in furtherance of Edgemoor if and until new and lawful approvals for Edgemoor are issued by the Army Corps;

       I.       Grant PhilaPort its costs of suit, including reasonable attorneys' fees to the extent authorized by law; and

       F.       Grant PhilaPort such further relief as the Court deems just and proper.

       Respectfully submitted,

Dated:  March 8, 2024       /s/ *Andrew S. Levine*
       Andrew S. Levine
       Michael J. Engle
       Brandon M. Riley
       STRADLEY RONON STEVENS & YOUNG, LLP
       2600 One Commerce Square
       Philadelphia, PA  19103-7098
       (215) 564-8000
       *Attorneys for*
       *The Philadelphia Regional Port Authority*

5893802