**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GREENWICH TERMINALS LLC, and GLOUCESTER TERMINALS LLC,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS, et al.,<br><br>　　　　Defendants. | Case No. 2:23-cv-4283 |
| THE PHILADELPHIA REGIONAL PORT AUTHORITY,<br><br>　　　　Plaintiff,<br>v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS, et al.,<br><br>　Defendants. | Case No. 2:24-cv-1008 |

## <u>DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS..........................................................................................................i

TABLE OF AUTHORITIES ..............................................................................................ii

GLOSSARY ........................................................................................................................v

INTRODUCTION ...............................................................................................................1

STATUTORY AND REGULATORY BACKGROUND....................................................2

    I.      Section 404 of the Clean Water Act ...................................................................2

    II.     Sections 10 and 14 of the Rivers and Harbors Act ...............................................4

STANDARD OF REVIEW .................................................................................................5

PROCEDURAL AND FACTUAL BACKGROUND.........................................................8

ARGUMENT ...................................................................................................................100

    I.      Plaintiffs Must Demonstrate Standing. ............................................................100

    II.     The Corps Did Not Need to Include the Turning Basin in its Public Interest
           Review Because the Corps Did Not, and Was Not Required to, Permit or Approve
           the Turning Basin under the Rivers and Harbors Act or the Clean Water Act... 122

    III.    The Corps Reasonably Concluded that the Section 404/10 Permit and 408
           Approval, including the Wilmington Port Expansion and Turning Basin, Are Not
           Contrary to the Public Interest. ........................................................................166

           A.     The Corps Appropriately Considered Navigation and the Safety of the
                  Wilmington Port Expansion and Turning Basin....................................166

           B.     The Corps Provided Robust Responses to all Substantive Comments on
                  Navigation and Safety.............................................................................222

           C.     The Corps Was Not Required to Provide Further Analysis of Cumulative
                  Impacts to Navigation or Safety. ..............................................................25

           D.     The Corps Was Not Required to Conduct a Safety Assurance Review. ..27

           E.     The Corps Was Not Required to Impose Vague, Unexplained Dredging
                  Protocols. .................................................................................................29

           F.     The Corps Appropriately Considered Economics, Needs, and the General
                  Welfare in Connection with the Wilmington Port Expansion and Turning
                  Basin. .....................................................................................................310

    IV.    The Corps Was Not Required to Obtain a Statement of No Objection from
           Plaintiff PhilaPort...............................................................................................37

    V.     The Corps Was Not Required to Hold a Public Hearing. ....................................39

CONCLUSION................................................................................................................400

# TABLE OF AUTHORITIES

Cases                                                                                                                    Pages

*AJA Assocs. v. Army Corps of Eng'rs*,
   817 F.2d 1070 (3d Cir. 1987)....................................................................... 14

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*,
   894 F.3d 692 (5th Cir. 2018) ...................................................................... 26

*Bailey v. Pilots' Ass'n for Bay & River Del.*,
   406 F. Supp. 1302 (E.D. Pa. 1976) ............................................................ 19

*Batterton v. Marshal*,
   648 F.2d 69402 (D.C. Cir. 198 ............................................................. 38, 39

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 51953 (197 ................................................................................... 28

*Byrne v. Beers*,
   No. 13-6953, 2014 WL 2742800 (E.D. Pa. June 17, 2014)...................... 8

*Camp v. Pitts*,
   411 U.S. 138 (1973)............................................ 6, 21, 26, 29, 30, 37

*Chem Serv., Inc. v. Env't Monitoring Sys. Lab'y-Cincinnati of U.S. E.P.A.*,
   12 F.3d 1256 (3d Cir. 1993).................................................................... 11

*Twp. of Bordentown, New Jersey v. FERC*,
   903 F.3d 23448 (3d Cir. 201 ............................................................... 34, 35

*Env't Coal of Broward Cnty, Inc. v. Myers*,
   831 F.2d 984 (11th Cir.1987) ................................. 7, 15, 21, 23, 28, 33

*Forsyth Cnty. v. U.S. Army Corps of Eng'rs*,
   633 F.3d 1032 (11th Cir. 2011) ................................................................ 7

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*,
   681 F.3d 581 (4th Cir. 2012) .................................................................. 14

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)................................................................................. 11

*Hart & Miller Islands Area Env't Grp., Inc. v. Corps of Eng'rs of U. S. Army*,
   621 F.2d 1281 (4th Cir. 1980) ................................................................ 15

*Hoosier Env't Council, Inc. v. U.S. Army Corps of Eng'rs*,
   105 F. Supp. 2d 953 (S.D. Ind. 2000) ...................................................... 7

*Judulang v. Holder*,
   565 U.S. 42 (2011)..................................................................................... 6

*Kleissler v. U.S. Forest Serv.*,
   183 F.3d 196 (3d Cir. 1999)........................... 25, 27, 28, 29, 35, 37, 39

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)................................................................................. 10

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990).................................................................................. 11

*Mall Properties, Inc. v. Marsh*
   672 F. Supp. 561 (D. Mass. 1987) ........................................................... 34

*Minisink Residents for Env't Pres. & Safety v. FERC*,
   762 F.3d 97 (D.C. Cir. 2014).................................................................... 25

*Nw. Env't Advocs. v. Nat'l Marine Fisheries Serv.,*
  460 F.3d 1125 (9th Cir. 2006) ................................................................. 25
*Occidental Eng'g Co. v. I.N.S.,*
  753 F.2d 766 (9th Cir. 1985) ..................................................................... 5
*Pilots' Ass'n for Bay & River Del.,*
  254 F. Supp. 447 (D. Del. 1966) .............................................................. 20
*Plains Res. Council, Inc. v. Surface Transp. Bd.,*
  668 F.3d 1067 (9th Cir. 2011) ................................................................. 25
*Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs,*
  343 F.3d 199 (3d Cir. 2003) ....................................................................... 6
*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ................................................................................ 11
*To Protect Nantucket Sound, Inc. v. U.S. Dep't of Army,*
  398 F.3d 105 (1st Cir. 2005) .................................................................... 14
*Town of Norfolk v. U.S. Army Corps of Eng'rs,*
  968 F.2d 1438 (1st Cir. 1992) .......................... 15, 21, 28, 30, 33, 37, 40
*Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.,*
  140 F.3d 478 (3d Cir. 1998) ............................................................... 11, 12
*Uddin v. Mayorkas,*
  862 F. Supp. 2d 391 (E.D. Pa. 2012) ..................................................... 5, 8
*United Ref. Co. v. U.S. EPA,*
  64 F.4th 448 (3d Cir. 2023) ....................................................................... 6
*United States v. Pa. Indus. Chem. Corp.,*
  411 U.S. 655 (1973) ................................................................................... 4
*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
  454 U.S. 464 (1982) ................................................................................ 11

Statutes

5 U.S.C. §§ 551–559 ................................................................................... v
33 U.S.C. § 401 .......................................................................................... v
33 U.S.C. § 403 ............................................................................... v, 4, 14
33 U.S.C. § 408 .......................................... 5, 9, 10, 15, 16, 27, 30, 38
33 U.S.C. § 1311(a) ................................................................................ 2, 3
33 U.S.C. § 1344 ................................................................................... v, 14
33 U.S.C. § 2232(f) .................................................................................. 36
42 U.S.C. §4321 ......................................................................................... v
46 U.S.C. § 8502 ...................................................................................... 20

Regulations

33 C.F.R. Part 3 ......................................................................................... 4
33 C.F.R. pts. 320-3 .................................................................................. 3
33 C.F.R. § 320.2(e) .................................................................................. 5
33 C.F.R. § 320 ........................................................................................ 36
33 C.F.R. § 320.4(q) ................................................................................ 34
33 C.F.R. §§ 320.2(b) ................................................................................ 4

40 C.F.R. § 2 .................................................................................................................. 3

33 C.F.R. § 327.4(b) ...................................................................................................... 40

40 C.F.R. § 230.10(a) ..................................................................................................... 3

*4*0 C.F.R. § 230.11(g) ................................................................................................... 26

40 C.F.R. pts. 230-2 ....................................................................................................... 3

# GLOSSARY

| Term | Reference |
|---|---|
| Section 404/10 Permit | Department of the Army Individual Permit issued under Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act, 40410AR-010334-42. |
| Section 408 Approval | Section 408 Permission Decision Letter and Section 408 Standard Terms and Conditions issued under Section 14 of the Rivers and Harbors Act of 1899, 40410AR-010344-48. |
| APA | Administrative Procedure Act, 5 U.S.C. §§ 551–559. |
| Corps | U.S. Army Corps of Engineers |
| Delaware River Channel | Delaware River, Philadelphia to the Sea Federal Navigation Project |
| DNREC | Delaware Department of Natural Resources and Environmental Control |
| MITAGS | Maritime Institute of Technology and Graduate Studies |
| NEPA | National Environmental Policy Act, 42 U.S.C. §4321 *et seq.* |
| Pilots' Association | Pilots' Association for the Bay and River Delaware |
| Rivers and Harbors Act | Rivers and Harbors Act of 1899, 33 U.S.C. § 401 *et seq.* |
| Section 10 | Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403 |
| Section 404 | Section 404 of the Clean Water Act, 33 U.S.C. § 1344 |
| Section 408 | Section 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408 |
| EC | Engineer Circular |

**INTRODUCTION**

Plaintiffs Greenwich Terminals LLC, and Gloucester Terminals LLC (hereafter referred to collectively as "Plaintiff Greenwich") and Plaintiff The Philadelphia Regional Port Authority ("Plaintiff PhilaPort") filed suit under the Administrative Procedure Act ("APA") in these related cases to challenge the United States Army Corps of Engineers' ("Corps") Section 404/10 Permit and Section 408 Approval that authorize Diamond State Port Corporation to undertake certain activities associated with the expansion of the Port of Wilmington in Edgemoor, Delaware, along the Delaware River ("Wilmington Port Expansion"). In issuing the Permit and Approval, the Corps performed a thorough analysis of public interest factors, balanced those factors, and concluded that neither the Permit nor the Approval would be contrary to the public interest. The Court should uphold the Corps' conclusions. The Corps' extensive technical expertise and experience balancing the public interest factors is entitled to deference.

As a threshold matter, Plaintiffs bear the burden of establishing subject matter jurisdiction over their APA claims. Thus, Plaintiffs must show that they have Article III standing to maintain this suit in their forthcoming cross motions for summary judgment.

On the merits of Plaintiffs' claims, first, the Corps reasonably considered the navigation and safety of the Wilmington Port Expansion and, even though not required by law, also considered navigation and safety of the associated turning basin ("Turning Basin") that ships will use while transiting to and from the Wilmington Port Expansion. Plaintiffs' primary navigation and safety complaints in this case address the Turning Basin, but because the Turning Basin is not a physical structure and does not alter the existing Delaware River Channel, the Corps was not required to approve or permit it. And because the Corps is required only to analyze the public interest of activities it permits or approves, all of Plaintiffs' unsupported concerns about the Turning Basin's impact on the public interest are not subject to judicial review here. But even if

they were, the administrative record contains robust consideration and analysis of the navigation and safety implications of the Wilmington Port Expansion and Turning Basin.

Second, the Corps reasonably considered the economic impact of the Wilmington Port Expansion and Turning Basin, including the need for the project and its impact on the general welfare. The Wilmington Port Expansion made possible by the challenged Section 404/10 Permit and Section 408 Approval will provide substantial economic benefits to the local community. For that reason and others, the Corps determined that the project is in the public interest, and that finding is entitled to deference. The Corps was not required to conduct an independent economic analysis in reaching its conclusion. Moreover, although Plaintiffs would prefer otherwise, the Corps' role under the Clean Water Act and Rivers and Harbors Act is not to insulate Plaintiffs from economic competition.

Finally, many of Plaintiffs' arguments are defective because they concern issues that could have been raised in public comments but were not. By failing to raise these issues during the public comment period Plaintiffs forfeited those issues, and the Court cannot consider them in its review of the Section 404/10 Permit and Section 408 Approval. Moreover, under the APA, this Court's review is limited to the administrative record. So, even if Plaintiffs had not forfeited their arguments by failing to raise them before the Corps, the Court cannot sustain those arguments now because the factual support for those arguments is absent from the record.

In sum, this Court should grant summary judgment in favor of the Corps on all claims related to the Section 404/10 Permit and Section 408 Approval.

## STATUTORY AND REGULATORY BACKGROUND

### I.    Section 404 of the Clean Water Act

The Clean Water Act prohibits the discharge of pollutants (including dredged spoil, rock, and sand) into the waters of the United States, including wetlands, from any point source. 33

U.S.C. § 1311(a). Section 404 of the Act, *id*. at § 1344, authorizes the Corps to issue permits for the discharge of dredged or fill material when certain conditions are met. *Id. at* §§ 1311(a), 1344. Section 404 Permits are issued by the Corps after a public notice and comment process pursuant to regulations promulgated by the Corps and the Environmental Protection Agency. 33 C.F.R. pts. 320-332; 40 C.F.R. pts. 230-232.

After the Corps receives a complete Section 404 permit application, it issues a public notice providing "sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment," including "information which may assist interested parties in evaluating the likely impact of the proposed activity . . . on factors affecting the public interest." 33 C.F.R. §§ 325.3(a), (a)(13). The Corps next evaluates the application pursuant to procedural guidelines set forth in 40 C.F.R. § 230, which implement Clean Water Act Section 404(b)(1) and are known as "404(b)(1) Guidelines." Among other things, under the Guidelines, the Corps must consider various alternatives to determine whether any of them is practicable as that term is defined in 40 C.F.R. § 230.10(a). If the Corps determines that a practicable alternative would have a lesser impact on the aquatic ecosystem, the Corps must deny the permit application. 40 C.F.R. § 230.10(a).

Finally, under its own regulations, the Corps conducts a "public interest review" to evaluate the probable impacts of the proposed activity, balancing its reasonably foreseeable benefits and detriments to determine "whether to authorize [the] proposal" and "the conditions under which it will be allowed to occur." 33 C.F.R. § 320.4(a)(1). That "decision should reflect the national concern for both protection and utilization of important resources . . . [and] a permit will be granted unless the [Corps] determines that [the activity] would be contrary to the public interest." *Id.* All factors "relevant" to the proposal "must be considered," and the regulation lists

the following factors as subject to the Corps' evaluation: "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people." *Id*.

The Corps' regulations state that the "benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1). The weight attributed to each factor "is determined by its importance and relevance to the particular proposal" and "how much consideration it deserves will vary with each proposal." 33 C.F.R. § 320.4(a)(3). The Corps must give "[f]ull consideration" to "all comments, including those of federal, state, and local agencies, and other experts on matters within their expertise." *Id*.

## II.    Sections 10 and 14 of the Rivers and Harbors Act

The Rivers and Harbors Act had its genesis over a century ago, when Congress passed a series of laws designed to preserve and protect the Nation's navigable waterways that were subsequently re-enacted in one package known as the Rivers and Harbors Act. *United States v. Pa. Indus. Chem. Corp.,* 411 U.S. 655, 663 (1973).

Section 10 of the Rivers and Harbors Act  prohibits structures that obstruct navigable waters unless they are expressly authorized by the Corps through individual permits that require case-by-case evaluations or through authorizations to proceed under nationwide permits that authorize activities that fall within specified parameters.  33 U.S.C. § 403; *see also* 33 C.F.R. §§ 320.2(b). The Corps' regulations implementing Section 10 are codified at 33 C.F.R. Part 321.

Section 14 of the Rivers and Harbors Act, 33 U.S.C. § 408, also known as (and referred to herein as) Section 408, prohibits the use, alteration, or obstruction of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States, unless authorized by the Corps. *Id.* § 408(a). The Corps may "grant permission for the alteration or permanent occupation or use of any of the aforementioned public works when in the judgment of the Secretary [of the Army] such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work." *Id.*; *see also* 33 C.F.R. § 320.2(e). There are no regulations implementing Section 408 authorizations. Instead, the Corps' policies for evaluating requests under Section 408 are set forth in Engineer Circular ("EC") No. 1165-2-220, *Policy and Procedural Guidance for Processing Requests to Alter U.S. Army Corps of Engineers Civil Works Projects Pursuant to 33 USC 408*, 408AR-007718.

## STANDARD OF REVIEW

Judicial review on summary judgment under the APA is different from non-APA cases. *Uddin v. Mayorkas*, 862 F. Supp. 2d 391, 399 (E.D. Pa. 2012). "While summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review, because the district judge sits as an appellate tribunal in such cases, the usual summary judgment standard does not apply." *Dorley v. Cardinale*, 119 F. Supp. 3d 345, 351 (E.D. Pa. 2015). In reviewing an agency decision under the APA, "the administrative agency is the finder of fact, and the district court does not need to determine whether there are disputed facts to resolve at trial." *Byrne v. Beers*, No. 13-6953, 2014 WL 2742800, at *3 (E.D. Pa. June 17, 2014) (citing *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 770 (9th Cir. 1985)). "[T]he function of the district court is to determine whether or not, as a matter of law, the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co.*, 753 F.2d at 769.

The APA's standard of review allows a court to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Dorley*, 119 F. Supp. 3d at 352 (quoting 5 U.S.C. § 706(2)(A)). "The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Maurice v. Trans Union, LLC*, No. 20-5804, 2023 WL 8358118, at *3 (E.D. Pa. Nov. 30, 2023) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).

The scope of review under the APA "is narrow and a court cannot substitute its judgment for that of the agency." *Maurice*, 2023 WL 8358118, at *3 (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011)); *see also United Ref. Co. v. U.S. EPA*, 64 F.4th 448, 456 (3d Cir. 2023) ("[W]e may not substitute our judgment for that of the agency.") (cleaned up). Under the APA, a court's review is also "exceedingly deferential to the agency." *Jessop v. Johnson*, No. 16-1232, 2017 WL 2957820, at *3 (E.D. Pa. July 10, 2017) (cleaned up); *see also Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs*, 343 F.3d 199, 200 (3d Cir. 2003) ("[T]he broad deference that Congress granted the Corps . . . places upon us the obligation to provide a correspondingly deferential judicial review."). "An action will not be deemed arbitrary, capricious, or an abuse of discretion simply because one may happen to think it ill-considered, or to represent the less appealing alternative solution available." *Hondros v. U.S. Civ. Serv. Comm'n,* 720 F.2d 278, 295 (3d Cir. 1983) (cleaned up).

The Corps' interpretation and application of the Rivers and Harbors Act "deserves more than usual deference" because the Corps "drafted the bill which became the 1899 Act, and administers both Sections 9 and 10 of the Act, and therefore has special familiarity with the interrelationship between the two sections." *Hart & Miller Islands Area Env't Grp., Inc. v. Corps of Eng'rs of U. S. Army*, 621 F.2d 1281, 1290 (4th Cir. 1980).

Neither the Clean Water Act nor Rivers and Harbors Act dictates how the Corps should consider the public interest, so the weight given to a public interest factor or how to weigh the public interest factors is "entitled to substantial deference." *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1454–55 (1st Cir. 1992) (citing *Env't Coal of Broward Cnty, Inc. v. Myers,* 831 F.2d 984, 986 (11th Cir.1987)); *see also, e.g., Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1041-42 (11th Cir. 2011) (judicial review of how the Corps balances public interest factors is "exceedingly narrow."); *Hoosier Env't Council, Inc. v. U.S. Army Corps of Eng'rs*, 105 F. Supp. 2d 953, 996 (S.D. Ind. 2000) (Corps reasonably gave additional weight to the comments of state agencies responsible for air quality aspects of project).

As a general matter, federal courts "do not consider issues that have not been passed on by the agency, as it would be unfair to force the agency to litigate issues that it did not have the opportunity to address in the first instance." *United Ref. Co.*, 64 F.4th at 456-57 (cleaned up). As the Supreme Court has explained: "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952). The Third Circuit has echoed this principle: "[W]e usurp the agency's function when we set aside the administrative determination upon a ground not theretofore presented to the agency." *Kleissler v. U.S. Forest Serv.*, 183 F.3d 196, 201 (3d Cir. 1999) (cleaned up).

## PROCEDURAL AND FACTUAL BACKGROUND[1]

On March 10, 2020, Diamond State Port Corporation submitted a Section 404/10 permit application for activities regulated by Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act. 40410AR-000008. The regulated activities, all associated with the development of a containerized cargo port on the Delaware River in Edgemoor, Delaware—the Wilmington Port Expansion—included dredging a new ship berthing area, dredging a new access channel connecting the Delaware River Channel to the new ship berthing area, placing the dredged material in an upland confined disposal facility construction of a bulkhead and wharf, discharging fill landward of the bulkhead, and maintenance dredging of the new ship berthing area and access channel. 40410AR-010020-24. Diamond State Port Corporation also provided an Environmental Assessment Technical Document, 40410AR-000034, with numerous appendices, including a ship navigation and safety simulation study, 40410AR-003415, an economics report, 40410AR-002709, and a dredged material disposal plan. 40410AR-000558.

---

[1] Because the standard for summary judgment is different in APA record review cases from non-APA cases, factual disputes are resolved by the agency and not the Court. *Uddin*, 862 F. Supp. 2d at 400 ("[B]ecause this case is reviewed under the APA there can be no factual disputes."); *Byrne*, 2014 WL 2742800, at *3 ("[T]he administrative agency is the finder of fact, and the district court does not need to determine whether there are disputed facts."). This motion for summary judgment does not contain a Statement of Material Facts because the only purpose of that statement is for the nonmoving party to respond and identify material factual disputes. Except for subject matter jurisdiction, there can be no material factual disputes in an APA record review case—the court must adjudicate the case based on the administrative record. All facts supported by the administrative record are provided in narrative form in this brief and include appropriate citation to the numbered pages of the relevant portion of the administrative record. Pursuant to the Court's procedures, an appendix of all cited administrative record documents accompanies this motion. Defendants cite to documents contained within the administrative record in support of the Corps' Section 404/10 Permit with the prefix 40410AR, and to documents contained within the administrative record in support of the Corps' Section 408 Approval with the prefix 408AR. To reduce duplication, when the same document appears in both administrative records, Defendants reference only the version appearing in the 404/10 administrative record.

Diamond State Port Corporation also submitted a request under Section 408, 33 U.S.C. 408, because of the proximity of the proposed Wilmington Port Expansion to the Delaware River Channel and because Diamond State Port Corporation wanted to place dredged material in Corps-owned dredged material placement facilities. 408AR-000001. For its Section 408 request, Diamond State provided the Corps with the same documents it submitted in support of its 404/10 permit application, including the same environmental assessment and appendices.

On July 30, 2020, the Corps published a public notice advising the public and interested parties of the proposed Wilmington Port Expansion activities for which Diamond State Port Corporation was seeking permission. 40410AR-004674. Public comments were due no later than September 1, 2020. *Id*. On September 1, 2020, the Corps published another public notice extending the public comment period for an additional 30 days and clarifying the description of the Turning Basin, including a design schematic depicting the location of the Turning Basin, 40410AR-004721-23. The new public comment period closed on October 1, 2020. *Id*. By the close of the comment period, interested parties, including Plaintiffs, submitted more than 20 comments.

On November 10, 2021, the Corps published a supplemental public notice to include more information about (1) Diamond State Port Corporation's proposed compensatory mitigation plan, (2) the removal of sedimentation fans from the proposed project to "minimize impacts to aquatic resources," and (3) plans for a new on-site disposal facility. 40410AR-008189. Public comments were due no later than December 10, 2021. *Id*. Commenters during this comment period, including Plaintiffs, submitted seven comments.

On August 4, 2022, the Corps issued the challenged Section 404/10 Permit and Section 408 Approval to Diamond State Port Corporation. 40410AR-010331. The Section 404/10 permit

authorizes: (1) the hydraulic dredging of more than three million cubic yards of material to create a new ship berth area and access channel from the ship berth area to the Delaware River Channel, 40410AR-010021; (2) placement of dredged material in the Wilmington Harbor South dredged material placement facility and a new dredged material placement facility created on the uplands portion of the Edgemoor property, 40410AR-010021-22; (3) construction of a steel sheet pile bulkhead, 40410AR-010022; (4) discharging 5.5 acres of fill material between the bulkhead and elevation of mean high water landward of the bulkhead, *id*.; (5) construction of an approximately 2,600-foot pile-supported wharf waterward of the bulkhead, *id*.; (6) periodic maintenance dredging of the ship berth area and access channel, 40410AR-010021; and (7) compensatory mitigation. 40410AR-010023; 40410AR-010026-28. The Section 404/10 Permit does not authorize dredging in the Delaware River Channel. 40410AR-010021.

The Section 408 Approval authorizes Diamond State Port Corporation and its contractors to (1) construct a wharf and bulkhead and (2) create a new berthing area and access channel adjacent to the Delaware River Channel. It does not allow any construction in, or alteration of, the Delaware River Channel. 408AR-007350-52.

## ARGUMENT

### I.   Plaintiffs Must Demonstrate Standing.

A plaintiff seeking relief in federal court must have standing and thus must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The injury must be "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Moreover, the injury "must have actually occurred or must occur imminently; hypothetical, speculative or other possible future injuries do not count in the

standings calculus." *Schmier v. U.S. Ct. of Appeals for Ninth Cir.*, 279 F.3d 817, 821 (9th Cir. 2002) (cleaned up).

A generalized harm to "the environment will not alone support standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990) (holding that requirements of standing are not met when plaintiff alleges harm in an "immense tract of territory"); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) ("The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff.").

In addition to the "immutable requirements of Article III, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (cleaned up). Those prudential principles are: (1) the plaintiff generally must assert its own legal rights and interests and cannot rest its claim to relief on the legal rights or interests of third parties; (2) even when the plaintiff has alleged redressable injury sufficient to meet the requirements of Article III, the federal courts will not adjudicate abstract questions that amount to generalized grievances most appropriately addressed in the representative branches; and (3) the plaintiff's complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 485 (3d Cir. 1998) (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474-75 (1982)) (cleaned up).

Relevant here, Plaintiffs are direct competitors to the Diamond State Port Corporation, the proponent of the Wilmington Port Expansion, so Plaintiffs must demonstrate that their alleged injuries fall within the zone of interests protected by Section 404 of the Clean Water Act and Sections 10 and 14 of the Rivers and Harbors Act. *See Chem Serv., Inc. v. Env't Monitoring*

*Sys. Lab'y-Cincinnati of U.S. E.P.A.*, 12 F.3d 1256, 1267 (3d Cir. 1993) (competitor's alleged injuries stemming from terms of memorandum of understanding between EPA laboratory and private accreditation organizations was not within the zone of interest protected by the Federal Technology Transfer Act); *Trump Hotels & Casino Resorts, Inc.*, 140 F.3d at 485 (injury resulting from highway increasing traffic to competitor was not within zone of interest protected by the Securities Exchange Act).

Because Plaintiffs' bear the burden of demonstrating their standing, Plaintiffs must include an argument for their standing in their forthcoming cross-motions for summary judgment, including a showing that their claims of competitive injury fall within the zone of interests of the statutes at issue here.

## II.   The Corps Did Not Need to Include the Turning Basin in its Public Interest Review Because the Corps Did Not, and Was Not Required to, Permit or Approve the Turning Basin under the Rivers and Harbors Act or the Clean Water Act.[2]

Pervading the bulk of Plaintiffs' challenges to the Section 404/10 Permit and 408 Approval are complaints about the Turning Basin to be used by ships transiting to and from the Wilmington Port Expansion and Plaintiffs' mistaken assumption that the Corps was required to permit and approve the location of the Turning Basin. The Corps was not required to permit or approve the Turning Basin because it is not subject to either Section 10 or 14 of the Rivers and Harbors Act, nor is it subject to Section 404 of the Clean Water Act.

---

[2] This section responds to PhilaPort's Section 408 Specific Challenges Nos. 3, 4, and 11. Case No. 2:24-cv-01008-MAK, ECF No. 20.

The Turning Basin is a 1,700 foot-in-diameter water location where ships will turn around in the Delaware River, thus "allow[ing] safe navigation in and out of the berth from the main channel of the Delaware River" to the Wilmington Port Expansion. 40410AR-010035. The Turning Basin will be located partially in the Delaware River Channel and partially in the new access channel to the Wilmington Port Expansion, so no dredging is required for the Turning Basin. The location of the Turning Basin can be used "as is," and, as a result, the Corps determined that there are no physical alterations to the existing Delaware River Channel required to use the Turning Basin. 408AR-007353. The below image shows the location of the Turning Basin superimposed on an aerial photograph of the proposed Wilmington Port Expansion, which includes a real container ship for scale:



40410AR-004723.

Under Section 10 of the Rivers and Harbors Act, the Corps is authorized to permit or approve the creation of "structures" in navigable waters—that is, physical obstructions to

navigation. 33 U.S.C. § 403. The Turning Basin at issue is not such a "structure," and is thus not subject to the Corps' approval under Section 10. Section 10 lists numerous structures subject to the Act, including a "wharf, pier, dolphin, boom, weir, breakwater, bulkhead, [and] jetty." *Id*. What these structures all have in common is that they are human-constructed, physical things that can impede navigation., hence the operative verbs used in the statute—"to build or commence the building of." *Id*. In contrast, non-constructed features, such as a place or location, are not subject to Section 10's prohibition on the placement of structures that obstruct navigation unless authorized by the Corps. For example, the Section 404/10 Permit here authorizes the building of a new wharf and bulkhead as part of the Wilmington Port Expansion, both of which are physical constructions, 40410AR-010022, and thus within the scope of Section 10's requirements for the placement of structures that may obstruct navigation, *see, e.g., AJA Assocs. v. Army Corps of Eng'rs*, 817 F.2d 1070, 1071 (3d Cir. 1987) (concerning construction of a seawall bulkhead); *All. To Protect Nantucket Sound, Inc. v. U.S. Dep't of Army*, 398 F.3d 105, 107 (1st Cir. 2005) (concerning construction of an offshore data tower); *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 583 (4th Cir. 2012) (concerning the construction of bulkheads, piers, mooring piles, and a walkway in conjunction with boat slips and a launching ramp). But neither Section 10 nor any interpretive case law supports the notion that a portion of a waterway to be used as a turning basin requires Corps authorization.

Under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act, the Corps must also authorize dredging or filling in navigable waters. 33 U.S.C. § 1344; 33 U.S.C. § 403. The Turning Basin does not require any dredging or filling. The only dredging authorized by the Section 404/10 Permit is for creating a ship berthing area and an access channel from the Delaware River Channel to the new ship berthing area at the Wilmington Port

Expansion. 40410AR-010021 ("The purpose of the proposed dredging is to deepen portions of the Delaware River adjacent to the federal navigation channel to create an access channel connecting the federal navigation channel to a ship berth proposed to be located along the shoreline of the [Wilmington Port Expansion]. [Diamond State Port Corporation] also proposes to create this berth by hydraulic dredging"). Notably, this dredging is necessary regardless of whether there is a Turning Basin.

Thus, the Turning Basin is not subject to Section 10 and Section 404 because (1) it is not a human-made structure that obstructs navigation, and (2) it requires no additional dredging. The Corps' determination that the Turning Basin is not covered by the Rivers and Harbors Act is entitled to deference. *See Hart & Miller Islands Area Env't Grp., Inc.*, 621 F.2d at 1290 (4th Cir. 1980). The Corps' decision is also entitled to deference because it relies on the Corps' technical determination within its area of expertise. *Town of Norfolk*, 968 F.2d at 1454-55; *Myers,* 831 F.2d at 986.

Nor was the Corps required to evaluate the Turning Basin under Section 408 of the Rivers and Harbors Act. Under Section 408, the Corps is required to approve only alterations to an existing public works project built by the United States—for example, an alteration that "impair[s] the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, [or] pier." 33 U.S.C. § 408. Here, the relevant public works project is the Delaware River Channel. 408AR-007373. The Corps lacked authority to regulate or approve the Turning Basin under Section 408 because the Turning Basin does not physically alter the congressionally-authorized dimensions of the Delaware River Channel. *Id*. The Corps also determined that the Turning Basin neither impairs the usefulness of the Delaware River Channel nor impairs the Corps' ability to maintain

the channel at its congressionally-authorized dimensions. *Id*. Thus, the Turning Basin is not subject to Section 408. *Id*.

## III.    The Corps Reasonably Concluded that the Section 404/10 Permit and 408 Approval, including the Wilmington Port Expansion and Turning Basin, Are Not Contrary to the Public Interest.

### A.    The Corps Appropriately Considered the Navigation and Safety of the Wilmington Port Expansion and Turning Basin.[3]

Even though the Turning Basin is outside the scope of Sections 404, 10, and 408, the Corps fully considered the navigation and safety impacts of the Wilmington Port Expansion and Turning Basin and concluded that neither the Section 404/10 Permit nor the 408 Approval would be contrary the public interest.

In making that determination, the Corps considered the independent, third-party, full-mission ship navigation simulation and feasibility study ("Navigation and Safety Study") conducted by the well-known and respected Maritime Institute of Technology and Graduate Studies ("MITAGS").[4] 40410AR-003415.[5] The purpose of the study was "to ensure that containerships are able to transit safely to the [Wilmington Port Expansion] on a regular basis,

---

[3] This subsection responds to PhilaPort's Section 404-10 Specific Challenges Nos. 1, 2, 3, 4, and 5 and PhilaPort's Section 408 Specific Challenges Nos. 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, and 15. Case No. 2:24-cv-01008-MAK, ECF No. 20. This subsection also responds to Greenwich's Section 404/10 Specific Challenges and Section 408 Specific Challenges on navigation and safety. Case No. 2:23-cv-04283-MAK, ECF No. 26 ¶¶ 3-20, 22-33.

[4] MITAGS is a non-profit, continuing education center for professional mariners and provides training for both civilian and military mariners at every level of their career. 40410AR-003480. MITAGS has over 30 years of experience in ship simulators, modeling, and is among the leading maritime training and simulation centers. 40410AR-003422. The center is supported by experienced ship-handling consultants and full-time simulation engineering staff. *Id*.

[5] The MITAGS study appears in both the administrative record for the 404/10 Permit and 408 Approval. 408AR-003385. As noted above, to avoid duplication, Defendant includes in the appendix only the copy in the 404/10 administrative record.

with minimum impact on existing vessel traffic," and its focus was "to determine the impact of the terminal on the ships transiting the deep-draft navigation channel." 40410AR-003419.

The study lasted three days and was run by multiple navigation experts and ship pilots, including current and former pilots from the Pilots' Association for the Bay and River Delaware ("Pilots' Association"), to ensure the accuracy of the simulation. 40410AR-003419-3422. The study focused on containerships up to 9,300 TEUs[6] because ships of that size are most likely to use the new Wilmington Port Expansion terminal. 40410AR-003419. The study also included 12,000 TEU ships to represent the largest class of ship capable of using the new terminal. 40410AR-003420. Each simulation tested for worst-case scenarios, including a static wind up to 25 knots. 40410AR-003425. Multiple tides, including 3-foot, 5-foot, and 6-foot tides, were also part of the simulation. 40410AR-003427. The simulation included a large control room and bridge to fully capture the experience of piloting a ship through the study runs. 40410AR-003421. Below are images depicting elements of the Navigation and Safety Study:

 

40410AR-003421.

---

[6] "TEU" means twenty-foot equivalent unit, the general unit of cargo capacity used for rating containership size.

The Navigation and Safety Study concluded that there will be no impacts to navigation or safety caused by the Wilmington Port Expansion or the Turning Basin:

> Throughout the study, 29 runs were completed including 19 inbound, 4 outbound, and 6 passing vessel runs. In all of the runs, the ships transited within the channel limits including the existing and proposed terminal limits[.]

40410AR-003441.

The ship pilots who participated in the study noted that "[o]f the 6 passing vessel tests, the distance between the vessels when passing ranged from 290 ft. to 425 ft. allowing safe passing distances" and "[n]o adverse effects occurred." 40410AR-003442. The ship pilots concluded that "the addition of the [Wilmington Port Expansion] and resultant deepening, reduces the bank effect in the channel adjacent to the terminal making navigation safer." 40410AR-003442 (bank effect is the tendency of the ship's bow to swing toward the riverbank, and, compared to status quo, it is reduced here because of the additional dredging). So, not only are there no negative impacts to navigation and safety, but the expert ship pilots concluded that the additional deepening required for the proposed Wilmington Port Expansion will make navigation safer. The ship pilots also concluded that "[t]he simulation results indicated the proposed [Wilmington Port Expansion] would have minimal impact on ships as they transit the existing navigation channel." 40410AR-003442.

The ship pilots in the Navigation and Safety Study recommended that the design plans consider deepening an additional area near the Wilmington Port Expansion "to provide additional maneuvering space as inbound vessels turn in the turning basin." 40410AR-003442. Figure 5-2 below shows the area in red that the pilots recommended be deepened:



40410AR-003442.

Diamond State Port Corporation adopted the ship pilots' design recommendation to deepen those additional areas in the final plans. 40410AR-010243 ("The simulation was performed by Delaware River Pilots, who are responsible for the navigation on the river, and the layout of the basin was adjusted based on the comments received in the simulation by the pilots, tug boat captains and the USACE Representatives."). The Pilots' Association submitted a letter in support of the Navigation and Safety Study's conclusions and acknowledged that the plan adopted the ship pilots' recommendation to deepen additional areas. 408AR-007365.

The Pilots' Association's members are responsible for safety and navigation on the Delaware River, including operating and coordinating marine traffic. 408AR-007353. The members are pilots who provide piloting services for interstate commerce on the Delaware River, and the Association provides a convenient means of arranging piloting services for containerships and other large commercial ships navigating the River. *Bailey v. Pilots' Ass'n for*

*Bay & River Del.*, 406 F. Supp. 1302, 1304 (E.D. Pa. 1976); *see also Gen. v. Pilots' Ass'n for Bay & River Del.*, 254 F. Supp. 447, 449-450 (D. Del. 1966) (describing the historical context for the origin and operation of the Pilots' Association).[7] For example, before a containership can transit up the Delaware River Channel to the proposed Wilmington Port Expansion, the containership must obtain a pilot from the Pilots' Association. 40410AR-010026 ("[A]fter picking up a river pilot, [containerships] will proceed directly up the navigation channel to an assigned berth."). The participation of pilots from the Pilots' Association in the Navigation and Safety Study, backed by the letter from the Pilots' Association, provides substantial support to the Corps' conclusion that the proposed Wilmington Port Expansion and Turning Basin will have no negative effect on navigation and safety. 408AR-007365.

In addition to its consideration of the Navigation and Safety Study, the Corps held two public notice and comment periods on the Section 404/10 Permit and 408 Approval (one in 2020 and one in 2021). Moreover, the U.S. Coast Guard was aware of the Wilmington Port Expansion and Turning Basin because of its coordination with the Delaware Department of Natural Resources and Environmental Control ("DNREC"), the state agency that authorized aspects of the Edgemoor terminal expansion.[8] The Coast Guard regulates vessel safety and enforces U.S.

---

[7] Generally, all large commercial cargo ships (containerships, tankers, etc.) must be piloted by a pilot licensed in the United States. 46 U.S.C. § 8502. The Pilots' Association arranges for and provides pilots for that purpose for ships that need to navigate the Delaware River.

[8] Plaintiffs appealed the DNREC state permit to the Delaware Environmental Appeals Board on the grounds that, among other things, the state agency failed to consider navigation and safety, but the Board unanimously dismissed the appeal as meritless. *In Re Phila. Reg'l Port Auth.*, Appeal Nos. 2021-08, 2021-09, 2021-10, Decision and Final Order (Del. Env't App. Bd. (May 10, 2024). In dismissing Plaintiffs' appeal, the Board concluded that DNREC's "[o]rder is clear on its face as having considered navigational factors by conferring and coordinating with the appropriate agencies responsible (e.g., Delaware River Pilots and the United States Coast Guard)" and rejected Plaintiffs' argument that DNREC should have to "re-do or override the

maritime laws. 408AR-007353. Although the Corps was not required to consult with the Coast Guard, at no point did the Coast Guard object to any aspect of the Wilmington Port Expansion or Turning Basin.

Plaintiffs appear to argue that the Corps was required to consult with the Coast Guard on the proposed project. Case No. 2:24-cv-01008-MAK, ECF No. 20 (404/10 Specific Challenge No. 5 and 408 Specific Challenge No. 8); Case No. 2:23-cv-04283-MAK, ECF No. 26 at ¶ 30. But the Corps is required to consult with the Coast Guard under Section 408 only if an applicant proposes to build a bridge over a navigable water of the United States. 408AR-007787 (EC 1165-2-220). No bridge will be built as part of the Wilmington Port Expansion.

For these reasons, and those in the following subsections, the Corps' consideration of navigation and safety factors associated with the Wilmington Expansion Project and Turning Basin was reasonable, is supported by the administrative record, and is entitled to substantial deference.[9] *Camp*, 411 U.S. at 142 (APA judicial review is based on the administrative record and not evidence outside the record); *Town of Norfolk*, 968 F.2d at 1454–55 (The Corps' consideration and balancing of public interest factors entitled to substantial deference); *Myers,* 831 F.2d at 986 (same). Thus, the Court should uphold the Corps' determination.

---

work of these agencies that are responsible, in fact, for the safe navigational operations upon the Delaware River." *Id*. at 16.

[9] The sincerity of Plaintiffs' complaints about the Turning Basin might be questioned, as Plaintiffs' operations rely on a similar turning basin in the part of the Delaware River Channel near Philadelphia's ports. 408AR-007353 (noting that "other ports and terminals use portions of the [Delaware River Channel] as a turning basin"). Plaintiffs' opposition to this Turning Basin ignores the commonsense reality that turning basins, like the one they use upriver, are necessary for large containerships to navigate in any sea-to-river system because, at some point, ships must turn around on the river and head back to sea. *Id*. (noting that "[o]ther ports throughout the USA have turning basins within Federally authorized navigation channels.").

**B.      The Corps Provided Robust Responses to all Substantive Comments on Navigation and Safety.**

Plaintiff Greenwich argued that the Turning Basin could cause "potential delays in upbound and downbound traffic" and "could force other ships to slow down or have to stop." 40410AR-004832. Putting aside the speculative nature of this claim, the purported delays are unlikely to occur. As the Corps explained in response:

> The [Navigation and Safety Study] demonstrates that typical activity in the turning basin would occur over a 10 to 15 minute period before berthing occurs in the harbor. The typical shipping traffic in the Delaware River consist[s] of an average of 151 ships . . . per month . . . , or 5 per day, or 1 per 5 hours along the entire shipping channel. The risk of turning basin[']s activity (0.2 hours) coinciding with the one vessel every 5 hours is not significant.

40410AR-010268.[10] In other words, because it takes only 10 to 15 minutes for a ship to use the Turning Basin, combined with the low frequency of ship traffic on the Delaware River (only about five ships per day), the Corps was reasonable in its response to Plaintiff's unrealistic concern about nautical traffic jams. 40410AR-010268.

Plaintiff Greenwich argued for imposing vague limitations on ships inbound to the Wilmington Terminal Expansion when wind is above 20 knots and during low tide. 40410AR-004832-33. But Greenwich never explained what those limitations should be. And, as a threshold matter, the Corps lacks authority to impose ship-traffic and operation limitations because such regulation is outside of the Corps' regulatory purview. The U.S. Coast Guard and the Pilots'

---

[10] The Corps' public notices in 2020 and 2021 were combined notices for both the Section 404/10 Permit and 408 Approval, so commenters often combined their comments on both into a single set of comments. As a result, the Corps responded to all Section 404/10 and 408 issues in a combined response to comment document, and an identical version is also in the administrative record for the 408 Approval. 408AR-007611. As noted above, to avoid duplication, Defendant includes in the appendix only the copy in the 404/10 administrative record.

Association are responsible for regulating ship traffic and operation in the relevant portion of the

Delaware River. As the Corps explained:

> The navigation on the river is under the guidance of the [Pilots'
> Association]. The impact of weather on ship transit on navigation [sic] and
> berthing will be evaluated by the pilots consistent with other facilities on
> the river. There are numerous locations along the shipping channel for a
> vessel to take shelter in adverse weather. It is noted that tide restricted
> travel and transit delays in period[s] of high winds impact many of the
> facility[i]es along the Delaware River and are not unique to this facility.

40410AR-010268.

But even assuming that the Corps had authority to impose restrictions on vessel traffic,

Greenwich's concerns would have no merit. The Navigation and Safety Study tested worst-case

scenarios with a static wind up to 25 knots, 40410AR-003425, and multiple tides, including a 3-

foot, 5-foot, and 6-foot tide. 40410AR-003427. Under all simulations, including worst-case

scenarios, "the ships transited within the channel limits including the existing and proposed

terminal limits," 40410AR-003441, and the pilot participants concluded that the plans "allow[]

safe passing distances" and "[n]o adverse effects occurred." 40410AR-003442.

In its comments on the proposed Wilmington Port Expansion, Greenwich complained

generally that the Navigation and Safety Study did not sufficiently study potential emergency

situations. But Greenwich provided no examples of specific emergency situations that the Corps

should have considered. 40410AR-004833. Based on that vague complaint, Greenwich

Terminals asserted that the Navigation and Safety Study failed to show that the Turning Basin

would have no significant adverse impact on navigation. *Id*. But, as the Corps explained in

response:

> The [Navigation and Safety Study], the scope of which was developed
> with input the [sic] project and river stakeholders and approved by the
> appropriate center of expertise at [the Corps,] demonstrates that the
> turning basin[] is appropriately configured and that there is not an adverse
> impact to shipping in the navigation channel.

40410AR-010269.

In its comments, Greenwich also complained about the location of the Turning Basin in parts of the Main Navigation Channel. 40410AR-004832. But, as the Corps explained in response to that comment, the Turning Basin is about 1,700 feet in diameter and most ships anticipated to operate in the new harbor are less than 1,200 feet in length and would use only part of the Main Navigation Channel. 40410AR-010273. This cushion supports the reasonable conclusion of the Navigation and Safety Study that there exists sufficient space "allowing safe passing distances." 40410AR-003442; *see also* 40410AR-003441 ("[T]he ships transited within the channel limits including the existing and proposed terminal limits."). In addition, as explained above, the frequency of ship traffic in the relevant area is about one ship every five hours, so the likelihood of any ship traffic jam is unlikely and not a realistic concern. 40410AR-010268.

Greenwich also commented that the Navigation and Safety Study should have included larger ship types in the simulation, including 14,000 TEU container ships and oil tankers. 40410AR-004857. As the Corps explained in response to that comment, "[t]he mix of ship traffic utilized in the simulation was selected as an appropriate difficulty for transit." 40410AR-010273. The types of ship coming to the proposed Wilmington Port Expansion will not be oil tankers or other large cargo ships; instead, they will mostly be smaller containerships around 9,300 TEU. 40410AR-003419. Furthermore, "the frequency of tanker traffic has dramatically reduced as all but one of the oil refineries up river of the project cite [sic] have stopped operations and are being re-purposed for other uses." 40410AR-010273.

Thus, the Corps adequately responded to all comments related to the proposed Wilmington Port Expansion and Turning Basin. Further, as the Navigation and Safety Study

concluded, there will be no impacts to navigation and safety caused by the Wilmington Port

Expansion or Turning Basin.

> ### C.     The Corps Was Not Required to Provide Further Analysis of Cumulative Impacts to Navigation or Safety.

Greenwich argues that the Corps failed to consider cumulative impacts on navigation and

safety stemming from the Wilmington Port Expansion.[11] Case No. 2:23-cv-04283-MAK, ECF

No. 26 at ¶ 20. But no one raised this issue in public comments, so it is forfeited here and cannot

be the basis for overturning the Corps' decision.[12] *See Kleissler*, 183 F.3d at 201. Even if not

forfeited, any challenge by Greenwich based on cumulative navigational and safety effects falls

short because the Corps determined that the Wilmington Port Expansion project will not cause

any direct or indirect impacts to navigation or safety. Thus, the Corps did not need to consider

cumulative impacts. *See, e.g., Nw. Env't Advocs. v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125,

1140-41 (9th Cir. 2006) (Under NEPA's analogous cumulative effects assessment requirement, a

cumulative effect analysis need focus only on those areas in which the agency's action would

have an effect.); *see also N. Plains Res. Council, Inc. v. Surface Transp. Bd*., 668 F.3d 1067,

1082 (9th Cir. 2011) ("[W]here a proposed project has 'virtually no effect' on water quality, the

agency is not required to examine cumulative impacts from other projects because it would not

provide an informed analysis.") (citing *Nw. Env't Advocs.*, 460 F.3d at 1140)); *Minisink*

*Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 113 (D.C. Cir. 2014) (concluding that

---

[11] PhilaPort appears to have abandoned this argument. Although the argument appears in its Amended Complaint, ECF No. 17 ¶¶ 150, 166, it does not appear in PhilaPort's Notice of Anticipated Challenges. Case No. 2:24-cv-01008-MAK, ECF No. 20.

[12] Some comments expressed concerns with cumulative impacts to the aquatic environment and fish habitats. *See, e.g.*, 40410AR-004699 (County of Gloucester, NJ, Comments); 40410AR-004706-45707 (Delaware Riverkeeper Comments); 40410AR-004727 (PhilaPort Comments). But none raised any substantive concerns about the Corps' analysis of cumulative impacts to navigation and safety.

no cumulative impact analysis was needed where "the [Environmental Assessment] concluded that because the . . . Project itself was expected to have minimal impacts, no significant cumulative impacts were expected to flow"); *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 703 (5th Cir. 2018) (holding that a full cumulative impact analysis was unnecessary where Environmental Assessments concluded that a project would have no incremental impact and "hence, there could be no cumulative effects").

Contrary to Plaintiffs' assertions, navigation and safety are likely improved by the Wilmington Port Expansion, as concluded by the ship pilots in the Navigation and Safety Study. 40410AR-003442 ("[T]he addition of the [Wilmington Port Expansion] and resultant deepening, reduces the bank effect in the channel adjacent to the terminal making navigation safer."). In response, neither public commenters nor Plaintiffs provide any examples of nearby new or existing projects that might pose additional navigation or safety issues in conjunction with the Wilmington Port Expansion, which is a necessary predicate for a cumulative effects analysis. *See, e.g.,* 40 C.F.R. § 230.11(g) (404(b)(1) Guidelines define cumulative impacts as "the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material."). Plaintiffs provide no factual allegations in their Amended Complaints to support their position, and Greenwich's Notice of Anticipated Challenges merely contains conclusory statements about navigation impacts without any support or citation to the administrative record. So, even if Plaintiffs have not forfeited the argument, there is no record evidence to support it. *See Camp*, 411 U.S. at 142 (APA judicial review is based on the administrative record and not evidence outside the record.). Thus, the Court should enter judgment in favor of the Corps as to any claim that the Corps failed to give adequate consideration of the safety and navigational considerations of the Wilmington Port Expansion.

**D.      The Corps Was Not Required to Conduct a Safety Assurance Review.**

Plaintiffs argue that the Corps should have conducted a Safety Assurance Review for the Wilmington Port Expansion. Case No. 2:24-cv-01008-MAK, ECF No. 20 (408 Specific Challenge No. 10); Case No. 2:23-cv-04283-MAK, ECF No. 26 ¶ 20. Again, no party raised this issue in public comments, so it is forfeited here and cannot be the basis for overturning the Corps' decision. *See Kleissler*, 183 F.3d at 201.

Even if Plaintiffs did not waive the argument, it makes no difference because the Corps was not required to conduct a Safety Assurance Review. The Corps' policies for evaluating Section 408 requests are set forth in the guidance document titled Engineer Circular ("EC") No. 1165-2-220, *Policy and Procedural Guidance for Processing Requests to Alter U.S. Army Corps of Engineers Civil Works Projects Pursuant to 33 USC 408*, 408AR-007718. That guidance document states that the decision to conduct a Safety Assurance Review for a Section 408 approval is left to the discretion of the Corps District overseeing the project. 408AR-007737 ("*If the district determines* a [Safety Assurance Review is required  . . . .") (emphasis added); 408AR-007742 ("The district Chief of Engineering will refer to reference A.40, or subsequent policy, *to determine if a [Safety Assurance Review] is required* for a proposed alteration.").

The Corps determined that a Safety Assurance Review was not required here because there are no known potential hazards that pose a significant threat to human life.[13] Neither the Wilmington Port Expansion nor the Turning Basin will physically alter the Delaware River

---

[13] Per the Corps' nonbinding guidance document, a safety assurance review is only required for a "project where potential hazards pose a significant threat to human life (public safety). U.S. ARMY CORPS OF ENGINEERS, REVIEW POLICY FOR CIVIL WORKS, EC 1165-2-217 at 44, *available at* https://www.publications.usace.army.mil/Portals/76/Publications/EngineerCirculars/EC_1165-2-217.pdf?ver=2018-05-01-105219-217. This is the document referred to as "reference A.40" at page 408AR-007742.

Channel. 408AR-007352. The lack of physical alteration is important: instances where the Corps might require a Safety Assurance Review under Section 408 concern only physical alterations to existing Corps' projects and the physical environment. 408AR-007742 (EC 1165-2-220 listing physical alterations to dams or levees as examples potentially requiring a Safety Assurance Review). The Corps' determination in this area of its expertise is entitled to substantial deference. *See Town of Norfolk*, 968 F.2d at 1454-55; *Myers,* 831 F.2d at 986.

Greenwich belatedly argues that the Corps was required to conduct a Safety Assurance Review because the proposed Wilmington Port Expansion allegedly "pose[s] a significant threat to human life." Case No. 2:23-cv-04283-MAK, ECF No. 26 ¶ 20. This argument misses the mark in at least two ways.

First, at no point during the administrative process did Greenwich or anyone else raise concerns regarding a "significant threat" to human life stemming from the proposed Wilmington Port Expansion or Turning Basin, so Greenwich cannot raise that argument now. *See Kleissler*, 183 F.3d at 201. Safety is paramount in the Corps' mission, and the Corps takes such allegations very seriously. Thus, it is imperative that the public and stakeholders raise such concerns with the agency as part of the administrative process. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978) ("[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'"). No one did so here.

Second, Greenwich's Notice of Anticipated Challenges merely contains a conclusory statement about "a significant threat to human life," but provides no explanation as to the nature

of the purported threat. Nor does Greenwich cite any evidence in the administrative record

regarding the "significant threat." Notice of Specific Anticipated Challenges to Sections 404/10

and 408 Approvals, Case No. 2:23-cv-04283-MAK (ECF No. 26), ¶ 20. Thus, even if

Greenwich's argument has not been forfeited, it nevertheless lacks any support in the

administrative record. *See Camp*, 411 U.S. at 142 (APA judicial review is based on the

administrative record and not evidence outside the record.).

### E.    The Corps Was Not Required to Impose Vague, Unexplained Dredging Protocols.

PhilaPort and Greenwich argue that the Corps erred by not establishing navigation and

safety protocols for dredging activities associated with the Wilmington Port Expansion. Case No.

2:24-cv-01008-MAK, ECF No. 20 (404-10 Specific Challenge No. 3); Case No. 2:23-cv-04283-

MAK, ECF No. 26 ¶ 32. But, again, no party raised this issue in public comments, so the issue is

forfeited and cannot be the basis for overturning the Corps' decision.[14] *See Kleissler*, 183 F.3d at

201.

But even if this issue was not forfeited, neither PhilaPort's nor Greenwich's Complaints

and Notices of Anticipated Challenges identify the navigation and safety protocols that the Corps

should have required. Nor do they explain why the Corps' failure to do so was arbitrary or

capricious. Plaintiffs' post hoc arguments have no support in the administrative record and

provide no basis for overturning the Corps' actions. *See Camp*, 411 U.S. at 142. Furthermore,

---

[14] PhilaPort raised navigation and safety concerns for other aspects of the project, such as the safety of proposed sedimentation fans and the Turning Basin, *see* 40410AR-004822, but it never raised safety concerns about the dredging proposed for the project. For its part, Greenwich made a conclusory comment that the Corps cannot approve the project until it evaluates the anticipated impacts of the dredging on the public interest, including navigation and safety on the Delaware River, *see* 40410AR-008319, but it never explained what dredging safety or navigation protocols the Corps should have required.

there is no dredging occurring in the Delaware River Channel to begin with, so Plaintiffs'

concerns about dredging's safety and navigational impacts to the Delaware River Channel are

without merit. 40410AR-010021. The only dredging associated with the Section 404/10 Permit

will occur adjacent to the Delaware River Channel. *Id*. ("The purpose of the proposed dredging

is to deepen portions of the Delaware River adjacent to the federal navigation channel to create

an access channel connecting the federal navigation channel to a ship berth proposed to be

located along the shoreline of the Edgemoor site.").

*       *       *

In sum, the administrative record evinces the Corps' careful consideration of navigation

and safety for the Wilmington Port Expansion and the Turning Basin. Under the Corps'

regulations, all it must do is consider these factors in conjunction with numerous other factors

and use its discretion to balance all relevant public interest factors. *See Town of Norfolk*, 968

F.2d at 1454-55 (The Corps' public interest consideration and balancing is "entitled to

substantial deference."). The Corps did so here and concluded that the proposed Wilmington Port

Expansion and Turning Basin pose no adverse effects on navigation or safety that, taken together

with the public interest factors, require the Corps to deny the Section 10/404 Permit. For the

same reasons, the Corps reasonably determined that the Wilmington Port Expansion and Turning

Basin would not impede the usefulness of the Delaware River Channel and thus should be

approved consistent with Section 408. *See* 40410AR-003442.

F. **The Corps Appropriately Considered Economics, Needs, and the General Welfare in Connection with the Wilmington Port Expansion and Turning Basin.[15]**

The Corps fully considered the economics, needs, and general welfare impacts of the Wilmington Port Expansion in concluding that neither the Section 404/10 Permit nor the 408 Approval would be contrary the public interest. The Corps reasonably found that the Wilmington Port Expansion would provide economic benefits: "Economic development opportunities are enhanced through the construction of a 45-ft. berth and access channel as a result of the ability to attract larger container vessels and the associated reduced transportation costs per TEU." 40410AR-010055.[16] The Corps also found that "[t]he new port at Edgemoor is expected to increase jobs, wages, and tax revenue opportunities for the City of Wilmington, and the socioeconomic region" and "is expected to support the growth of over 4,000 jobs annually." 40410AR-010056. As a result, "these changes are expected to benefit the quality of life for many residents in the area." 40410AR-010056. These economic and general welfare benefits can be realized only by the Wilmington Port Expansion.

Regarding the need for the project, the Corps found that an "increase in trade shipping to the eastern seaboard is expected to come through the use of new ships that are larger than those currently in service" and, therefore, "[t]to accommodate these new ships entering east coast ports, the Applicant anticipates that there will be a demand for expansion of east coast port

---

[15] This subsection responds to PhilaPort's Section 404-10 Specific Challenge No. 6 and PhilaPort's Section 408 Specific Challenges Nos. 9, 15, 16, and 17. Case No. 2:24-cv-01008-MAK, ECF No. 20. This subsection also responds to Greenwich's Section 404/10 Specific Challenges on economics, need, and general welfare. Case No. 2:23-cv-04283-MAK, ECF No. 26 ¶ 21.

[16] The Corps 404/10 Decision Document is also in the 408 Approval administrative record. 408AR-007389. As noted above, to avoid duplication, Defendant includes in the appendix only the copy in the 404/10 administrative record.

operations." 40410AR-010056. Currently, no ports in the State of Delaware can accept these anticipated larger vessels, so container vessels that are bound for Ports in Delaware would need to be light-loaded or lightened prior to arrival. 40410AR-010056. Either option decreases the efficacy of operations and increases the potential for impacts to the environment. 40410AR-010056. Thus, the Corps reasonably concluded, based on evidence in the administrative record, that there is a need for a port in Delaware that can handle these larger vessels.

The Corps received numerous comments supporting the need for the Wilmington Port Expansion, including the well-paying jobs it will create and other positive economic benefits. *See, e.g.,* 40410AR-004799 (City of Wilmington, DE, Comments); 40410AR-004805 (Delaware Building and Construction Trades Council Comments); 40410AR-004807 (Laborers' International Union of North America Local 199 Comments); 40410AR-004809 (Laborers' District Council of Delaware Comments); 40410AR-004811 (Delaware State AFL-CIO Comments); 40410AR-004819 (New Castle County, DE, Comments).).

Unsurprisingly, the Corps also received comments from out-of-state parties opposing the project, such as Plaintiff PhilaPort, arguing that the Corps should conduct a full economic analysis demonstrating the need for the Wilmington Port Expansion and addressing the economic impacts to the regional and national economies. *See, e.g.,* 40410AR-004700 (Gloucester County, NJ, Comments); 40410AR-004735 (PhilaPort Comments); 40410AR-004813 (South Jersey Port Corporation Comments); 40410AR-004821 (Camden County, N,J Comments); 40410AR-004825 (Commonwealth of Pennsylvania Comments).

As a threshold matter, the Corps' regulations dictate how it should consider the public interest factor for economics: "When private enterprise makes application for a permit, it will generally be assumed that appropriate economic evaluations have been completed, the proposal

is economically viable, and is needed in the market place." 33 C.F.R. § 320.4(q). The regulation also notes that "[t]]he economic benefits of many projects are important to the local community and contribute to needed improvements in the local economic base, affecting such factors as employment, tax revenues, community cohesion, community services, and property values." *Id.* That is the exact situation here: Diamond State Port Corporation is a private enterprise that applied for the Wilmington Port Expansion, so Corps regulations allow the Corps to assume that the proposal is economically viable and needed in the marketplace.[17] But even if not, as described above, the administrative record contains ample public comments supporting the need for the Wilmington Port Expansion and the economic benefits to the local community it will bring. *See, e.g.,* 40410AR-004799; 40410AR-004805; 40410AR-004807; 40410AR-004809; 40410AR-004811; 40410AR-004819. The record demonstrates that the port expansion is needed so that it can handle the increases in port activity on the east coast, including the new, larger containerships that cannot currently be docked at the existing port. 40410AR-010056. The record thus supports the Corps' finding that the project is in the public interest.

Although the Corps' regulations provide it discretion to undertake an independent review of the need for a project, that decision is entitled to substantial deference. *See Town of Norfolk*, 968 F.2d at 1454-55; *see also Myers,* 831 F.2d at 986. Furthermore, the language of the Corps'

---

[17] Diamond State Port Corporation is a corporate entity created by the State of Delaware to operate the Port of Wilmington with a primary goal of maintaining its economic viability. 40410AR-000220-000224; Del. Code Ann. tit. 29, § 8780 (2024). Because the Port is operated as a commercial business and is used for commercial shipping activities, Diamond State Port Corporation functions like a private enterprise. For example, employees of the corporation are generally considered private employees and not employees of the state, Del. Code Ann. tit. 29, § 8789 (2024), the corporation has a board of directors, Del. Code Ann. tit. 29, § 8781 (2024), and the corporation is run by an executive director. Del. Code Ann. tit. 29, § 8783 (2024).

regulation focuses on the "local" economic impacts, so even if the Corps had exercised its discretion to undertake an independent analysis, it would have focused on local impacts and not the regional or national impacts that out-of-state commenters complained about. *See* 33 C.F.R. § 320.4(q) (addressing consideration of impacts to "local community" and "local economic base"). Thus, the Corps was not required to conduct an independent analysis of the regional or national economic impact and need for the Wilmington Port Expansion. And the Corps' was reasonable in the exercise of its discretion not to consider regional or national impacts of the project.[18]

Plaintiff PhilaPort contends that the Corps improperly "segmented" its public interest review of economics by not focusing on regional or national impacts. 40410AR-004737. That contention is incorrect. Not only is the local impact the focus of the economic review under the Corps regulations, *see* 33 C.F.R. § 320.4(q), but the concept of "segmentation" applies only to separating a project into pieces to avoid a wholistic analysis of the *environmental* impacts of a project under the National Environmental Policy Act ("NEPA"). *See Twp. of Bordentown, New*

---

[18] Relevant case law suggests that the Corps' analysis of economic impacts must be even narrower and focused only on the actual physical changes to the environment authorized by the permit or approval. In *Mall Properties, Inc. v. Marsh*, the Corps denied a Section 404/10 permit for a mall development because of the economic impact it might have on neighboring areas, but the court remanded. 672 F. Supp. 561, 567-69, 575 (D. Mass. 1987). The court explained that neither the Clean Water Act nor the Rivers and Harbors Act "reveal[s] an intention to empower the Corps to decide whether to issue permits based upon an assessment of economic effects unrelated to impacts on the natural environment." *Id*. at 574; *see also id*. at 573 ("[D]ecisions concerning which competing constituency's economic interests ought to be preferred are traditionally made by democratically accountable officials" and not by the Corps, which only has "a central role in this process because of its expertise in matters relating to our nation's waterways" and not economics).

*Jersey v. FERC*, 903 F.3d 234, 248 (3d Cir. 2018).[19] The concept of prohibited "segmentation" under NEPA is not applicable to the Corps' consideration and balancing of public interest factors under its regulations.

Lastly, Plaintiffs argue that the Corps' consideration of economics was illegally "segmented" from the Corps' separate process under Section 204(f) of the Water Resources Development Act of 1986. Again, because no party raised this issue in public comments, it is forfeited and cannot be the basis for overturning the Corps' decision. *See Kleissler*, 183 F.3d at 201.

Even assuming Plaintiffs have not forfeited the issue, it is unavailing here. The Corps' differing treatment of economics under its Clean Water Act/Rivers and Harbors Act public interest review and its Section 204(f) process is legal and reasonable because the structure of Section 204(f) necessitates a process that is wholly separate. For example, an applicant's Section 204(f) request is approved by the Department of the Army and not the Corps, and the Corps cannot submit the request for approval until *after* the Corps first issues all necessary Section 404/10 permits and/or Section 408 approvals. U.S. CORPS OF ENGINEERS, *Operation and Maintenance of Improvements Carried Out by Non-Federal Interests to Authorized Harbor or Inland Harbor Projects*, ER 1165-2-211 at 4, 40410AR-010357 ("ER 1165-2-211").

_____

[19] In *Township of Bordentown*, the court described improper segmentation: "When evaluating a proposed project's environmental impacts, an agency must take account of connected, cumulative, and similar actions whose impacts should be discussed in the same impact statement as the project under review . . . . Where an agency instead attempts to consider such related actions separately by segmenting the mandated unified review into multiple independent analyses that insulate each project from the impacts created by its sister projects, it fails to address the true scope and impact of the activities that should be under consideration and therefore runs afoul of NEPA." 903 F.3d at 248 (cleaned up).

The Section 204(f) process is governed by ER 1165-2-211, which dictates how the process should flow and how the Corps should consider economics. Pursuant to that guidance, the Secretary cannot grant a Section 204(f) request unless he approves an economic justification provided by the requestor that must be prepared in accordance with complex and highly specialized evaluation procedures set forth in Corps policy documents and must demonstrate, among other things, that the improvement benefits exceed improvement costs, and that the improvement is justified entirely by commercial navigation benefits. 40410AR-010355. At no point does that guidance document equate this specialized economic evaluation and justification with the general economic considerations that the Corps considers in its public interest review, which merely requires the Corps to weigh many factors and to balance the benefits against the detriments and requires no affirmative findings regarding economic justification. Indeed, 33 C.F.R. § 320.4, the regulation requiring public interest review, is not referenced in the Section 204(f) guidance, ER 1165-2-211. And, in contrast to Section 404 of the Clean Water Act and Sections 10/14 of the Rivers and Harbors Act, Section 204(f) does not even require consideration of the public interest. *See* 33 U.S.C. § 2232(f) (stating only that the Secretary of the Army must "determine[] that the improvements are feasible and consistent with the purposes of this subchapter"). Thus, the public interest evaluation of economics under the Corps' regulations for Section 404/10 permits and Section 408 approvals is completely unrelated to the separate economic evaluation and justification analysis the Corps conducts under Section 204(f) of the Water Resources Development Act of 1986.

In sum, the administrative record amply demonstrates the Corps' careful consideration of the economics, need, and general welfare impacts associated with the Wilmington Port Expansion and Turning Basin. Under the Corps' regulations, all it is required to do is consider

these factors in conjunction with numerous other factors and use its discretion to balance those factors to determine whether the project is in the public interest. *See Town of Norfolk*, 968 F.2d at 1454-55 (The Corps' public interest consideration and balancing is "entitled to substantial deference."). The Corps did so here and concluded that the Wilmington Port Expansion is needed and will bring about substantial positive economic impacts to local communities, promoting the public interest and general welfare. That conclusion is entitled to deference and should be upheld.

## IV.    The Corps Was Not Required to Obtain a Statement of No Objection from Plaintiff PhilaPort.

PhilaPort argues that the Corps should have obtained a Statement of No Objection from PhilaPort as part of the Corps' 408 Approval. Case No. 2:24-cv-01008-MAK, ECF No. 20 (Section 408 Specific Challenge No. 1). While PhilaPort was a nonfederal sponsor of the Delaware River Main Channel Deepening Project, which modified the already existing Delaware River Channel, neither PhilaPort nor any other party raised this argument in public comments, so it has been waived and cannot be the basis for overturning the Corps' decision. *See Kleissler*, 183 F.3d at 201. Notably, PhilaPort had two opportunities to raise this concern when the Corps issued public notices and solicited comments in both 2020 and 2021, but it never once complained that the Corps was required to obtain a Statement of No Objection. PhilaPort failed to raise this issue in comments and its Notice of Specific Challenges contains only post hoc arguments with no support in the administrative record.[20] *See Camp*, 411 U.S. at 142 (APA judicial review is based

---

[20] For example, PhilaPort bases its post hoc, extra-record argument on the existence of a Project Partnership Agreement between PhilaPort and the Corps. But because PhilaPort never raised this issue in the comments, the Agreement is not in the administrative record. When provided an opportunity to raise concerns with the administrative record per this Court's April 25 Scheduling Order, PhilaPort never mentioned the absence of the Project Partnership Agreement. So, not only

on the administrative record and not evidence outside the record.). Thus, the Court should reject PhilaPort's argument.

But even assuming PhilaPort has not forfeited the argument, it fails on the merits. The Corps was not required to obtain a Statement of No Objection from PhilaPort. As a threshold matter, there is no requirement in either statute or regulation to obtain a Statement of No Objection for a Section 408 Approval. Instead, under the Corps' guidance document for Section 408 applications, when a Section 408 application requests modification of an existing public works project, the Corps should obtain a "Statement of No Objection" from any non-federal sponsor of that public works project. U.S. CORPS OF ENGINEERS, *District Standard Operating Procedure Pursuant to 33 USC § 408*, at 16, 408AR-007853. Here, the relevant public works project is Delaware River Channel. 408AR-007373. Because the requirement for a Statement of No Objection stems from guidance, and not a statute or regulation, the Corps' compliance with it (or alleged noncompliance) cannot be a basis for overturning the agency action under the APA. *See Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980) ("Unlike legislative rules, non-binding agency statements carry no more weight on judicial review than their inherent persuasiveness commands.").

Even if the Corps' compliance with its non-binding guidance could be the basis for overturning the Section 408 Approval, there are five exceptions to guidance's protocol on when to obtain a Statement of No Objection. Relevant to this case is the second exception:

> 2. A Statement of No Objection is not required when [the Corps] has all operation and maintenance responsibilities for the portion of the [the Corps] project proposed to be altered.

---

did PhilaPort forfeit this issue by failing to raise it in comments, but it also waived the issue by not raising it as part of the Court's administrative record deadlines.

408AR-007854.

This exception applies here because, under the challenged 408 Approval, only the Corps has operation and maintenance responsibilities for the portion of the Delaware River Channel being altered. 408AR-007854; *see also* 408AR-007355 ("USACE-Philadelphia District is 100% responsible for maintaining the Philadelphia to the Sea Project to authorized depths and reporting depths to all stakeholders along the USACE Project."); *id*. ("The Delaware River, Philadelphia to the Sea River Federal Navigation Project is maintained at 100% Federal expense."). PhilaPort has no operation and maintenance responsibilities for the portion of the Delaware River Channel impacted by the Wilmington Port Expansion; PhilaPort's facilities are more than 20 miles upstream from the proposed Wilmington Port Expansion. The creation of the new ship berthing area and associated access channel, along with the immediate vicinity, are the only locations susceptible to impact, and they are far from PhilaPort's facilities.  So, even had PhilaPort raised this issue in comments, the Corps' guidance does not require a Statement of No Objection from PhilaPort.

**V.      The Corps Was Not Required to Hold a Public Hearing.**

PhilaPort appears to argue that the Corps was required to hold a public hearing on the Section 404/10 Permit. Case No. 2:24-cv-01008-MAK, ECF No. 20 (404-10 Specific Challenge No. 7). Although PhilaPort submitted comments asking for a public hearing, its Amended Complaint does not allege that the Section 404/10 Permit should be overturned because the Corps did not hold a public hearing, nor does its Amended Complaint contain any factual basis to support its position. Thus, PhilaPort forfeited this argument here and it cannot be a basis to overturn the Corps' Section 404/10 Permit. *See Kleissler*, 183 F.3d at 201.

Even if PhilaPort has not waived the argument, there is no basis to find that the Corps' decision to not hold a public hearing renders the Section 404/10 Permit arbitrary or capricious.

Neither the Clean Water Act nor the Rivers and Harbors Act requires the Corps to hold a public hearing on a permit application. Instead, the Corps' regulations dictate when and if a public hearing should be held, and those regulations provide the Corps with significant discretion on when to hold a hearing. *See* 33 C.F.R. § 327.4(b) (The Corps will not hold public hearing if it "determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing."); *see also Town of Norfolk*, 968 F.2d at 1454–55 (The Corps' decisions in this area are "entitled to substantial deference").

The Corps did not hold a public hearing here "because the Corps determined that issues raised in the request for a public hearing were insubstantial and could be addressed without a public hearing." 40410AR-010029. On this point, although PhilaPort asked for a hearing in its comments, PhilaPort provided no substance to undermine the Corps' conclusion that it could address all issues without a public hearing. In its comments, PhilaPort asserted that the Corps should hold a public hearing because of the "magnitude of the project and associated economic and environmental impacts to the port community," 40410AR-004725, but it did not explain why the Corps could not sufficiently address those issues by considering the hundreds of pages of public comments it received and issuing a written 36-page response to comments document. 40410AR-010242. The Corps exercised its discretion to not hold a hearing and explained why it was not holding a hearing, and PhilaPort does not provide any law or evidence to undermine that exercise of discretion.

## CONCLUSION

For the forgoing reasons, the Court should grant summary judgment in favor of Defendants and deny Plaintiffs' motion for summary judgment.

Dated: June 21, 2024

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney
Eastern District of Pennsylvania

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

*/s/ Stacey Smith*
Stacey Smith
Assistant United States Attorney
United States Attorney's Office
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

*/s/ Jeffrey Hammons*
Jeffrey Hammons
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044
(202) 598-6925
jeffrey.hammons@usdoj.gov

*Attorneys for Defendants Army Corps of Engineers, et al.*

## CERTIFICATE OF SERVICE

The below signed counsel certifies that the foregoing was filed via the Court's ECF system and service to all counsel of record was accomplished by email via the Court's ECF system.

Dated: June 21, 2024

/s/ Stacey Smith
Stacey Smith
Assistant United States Attorney