**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GREENWICH TERMINALS LLC and GLOUCESTER TERMINALS LLC** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | **NO. 23-4283** |
| | : | |
| **UNITED STATES ARMY CORP OF ENGINEERS, DISTRICT COMMANDER FOR THE PHILADELPHIA DISTRICT OF THE ARMY CORPS OF ENGINEERS, JEFFREY BEEMAN, and THE CHIEF OF THE REGULATORY BRANCH FOR THE PHILADELPHIA DISTRICT OF THE ARMY CORP OF ENGINEERS, TODD A. SCHAIBLE** | : | |

| | | |
|---|---|---|
| **THE PHILADELPHIA REGIONAL PORT AUTHORITY** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | **NO. 24-1008** |
| | : | |
| **UNITED STATES ARMY CORPS OF ENGINEERS, DISTRICT COMMANDER FOR THE PHILADELPHIA DISTRICT OF THE ARMY CORPS OF ENGINEERS, JEFFREY BEEMAN, CHIEF OF THE REGULATORY BRANCH FOR THE PHILADELPHIA DISTRICT OF THE ARMY CORPS OF ENGINEERS, TODD A. SCHAIBLE** | : | |

## MEMORANDUM

KEARNEY, J.                                                          October 28, 2024

Our community relies upon the national government and its federal agency experts to carefully study applications which may affect large cargo ships safely passing through our interstate rivers to deliver products from around the World to riverside ports for our eventual use.

Congress and those experts set standards to ensure exhaustive analysis of applications seeking to alter the present waterways. The experts must consider a variety of factors including the public interest of ensuring ships can safely pass on the river and the economic effects of changes to our rivers. We do not second guess the experts' technical expertise, but Congress requires we must ensure the experts fulfill their crucial mission by studying all factors. And we ask experts to again study applications if citizens with standing persuade us the experts did not meet the standards.

Our case today involves applications affecting the Delaware River on the eastern boundary of our District. Congress authorized the deepening of the Delaware River Main Channel over thirty years ago. The Deepening Project involves initial and maintenance dredging of the Delaware River Main Channel to a depth of forty-five feet. This important public work allows large cargo vessels to navigate upriver to deliver products to previously inaccessible riverside ports from the Delaware Bay to Philadelphia. The United States partnered with the Philadelphia Regional Port Authority to fund the Deepening Project.

This considered idea of deepening the Delaware River inspired Diamond State Port Corporation, a corporate entity of the state of Delaware, to develop a new port along the Delaware River at Edgemoor, Delaware—a few miles south of the Pennsylvania/Delaware border. Delaware hopes this new port will generate hundreds of millions of dollars in economic benefit for her citizens. All agree the Edgemoor site poses logistical and size challenges. The site is located at a tight turn where the Delaware River Main Channel comes close to the shoreline. The anticipated problem is the large vessels need enough deep water and room to turn around at the Edgemoor site to deliver their cargo before heading back to the Atlantic Ocean. Diamond State proposed to overcome this obstacle through a planned combination of a forty-five-foot-deep berthing area

connecting the proposed port at Edgemoor to the Main Channel and using the Main Channel as a turning basin for large vessels delivering products to the Edgemoor port.

Congress requires Diamond State apply to the United States Army Corps of Engineers to obtain the District Commander's: (1) approval of a dredging and construction permit under section 404 of the Clean Water Act and section 10 of the Rivers and Harbors Act, and (2) authorization for use of a federal project under section 408 of the Rivers and Harbors Act because of the proposed location of the turning basin. We rely upon experts within the Corps to study applications and recommend actions to its District Commander. The Corps studied the applications, sought public comment, and recommended approval. Its District Commander issued the permit and the authorization.

Three upriver port entities sued asking us to evaluate the Corps' scrutiny of Diamond State's applications. The Philadelphia Port Authority and two other upriver ports challenge the Corps' decision making process under the Administrative Procedure Act. Our scope of review is narrow to avoid substituting our judgment for the Corps' expertise. We consider whether the Corps articulated a satisfactory explanation for its actions, including a rational connection between the facts found and the recommendation to the District Commander. We study the quality of the Corps' decision making process, not the wisdom of the decision.

We find the Corps did not engage in reasoned decision making as to the section 404/10 permit because it failed to consider the impact of the turning basin and dredging activities on the public interest in navigation and safety. We today vacate the section 404/10 permit in accompanying Orders. We also find the Corps arbitrarily and capriciously departed from its own procedures in recommending the 408 approval by not requiring Diamond State obtain a Statement

of No Objection from the Philadelphia Port Authority as the sole non-federal sponsor of the Deepening Project. We vacate the section 408 authorization in the accompanying Orders.

## I.   Factual Background[1]

We study approvals necessary to expand ports along the Delaware River, which stretches from the Delaware Bay to Philadelphia and beyond in our District. Three states (Delaware, New Jersey, and Pennsylvania) border this important waterway in or near our District. The Delaware River connects ports in these states to World commerce. The Ports before us operate in and around Philadelphia. They naturally compete for shipping business with other ports along the Delaware River.



***Ports on the Delaware River are of economic importance to the border states.***

The Commonwealth of Pennsylvania established the Philadelphia Port Authority in 1989 to manage and operate Philadelphia's ports. The State of Delaware through its General Assembly established Diamond State Port Corporation in 1995 to manage and operate the Port of Wilmington.[3] Greenwich Terminals LLC operates the Packer Avenue Marine Terminal in Philadelphia, Pennsylvania.[4] Gloucester Terminals LLC operates the Gloucester Marine Terminal in Gloucester City, New Jersey and the Paulsboro Marine Terminal in Paulsboro, New Jersey.[5]

Congress authorized the Delaware River Main Channel Deepening Project in 1992 with the goal of deepening the Main Channel to forty-five feet.[6] Congress, in directing the Corps to develop the Delaware River Main Channel Deepening Project, intended to allow larger vessels to travel north to ports in Camden, New Jersey and Philadelphia.[7] The Philadelphia Port Authority and the Corps' Philadelphia District signed a Project Partnership Agreement for the Deepening Project.[8] The Philadelphia Port Authority became a non-federal sponsor of the Deepening Project under this Agreement by agreeing to pay a percentage of the costs of construction and maintenance including the construction of new dredged material disposal facilities.[9]

The ports saw an increased need for deeper channels after the Panamanian government completed the Panama Lock Expansion Project in 2017.[10] After 2017, "New Panamax ships, or ships that were too large to traverse the Panama Canal prior to expansion, are [now] able to more efficiently reach East and Gulf Coast Ports."[11] Diamond State purchased property in Edgemoor, Delaware in 2016 "[t]o capitalize on the economic benefits of the" Delaware River Deepening Project, "with the intent of re-developing the property into a multi-user containerized cargo port capable of accepting New Panamax cargo ships."[12] The State of Delaware signed a 50-year

concession agreement in 2018 committing "to invest approximately $400 million to construct the Edgemoor facility."[13]

***Diamond State seeks a permit under section 10 of the Rivers and Harbors Act and section 404 of the Clean Water Act from the Corps to dredge and construct a new port at Edgemoor.***

Diamond State applied to the Corps for a permit under section 10 of the Rivers and Harbors Act of 1899 and section 404 of the Clean Water Act on March 10, 2020.[14] The Corps, after receiving an application, evaluates the application and then either recommends or does not recommend the local Corps District Commander grant the permit or permission sought. Diamond State sought to develop the "new containerized cargo port" at its purchased Edgemoor site.[15] Diamond State wanted to create a new, forty-five-foot deep access channel between the existing federal Delaware River Navigation Channel and the Edgemoor port.[16] The proposed access channel would terminate in a new ship berthing area. Diamond State would also construct a 2,600-foot, pile-supported wharf and retaining wall.[17] Diamond State intended to store dredged material in the Corps' Wilmington Harbor South confined dredge facility.[18] Diamond State predicted it would need to dredge a total of 3,325,000 cubic yards of material.[19] Access to this new harbor required "the construction of a 1,700-foot diameter turning basin on the downstream portion" of the Edgemoor Project.[20] Diamond State swore its turning basin would be "inclusive of the Delaware River main shipping channel" because there is not enough space between the proposed port and the main shipping channel for the needed turning basin to be situated anywhere else as shown:





Diamond State supported its application with an Environmental Assessment Technical Document,[22] a Dredged Material Disposal Plan,[23] a Port of Wilmington Economic Impact Study,[24] and a Maritime Institute of Technology and Graduate Studies Full Mission Ship Simulation for Edgemoor Navigation Feasibility Study.[25]

The Maritime Institute of Technology and Graduate Studies released a Report on the Study on September 18, 2019.[26] The Institute sought to demonstrate the existence of the constructed terminal on the Edgemoor site would minimally impact vessels transiting on the Delaware River, validate the terminal turning basin designs for handling containerships up to 9,300 TEUs on a routine basis, provide suggestions on how to facilitate vessel movement in and out of the terminal, and provide "preliminary validation on the feasibility of a 12,000 TEU vessel to call on the terminal."[27] The Institute did not look at the impact of vessels using the turning basin on traffic in the main channel. The Institute did not look at the impact of Diamond State's dredging on traffic in the main channel. The Institute pilots rated the safety of a single vessel turning in the basin with no traffic in the main channel a 5.4/10, with 10 being the safest.[28] The Institute's Feasibility Study

constituted a "preliminary" evaluation and the Institute clarified "[b]erthing procedures, tug power required, and emergency procedures will be developed in future simulation studies."[29]

Diamond State projected the Edgemoor Port would increase traffic to Wilmington area ports by 55% and net $383 million a year to Delaware's economy.[30] "The benefits of the increased jobs, wages, and taxes [we]re expected to directly improve unemployment and reduce poverty in the City of Wilmington" and add approximately 2,260 new jobs.[31]

Diamond State included limited information on maintenance dredging in its application and supporting materials for the Corps.[32] But "[i]n order to reduce the volume of maintenance dredging associated with th[e] project and to maintain the functionality of the berths," Diamond State proposed "to install a sedimentation reduction device along the face of the wharf consisting of a series of sediment fans[.]"[33] Diamond State swore "[t]he disposal of the dredged materials from the construction represent[ed] a volume that is larger than typoial [sic] maintenance dredging volumes in the region."[34] Diamond State acknowledged "[t]here may be temporary impacts to commercial shipping during dredging, mobilization and project construction."[35]

### Diamond State seeks authorization under section 408 of the Rivers and Harbors Act from the Corps for the Edgemoor Project.

Diamond State wrote to the Corps on April 3, 2020 referring the Corps to the materials submitted in support of its section 404/10 permit application and stated "[f]ollowing an initial discussion with the regulatoary [sic] program, we undersand [sic] that the construction of the project subject to a Sectoin [sic] 408 review due to its proximity to a federal navigation project (the Delaware River Main Channel Philadelphia to Sea Project ) and its anticpated [sic] use of a Federal Dredged Material Dispoal [sic] Area (Wilmingon [sic] Harbor South Disposal Area)."[36] The Corps began a section 408 review in response to Diamond State's section 408 application.

***The Corps issues a public notice seeking comment on Diamond State's***
***section 404/10 and section 408 applications.***

The Corps issued a public notice on July 24, 2020 and then revised and reissued the notice on July 30, 2020 seeking public comment on the proposed Edgemoor Project under section 404/10 and section 408.[37] The Corps in its notice described Diamond State as seeking "authorization from the U.S. Army Corps of Engineers under the authorities of Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act to discharge fill material and to conduct dredging and disposal activities within, and adjacent to, navigable waters of the United States at the proposed Port of Wilmington Edgemoor Expansion project site."[38] The Corps included Diamond State's estimate the Edgemoor Project required 3,325,000 cubic yards of material in initial dredging and 500,000 cubic yards of material in annual dredging.[39] The Corps included Diamond State's plans to use sedimentation fans along the new port face to reduce the amount of required maintenance dredging.[40]

The Corps explained Diamond State also sought, under section 408, "permission to have a section of their proposed ship turning basin to fall within the boundaries of the Main Navigation Channel of the Delaware River, Philadelphia to Sea Federal Navigation Project."[41] The Corps stated it would review Diamond State's proposed use of the Corps' dredge disposal facilities under "Section 217(b) of the Water Resources Development Act of 1986" and added, "[t]he anticipated 217(b) request is not a subject of this public notice."[42] The Corps issued a September 1, 2020 Notice to extend the comment period an additional thirty days and to clarify the turning basin required using the Main Navigation Channel of the Delaware River.[43] The turning basin clarification included the diagram shown above for the public's consideration.[44]

*Submitted concerns about navigation, maintenance dredging plans, and safety.*

The Philadelphia Port Authority submitted comments on September 17, 2020.[45] It requested public hearings be held in New Jersey, Pennsylvania, and Delaware.[46] It wanted to publicly address (1) Diamond State's application hinged on Corps' approvals for dredged material disposal and maintenance but Diamond State had not yet applied for these approvals and the notice did not contain enough information for the public to understand the plan[47]; (2) the Edgemoor Project should not be approved until the impacts on the Delaware River Main Navigation Channel maintenance had been adequately assessed, including the impacts of the proposed sedimentation fans[48]; (3) the public notice and Diamond State's application did not address the public interest factors and this information should be made available for public comment[49]; (4) the discharge of fill material to build a wharf required compensatory mitigation, and the notice's suggestion it did not fulfill compensatory mitigation requirements contravened Corps policy[50]; (5) the Corps should require Diamond State to identify disposal sites for initial dredging and at least twenty years of maintenance dredging[51]; and (6) the Corps' notice did not contain information allowing meaningful public input on the proposed turning basin.[52] The Philadelphia Port Authority also highlighted its status as a non-Federal sponsor of the Delaware River Deepening Project entitling it "to a detailed delineation of how [Diamond State] intends to conduct its dredging in a manner that is completely protective of the maintenance of the Main Navigation Channel, contributes no dredge material to the annual burden associated with that Project, and protects the benefits off [sic] its contract with the federal government" and explained "[u]nder the Project Partnership Agreement, [the Philadelphia Port Authority] has agreed to contribute 35 percent of the costs of construction (among other costs)[.]"[53]

South Jersey Port Corporation submitted comments twelve days later addressing impacts to navigation on the Delaware River, "especially the request to use the main navigation channel as

a cargo ship turning basin."[54] South Jersey Port Corporation pointed out the navigation feasibility study "did not assess whether there would be delays or impacts to ships in the main navigation channel as a result of the turning basin. A large cargo ship turning in the main channel creates an obvious risk of a collision and will inevitably cause delays as ships slow down or stop altogether to accommodate the turning ship, thereby negatively harming port operators up and down the River."[55] South Jersey Port Corporation emphasized the Corps' failure to consult with the Coast Guard to assess the impact the proposed sedimentation fans and turning basin would have on ship traffic and safety on the Delaware River.[56]

The Pennsylvania Attorney General submitted comments a couple days later explaining the application did not contain information about all activities Diamond State Port Corporation planned to undertake; did not contain adequate information about the dredged material disposal plan; did not meet the requirements applied to the Delaware River Deepening Project required under 33 C.F.R. section 322.5; and did not explain where the dredged materials will go if the federal dredging facilities have no capacity.[57]

The Greenwich and Gloucester Ports submitted comments the same day as the Attorney General addressing Diamond State's plan for the proposed turning basin occupying the entire Delaware River Main Channel during use[58]; the failure of the Institute's Feasibility Study to simulate ships using the turning basin and the effect on navigation in the Main Channel[59]; whether Diamond State intended to implement the Institute's suggestion in its Feasibility Study that navigation into and out of Edgemoor only be attempted in certain tide and wind conditions[60]; and noted the application did not contain information about emergency situations.[61]

Greenwich and Gloucester included a memorandum authored by Craig Jones, Ph.D, addressing how sedimentation fans could impact navigation.[62] They also provided a report by

11

Captain Jerzy J. Kichner, a retired United States Coast Guard Captain, detailing specific concerns with the Institute's Feasibility Study and the uncertain impacts of using the Delaware River Main Channel as a turning basin.[63] Captain Kichner highlighted the coordination and machinery needed to turn a ship with tugboats and the care captains must take to ensure the ship does not run aground.[64] He highlighted international authorities on navigation including the Permanent International Association of Navigation Congresses, the International Association of Ports and Harbors, the International Maritime Pilots Association, and the International Association of Lighthouse Authorities, issued 2014 public harbor approach guidelines recommending no turning basin intrude on a deep draft channel.[65] Captain Kichner expressed concern the Institute's Feasibility Study did not account for the size of various vessels using the Delaware River Main Channel as they pass Edgemoor and did not conduct a simulation assessing the impact of a turning basin across the entirety of the Main Channel.[66] Captain Kichner explained some large vessels, such as car carriers and large container ships, are impacted by winds and must maintain sufficient speed to maintain vessel maneuverability. He stated "large vessels constrained to the confines of the channel . . . cannot slow down without potentially impacting their own navigational safety under certain weather conditions."[67] He further highlighted the study only focused on days of clear visibility and average tide.[68]

### The Corps issues a supplemental public notice.

The Corps issued a supplemental public notice over thirteen months later detailing changes to the Edgemoor Project proposal and seeking input on the newly-added compensatory mitigation plan.[69] The Corps informed the public "[t]he sedimentation fans have been removed from the proposed project to minimize the impacts to aquatic resources and plans for an on-site confined disposal facility . . . in uplands have been added to the project."[70] The Corps again highlighted

Diamond State "requested Corps of Engineers [sic] permission under Section 14 of the Rivers and Harbors Act of 1899 (33 U.S.C. 408; hereinafter Section 408) to utilize a portion of the Main Navigation Channel of the Delaware River, Philadelphia to Sea Federal Navigation Project as their ship turning basin."[71]

The Corps did not include information in the notice regarding the impact of removing the sedimentation fans on the volume of required annual maintenance dredging and commenters noted the removal of these fans would increase the required yearly maintenance dredging volume in the supplemental comment period.[72] Commenters also noted the Corps should apply scrutiny to the lack of details provided regarding Diamond State's proposed maintenance dredging activities because Diamond State expressed an intent to seek federal funding for the maintenance dredging under section 204(f).[73] Commenters further addressed the scale of the annual maintenance dredging project would require exclusive use of the areas being dredged plus a safety radius but the Institute's Feasibility Study failed to look at the impact of maintenance dredging operations on traffic in the Delaware River Main Channel.[74]

### The Corps' Philadelphia District recommends approval of the section 408 request.

The Corps reviewed Diamond State's section 408 request under its published Policy and Procedural Guidance.[75] The Corps explained (1) the Edgemoor Project's close proximity to the Main Channel warranted the Corps' review to assess "possible increased [operation and maintenance] costs due to the increased sedimentation rates caused by construction and subsequent operation of the [Edgemoor] Project;" and "(2) possible impacts to navigation caused by use of a portion of the [Delaware River] Federal Navigation Channel as a ship turning basin."[76]

The Corps recommended the District Commander approve Diamond State's section 408 request on June 23, 2022.[77] The Corps explained it was "required" to determine whether a Safety Assurance Review was warranted "by EC 1165-2-220." The Corps "determined that a Safety

Assurance Review was not required because the Proposed Project, as presented in this Section 408 Request, does not physically alter the Philadelphia to the Sea Project."[78]

The Corps further explained, based on the Agency Technical Review, it deemed impacts to future operations and maintenance of the Delaware River Main Channel Deepening Project negligible because Diamond State "provided a thorough Hydrodynamic Model that was reviewed by [Corps] Subject Matter Experts, who determined that the conclusions presented in the model were scientifically sound and that increased sedimentation within the boundaries of the Philadelphia to the Sea Project would not occur . . . [and] increased [operation and maintenance] costs are not a concern,;]" therefore, "the Proposed Project is not injurious to the public interest and does not impair the usefulness of the Philadelphia to the Sea Project."[79] The Corps "determined, in coordination with the Marine Advisory Committee/Delaware River Pilot's Association, that the construction of the Proposed Project will not negatively impact navigation along the [Delaware River] Federal Navigation Channel."[80] The Corps found "considering potential impacts of the Turning Basin on navigation is outside the scope of the Section 408 review" because other ports "have turning basins within Federally authorized navigation channels" and the "USACE-Philadelphia District is not responsible for operating/coordinating marine traffic within the Federal Navigation Channel on the Delaware River."[81]

The Corps concluded, under the heading "Non-Federal Sponsor," "[t]he Delaware River, Philadelphia to the Sea River Federal Navigation Project is maintained at 100% Federal expense."[82] The Corps did not mention a Statement of No Objection from the Philadelphia Port Authority or an attempt to secure one.

### *The Corps answers public comments*
### *and recommends issuance of the section 404/10 permit.*

The Corps waited approximately seven weeks after issuing its section 408 recommendation before recommending the District Commander approve the section 404/10 permit on August 4, 2022 in its section 404/10 Decision Document.[83] The Corps anticipated 3,325,000 cubic yards of initial dredging consistent with Diamond State's first application.[84] The Corps departed from the originally envisioned 500,000 cubic yards in annual maintenance dredging with sedimentation fans. The Corps predicted "the access channel and berth site would require annual maintenance dredging to remove approximately 275,000 cubic yards of accumulated sediment. Annual maintenance dredging totals include 155,000 cubic yards for dredging of the access channel and 120,000 cubic yards for dredging the berthing area."[85] The Corps did not explain how the removal of the sedimentation fans from the project plan did not *increase* the anticipated maintenance dredging, and instead *decreased* the proposed figure. The Corps detailed plans to store dredged material in Corps-owned disposal facilities, Wilmington Harbor North and Wilmington Harbor South. The Corps noted a hydraulic pipeline would transport dredged material to the disposal area.[86]

The Corps stated "a public meeting/hearing was requested but was not held. The public hearing was not held because the Corps determined issues raised in the request for a public hearing were insubstantial and could be addressed without a public hearing."[87] The Corps did not explain what those issues were, why they were insubstantial, or how the Corps addressed them. The Corps advised Diamond State identified "Wilmington Harbor South and Wilmington Harbor North[,] to use for placement of dredged material from initial construction."[88] Diamond State's representative completed a study to determine if Wilmington Harbor South would have sufficient capacity for dredging material because Wilmington Harbor North had limited capacity.[89] The Corps then

explained "[t]here is sufficient capacity in the Wilmington Harbor North CDF to accommodate the material from yearly maintenance dredging of the private berth area[,]" but did not specify for how many years the harbor could accommodate this material.[90] The Corps noted Diamond State intended "to request Federal assumption of maintenance of the access channel under Section 204(f) of the Water Resources Development Act" and if the Corps granted Diamond State's request, "the [Confined Disposal Facilities] utilized for the maintenance dredging of the access channel would likely be at the Pedricktown Complex of [Confined Disposal Facilities], but w[ould] be the responsibility of the Corps and may be modified."[91]

The Corps included information pertinent to some public interest factors defined by the Code of Federal Regulations.[92] The Corps through these public interest factors assesses the impacts of the proposed activity and its intended use on the public interest.[93] The Corps marked the economics of the Project as "beneficial," navigation as "neutral (mitigated)," and safety as "not applicable."[94] The Corps did not assess safety in its Decision Document beyond marking it not applicable.

In its economic consideration, the Corps stated "[e]conomic development opportunities are enhanced through the construction of a -45-ft. berth and access channel as a result of the ability to attract larger container vessels" and container ports with berths less than forty-five feet will not be competitive in the mid-Atlantic region in the future.[95]

As to navigational impacts, the Corps remarked "[a]lthough the tuning [sic] basin for the proposed port is located in the federal navigation channel, navigation in the Delaware River will not be impacted by the proposed project. Please refer to section 9.8 Effects on Corps Civil Works Projects[.]"[96] The Corps explained in section 9.8 "[o]n 22 June 2022, the Corps granted Section 408 Permission" because the Corps concluded the Edgemoor Project "will not adversely affect the

Philadelphia to the Sea Project because it will not limit the ability of the Philadelphia to the Sea Project to function as authorized, does not impair the Corps' ability to operate and maintain the Philadelphia to the Sea Project to its authorized dimensions, . . . will not increase the Corps' future [operation and maintenance] costs[, . . .] is not injurious to the public interest and will not impair the usefulness of the Philadelphia to the Sea Project."[97]

The Corps attached its response to public comments to its Decision Document recommending approval of the 404/10 permit.[98] The Corps provided the following responses to comments concerning navigation, economics, and safety pertinent to our review[99]:

| Comment | Diamond State's Response | Corps' Response |
|---------|--------------------------|-----------------|
| The U.S. Army Corps of Engineers (USACE) should not issue Section 404 and Section 10 permits to Diamond State Port Corporation (DSPC) for the Edgemoor Expansion project until the potential negative impacts of the Edgemoor Expansion project on the completion of the Delaware River Deepening Project, the ongoing maintenance of the Delaware River Main Navigation Channel, and the New Jersey sites in this area have been adequately assessed, including the impacts of the proposed Sedimentation Fans. | It is the Applicants understanding that the new dredging associated with the main channel "deepening' [sic] was completed in 2020. Thus the Edgemoor project will not impact the project completion. The information provided in the Applicant's hydrodynamic analysis (EATD Appendix 10) and Preliminary Modeling report provided to address Section 408 comments both demonstrate that the construction of this project will not have an adverse impact (increase the sedimentation rate) on the ongoing maintenance of the Delaware River Main Channel. | The Section 408 review analysis [sic] impacts to the navigation channel on [sic] the proposed activity and determined that the proposed activity would not impacts [sic] the federal navigation channel. The Corps agrees with the response regarding the completion of the Delaware deepening project being completed in 2020. |
| In performing the public interest analysis under 33 C.F.R. § 320.4, USACE should conduct an independent review of the economic need for the project and should consider the economic impacts to the national and regional economy, not just local benefits to Delaware. | The Applicant has provided economic justifications consistent with the justifications provided for similar construction permits on the Delaware River and will support appropriate analysis required by USACE. | The Corps reviews the economic need for the project based on the Applicant's purpose and need statement. The purpose and need for the proposed activity is local to the Delaware River. Reviewing economic need on a national scale would be |

| Comment | Diamond State's Response | Corps' Response |
|---|---|---|
| | | outside of the NEPA scope of analysis for this project. |
| The Public Notice and DSPC's application documentation do not contain the requisite information about DSPC's dredged material disposal plan | The Application provides the requisite information about the management of maintenance material in the portion of the project which is to be the responsibility of the applicant during the 10 year period of the permit action | The Corps agrees with DSPC's response. |
| USACE should not approve DSPC's Section 408 request to allow a section of its proposed ship turning basin to fall within the boundaries of the Main Navigation Channel of the Delaware River without additional information and assurances on the impact to ship traffic. | Information related to the turning basin was provided in the navigation simulation provided in Appendix 23 of the applicant's EATD. The navigation simulation program was developed by the applicant and was approved by the USACE Deep Draft Navigation Center, which provided in person review of the simulation. The simulation was performed by Delaware River Pilots, who are responsible for the navigation on the river, and the layout of the basin was adjusted based on the comments received in the simulation by the pilots, tug boat captains and the USACE Representatives. The current design reflects this input. A letter from the Delaware River Pilots Association confirming their involvement and recommendation has been provided. | The Corps agrees with DSPC's response. |
| The Public Notice has insufficient information to allow meaningful input on the request for a turning basin, and such information should be provided in another public notice. | The notice for extension to the pubic [sic] comment period issued on September 1, 2020 included detailed information on the turning basin. | The Corps agrees with DSPC's response. |
| The USACE must analyze and give great weight to the | C.F.R. §§ 320 and 325 include language that requires a public | The Corps agrees with DSPC's response. |

| Comment | Diamond State's Response | Corps' Response |
|---|---|---|
| reasonably foreseeable detrimental impacts on the economic vitality of other entities in the area, including other regional maritime ports. See 33 C.F.R. §§ 320 and 325. To fulfill this obligation, the USACE has specific guidance on what must be included in an appropriate accounting analysis. As applied to the instant application, the guidance requires that the accounting include an analysis of whether the proposed additional port on the Delaware River is needed or whether this proposed port will pull customers away from other ports on the river and thus undermine the economic viability of the existing ports. | interst [sic] but does not imply that USACE should pick favorites between State run Public Ports. However, the independent economic analyis [sic] being performed by the USACE Deep Draft Navigation Center does allocate future growth proportional between regional public ports, and does not reallocate shiping [sic] from ports beyond the existing Port of Wilmington container operations | |
| This application proposes to conduct dredging and disposal activities. Despite this central focus of the application, the application does not provide information about the site and plans for disposal of the dredged material from maintenance dredging – an activity that the applicant plans to undertake. | The application identifies four constructed dredged disposal areas along the Delaware River that are requested for regulatory approval in support of a Section 217 application. Each of the disposal areas is identifed [sic] in the EATD and are operated by USACE Philadelpha [sic] and are well documented. | Since the removal of the sedimentation fans, dredging activities and disposal of dredged material have been evaluated appropriately |
| DSPC's application hinges on USACE approvals for dredged material disposal and maintenance that have not yet been applied for and which are not included as part of the Public Notice. DSPC has segmented its Section 404 approvals to exclude problematic dredge disposal and aquatic life issues that it cannot currently address. USACE must require that the Section 404 | The application documents include the portions of the project which are subject to regulatory approvals and is complete. There is not a separation of 404 approvals, which are requested for the impacted CDFs. The subsequent application noted in the public notice (Section 217b and 204f applications) are not regulatory permits and have each been indicated at this time. Both applications require regulatory | Dredging activities and disposal of dredged material have been evaluated appropriately. |

| Comment | Diamond State's Response | Corps' Response |
|---|---|---|
| Application address all foreseeable aspects of the Edgemoor Development Project | approval as a prerequiste [sic] to be considered. | |
| DSPC's application fails to provide any meaningful detail with respect to dredge disposal, the most critical aspect of its dredging proposal. The Public Notice fails to include any substantive information to justify the summary identification of CDFs | The applicant has provided estimates of the initial dredge volume, anticipated maintenance dredge volumes for the 10 -year life of the dredging permit, several viable alternatives for upland storage of dredged material and has assessed the potential for sediment and water quality impacts associated with dredging activities. This information is found in the applicant's EATD. | Dredging activities and disposal of dredged material have been evaluated appropriately. |
| As the non-Federal sponsors of the dredging of the Main Navigation Channel, PhilaPort and the Commonwealth of Pennsylvania are entitled to a detailed delineation of how DSPC intends to conduct its dredging in a manner that is completely protective of the maintenance of the Main Navigation Channel, contributes no dredge material to the annual burden associated with that Project, and protects the benefits of its contract with the federal government. | It is understood that Philaport was the non-federal sponsor of the construction main channel deepening project that was completed in 2020, and the USACE is 100% responsible for the O&M of the main channel. The hydraulic modeling demonstrates that the Edgemoor project does not increase the sedimentation in the main channel. Further, the requirements of the section 204(f) guidance require that the maintenance dredging disposal capacity be provided separate from the existing capacity of the federal navigation project. | Dredging activities and disposal of dredged material have been evaluated appropriately. |
| The expanded dredging volume and footprint for the Edgemoor Development Project must be considered in assessing all of the impacts the Edgemoor Development Project may have on the Main Navigation Channel | The hydraulic modeling demonstrates that the Edgemoor project does not increase the sedimentation in the main channel, and further demonstrates de minimus impacts to salinity, tidal flow and other aspects of the main navigation channel. Chapter 5 of the EATD discusses | Dredging activities and disposal of dredged material have been evaluated appropriately. |

| Comment | Diamond State's Response | Corps' Response |
|---|---|---|
| | addtional [sic] cumulative impact of the project. | |
| The Public Notice and available application materials provide virtually no information on the public interest factors specified in 33 C.F.R. § 320.4. | Relevant public interest factors are identified and discussed in the Environmental Assessment Technical Document as part of the applicant's permit application. These include economics, aesthetics, general environmental concerns, wetlands, fish and wildlife values, flood hazards, navigation, recreation, water supply and water quality. | The Corps agrees with DSPC's response. |
| The Public Notice Extension provided for the first time a plan showing the location of the proposed turning basin. As shown on the plan, the proposed turning basin occupies the entire main navigation channel. Placing a turning basin so that it occupies the entire main navigation channel is contrary to recognized industry and government best practices and standards, including recommendations by the World Association for Waterborne Transport Infrastructure (PIANC) Maritime Navigation Commission. The proposed Edgemoor project and turning basin is also located at a critical turn in the main channel, and so is likely to affect visual navigational aids and vessel maneuverability. Efforts should be made to relocate the proposed turning basin. | The turning basin indicated which represendes [sic] a potential 1,700 foot diamter [sic] turning basin only shows the maximum potential area which may be available under some conditions. The majority of the ships which are anticated [sic] to operate in harbor are less than 1,200 feet in lenght [sic] and would only utilzied [sic] a portion of the channel. The 2018 Delaware River PAWSA does not indicate stakeholder concerns beyound [sic] seasonal maintentance [sic] dredging in this vicinity of the river and notes the heavy taffic [sic] is primiarly [sic] in Delaware City and Marcus Hook. | The Section 408 review analysis [sic] impacts to the navigation channel on [sic] the proposed activity and determined that the proposed activity would not impacts [sic] the federal navigation channel. |
| The Navigation Study does not include any simulations involving a turning ship or use of the turning basin. In | The navigation study demonstrates that typical activity in the turning basin would occur over a 10 to 15 minute period | The Section 408 review analysis [sic] impacts to the navigation channel on [sic] the proposed activity and |

| Comment | Diamond State's Response | Corps' Response |
|---------|------------------------|-----------------|
| connection with safety in the main channel, MITAGS only conducted simulations of two ships passing in the main channel under favorable conditions. A ship that is turning in the main channel would prevent use of this section of the main channel for a significant period of time resulting in potential delays to upbound and downbound traffic, and could force other ships to slow down or have to stop, thereby affecting these other ships' maneuverability and safety. | before berthing occurs in the harbor. The typical shipping traffic in the Delaware River consist of an average of 151 ships (>1600GRT) per month (DEPAWSA, 2018), or 5 per day, or 1 per 5 hours along the entire shipping channel. The risk of turning basins activity (0.2 hours) coinciding with the one vessel every 5 hours is not significant. | determined that the proposed activity would not impacts [sic] the federal navigation channel. |
| Neither the Navigation Study nor any of the application materials address the potential emergency situations that ships could encounter in connection with the Edgemoor project and turning basin. DSPC's studies fail to demonstrate that use of the proposed turning basin will not have significant adverse impacts on the ports and ship-dependent businesses north of the Edgemoor project. | The navigation study, the scope of which was developed with input the project and river stakeholders and approved by the appropriate center of expertise at USACE demonstrates that the turning basins is appropriately configured and that there is not an adverse impact to shipping in the navigation channel. | The Section 408 review analysis [sic] impacts to the navigation channel on [sic] the proposed activity and determined that the proposed activity would not impacts [sic] the federal navigation channel. |

**The District Commander formally approves the 404/10 permit and 408 authorization.**

The Corps' District Commander formally approved the Edgemoor Project in its 404/10 Permit and 408 Approval Package on August 4, 2022 in response to the Corps' recommendations (the same day as the Corps' 404/10 recommendation).[100] The District Commander explained "[u]pon recommendation of the Chief of Engineers and under the provisions of Section 10 of the Rivers and Harbors Act . . . and Section 404 of the Clean Water Act" Diamond State was authorized to undertake the work described in the attached permit.[101] The District Commander

further explained "[t]he North Atlantic Division of the [Corps] has completed its review of your request pursuant to . . . 33 U.S.C. 408 (Section 408). This evaluation was performed in accordance with Engineer Circular (EC) 1165-2-220."[102] The District Commander granted Diamond State "permission to construct a wharf and bulkhead; and create a new berthing area and access channel adjacent to the Delaware River Philadelphia to the Sea Federal Navigation Project; subject to compliance with the enclosed Section 408 Permission Decision Letter[.]"[103]

### *The Ports sue challenging the permits and authorizations.*

Greenwich and Gloucester timely sued last November under the Administrative Procedure Act challenging the Corps' issuance of the section 404/10 permit and section 408 authorization.[104] They claim the "Corps failed to adequately evaluate, study, consider, and mitigate the [Edgemoor] Project's negative impacts on navigation, safety, economics, and the Delaware Deepening Project."[105] The Philadelphia Port Authority sued under the Administrative Procedure Act approximately four months later joining Greenwich and Gloucester's challenges to the Corps' issuance of the section 404/10 permit and section 408 authorization.[106] The Philadelphia Port Authority sought to challenge the section 408 authorization on the additional ground the Corps did not seek or obtain a Statement of No Objection from the Philadelphia Port Authority.[107] We consolidated these cases for summary judgment briefing on the section 404/10 permit and section 408 approval.[108] The parties timely cross moved for summary judgment on the section 404/10 permit and section 408 authorization followed by extensive oral argument.[109]

## II.     We apply a modified summary judgment standard of review under the Administrative Procedure Act.

The Ports seek judicial review of the District Commander's approvals under the Administrative Procedure Act. We begin with an overview of the unique standard of review.[110]

Congress through section 702 of the Administrative Procedure Act provides a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."[111] Summary judgment is the proper mechanism for deciding whether an agency's action is supported by the administrative record.[112] But the usual summary judgment standard does not apply in such cases because we sit as an appellate tribunal.[113]

Congress, under section 706 the Administrative Procedure Act, allows us to set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[114] Our scope of review is narrow to avoid substituting our judgment for the agency's.[115] An agency's decision is lawful when it "articulate[s] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made."[116]

But we find agency decision making arbitrary and capricious where "the agency relied on factors outside those Congress intended for consideration, completely failed to consider an important aspect of the problem, or provided an explanation that is contrary to, or implausible in light of, the evidence."[117] We must look at the reasons articulated by the agency itself at the time of the decision rather than post-hoc rationalizations.[118]

As a general rule we only reverse agency decisions where "the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."[119] But "[a] party need not rehearse the identical argument made before the agency; it need only confirm that the government had notice of the challenge during the public comment period and a chance to consider in substance, if not in form, the same objection now raised in court."[120] And our Court of Appeals finds petitioners have not waived an objection where an issue is "obvious" or "otherwise brought to the agency's attention."[121] The Corps' determinations of its statutory

authority and the Corps' interpretation of the applicable statutes are not waivable issues.[122] We decide all questions of law.[123]

## III.    Analysis

The Ports' claims require we decide whether the Corps' decision making leading to the District Commander's August 4, 2022 issuance of the 404/10 permit and 408 approval was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the Administrative Procedure Act.[124] Our review is deferential as the Corps has expertise and experience in administering Congress' mandates and its internal policies. But we must ensure agencies engaged in "reasoned decisionmaking."[125]

The Corps did not engage in reasoned decision making on material concerns raised by commenters. We find the Ports enjoy standing to challenge the Corps' decision making. We find Congress required the Corps assess the impact of the turning basin under both its section 404/10 review and its section 408 review.

We further find the Corps arbitrarily and capriciously recommended the District Commander issue the section 404/10 permit because the Corps "failed to consider an important aspect of a problem" in: (1) dismissing navigation concerns raised by commenters and relying on traffic data submitted by Diamond State and conclusions drawn from the data without any attempt at independent verification; and, (2) finding safety concerns "not applicable" to the Edgemoor Project despite safety concerns raised by commenters.[126] But we also find the Corps engaged in reasoned consideration of economic impact and the Corps did not need to assess impacts on regional competition. We today vacate the 404/10 permit and expect the Corps will reevaluate the Project consistent with this opinion.

We find the Corps arbitrarily and capriciously issued the section 408 decision because the Corps departed from its standard procedure of obtaining a Statement of No Objection from non-federal sponsors of the federal project the applicant seeks to modify before beginning its review. The Corps did not justify the troubling departure in the record and we are not satisfied it departed with good reason. We do not reach whether the District Engineer appropriately exercised discretion by not conducting a formal Safety Assurance Review under Corps' guidance because we find the omitted Statement of No Objection dispositive. We vacate the section 408 authorization as the Corps could not begin its review without first ensuring Diamond State had sought a Statement of No Objection from the Philadelphia Port Authority.

### A.  The Clean Water Act and Rivers and Harbors Act define the parties' obligations.

We analyze the Corps' actions taken under a congressional grant of authority to it in the Clean Water Act and the Rivers and Harbors Act.

### 1.  We consider the preservation of the nation's navigable waterways and the public interest in reviewing the section 404/10 permit.

The Corps considers both the statute under which the permit is requested and the public interest. The statutes under which the permit at issue here is sought are section 404 of the Clean Water Act and section 10 of the Rivers and Harbors Act.

Congress prohibits the discharge of dredged material into the waters of the United States through the Clean Water Act.[127] Congress authorized the Corps in section 404 of the Clean Water Act to issue permits for the discharge of dredged or fill material when certain conditions are met.[128] The Corps promulgated regulations for issuing permits under section 404.[129]

Congress re-enacted a series of laws in 1973 designed to preserve and protect the nation's waterways in a package now known as the Rivers and Harbors Act.[130] Congress in section 10 of

the Act bars obstructions to the navigable capacity of the nation's waterways.[131] The Corps promulgated regulations for issuing permits under section 10.[132]

The Corps acts under an established procedure: after receiving a complete section 404/10 permit application, it issues a public notice providing "sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment," including "information which may assist interested parties in evaluating the likely impact of the proposed activity . . . on factors affecting the public interest."[133]

The Corps requires this "public interest review" with public comment for all permit applications under its regulations.[134] Under this review, "the decision whether to issue a permit will be based on an **evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest**" and the Corps makes its decision as a result of this balancing process.[135] All relevant factors must be considered. "[A]mong those are conservation, **economics**, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, **navigation**, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, **safety**, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people."[136] The specific weight of each factor is determined by its importance and relevance to the proposed project, "[h]owever **full consideration and appropriate weight will be given to all comments**[.]"[137]

> **2. We are guided by the Corps' published guidelines in reviewing its section 408 authorization.**

The section 408 authorization review process mirrors the section 404/10 permitting process with a few exceptions.

Congress in section 14 of the Rivers and Harbors Act—more commonly known as "Section 408"—prohibits "any person or persons to take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any . . . work built by the United States."[138] Congress authorizes the Corps to "grant permission for the alteration or permanent occupation or use of any of the aforementioned public works when in the judgment of the Secretary [of the Army] such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work."[139]

The Corps has not promulgated regulations under its section 408 authority. As such, an internal guidance document titled POLICY AND PROCEDURAL GUIDANCE FOR PROCESSING REQUESTS TO ALTER US ARMY CORPS OF ENGINEERS CIVIL WORKS PROJECTS PURSUANT TO 33 USC 408 guides the Corps' review of a section 408 approval request.[140] The Corps set the version of the POLICY AND PROCEDURAL GUIDANCE cited to by the parties to expire in 2020, but the Corps recently reaffirmed the guidance.[141]

The Corps instructs in its POLICY AND PROCEDURAL GUIDANCE it should conduct a review of the proposed modification of a federal work in a manner mirroring the process for section 404/10 permit applications, including the same consideration of the impact of a proposed project on the public interest.[142]

The Corps further instructs project applicants like Diamond State must seek a Statement of No Objection from a non-federal sponsor of the project the applicant seeks to modify (like Philadelphia Port Authority):

> a. Statement of No Objection. **For USACE projects with a non-federal sponsor, a written "Statement of No Objection" from the non-federal sponsor is required** if the requester is not the non-federal sponsor. Non-federal sponsors typically have operation and maintenance responsibilities; have a cost-share

investment in the USACE project; and/or hold the real property for the USACE project. The purpose of the Statement of No Objection is to document that the non-federal sponsor is aware of the scope of the Section 408 request and does not object to the request being submitted to USACE to initiate the evaluation of the request. **Districts must coordinate with non-federal sponsors throughout the review process and ensure feedback from non-federal sponsors is considered prior to USACE rendering a final decision on the Section 408 request**. Requesters can ask the USACE district office to facilitate coordination with, and seek to obtain the Statement of No Objection from, the non-federal sponsor. . . .[143]

The Corps' bright line mandate—"[i]f a Statement of No Objection cannot be obtained, the district will not proceed with the Section 408 review"—has a few limited exceptions. One such exception occurs where a Statement of No Objection cannot be obtained and the Corps "has all operation and maintenance responsibilities for the portion of the [the Corps] project proposed to be altered."[144]

### B.  The Ports enjoy Article III standing.

The Corps argued in its briefing the Ports' injuries (1) did not meet Article III's requirements, and (2) did not fall within the "zone of interests" of the Clean Water Act and the Rivers and Harbors Act.[145] But the Corps conceded at oral argument if we were to find the Ports had Article III standing the Ports would also meet the zone of interests test, so we focus only on Article III standing here.

We must first determine if the Ports have standing to challenge the Corps' decision making process leading to the District Commander's approvals. The "irreducible constitutional minimum" of Article III standing consists of three elements.[146] The Ports must establish: (1) they "suffered a concrete and particularized injury that is either actual or imminent," (2) their "injury is fairly traceable to the defendant," and (3) "it is likely that a favorable decision will redress th[eir] injury."[147]

The Corps argues the Ports have not established injury in fact sufficient to meet Article III's requirements because the Ports' harms from potential navigation and safety issues are speculative.[148] The Corps further argues the Ports assume pilots and the United States Coast Guard will not act to eliminate navigational risks arising from the Edgemoor Project.[149] The Ports counter they will be injured in their business by impacts to navigation in the Delaware River Main Channel resulting from the Corps' issuance of the permit and approval, which the Ports argue is sufficient injury.[150] We may consider extra-record evidence in our review of standing.[151] We find the Ports establish standing.

### 1.  The Ports demonstrated Article III injury.

An injury is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."[152] A real risk of future harm can qualify as an injury and the future harm need not be "literally certain"; the Ports may suffer "injury where the [Corps'] conduct 'substantially increased the risk of harm'" to the Ports.[153]

The Ports established by way of signed declarations significant traffic passes through the Edgemoor site in the Delaware River Main Channel: up to fifty-four ships pass by per day with a per day average of thirty-six ships.[154] The Ports also established by signed declarations the proposed turning basin at Edgemoor would slow or halt this traffic in the Delaware River Main Channel.[155]

The Ports attach the President of Gloucester Port Mr. Inskeep's declaration arguing delays in shipping can increase costs because "[t]he scheduling of when ships can call on the . . . Terminals is done ahead of time with specific ships being assigned specified windows of time when they can dock at the terminal."[156] Where a ship misses its allotted window of time to dock, or misses "the high tide window to which certain vessels are limited to for transiting to our

facilities," issues can result, including: (1) ships having to anchor in the Delaware Bay until another window of time is available, (2) impacts to scheduling for later ships, and (3) Ports not having labor available to unload or load ships.[157] Mr. Inskeep explained "[r]equests to our labor unions for specified numbers of workers are done ahead of time in conjunction with the expected times that the ships will be calling[,]" and "[b]ased on our contracts with unions, if ships miss their allotted times, we are still required to pay the workers who were scheduled for that time for a minimum number of hours."[158] The Ports claim "delays of even a couple hours will affect operations," and "[i]f this type of problem is experienced more regularly due to the Edgemoor Terminal, this may cause our customers to seek other ports of call due to the delays experienced by their vessels."[159] Mr. Inskeep further highlighted customers select terminals based in part on reliability and the traffic and delays from the turning basin would affect the terminals' reputations and ability to attract customers because many customers calling on these terminals deal in perishable goods.[160] The President of Greenwich Port Mr. Whene represents timeliness is an element of some contracts between the Ports and shipping customers.[161] We find the risks of financial harm from delays constitute an injury in fact.

The Ports also argue there is a safety risk associated with placing the turning basin across the full width of the Delaware River Main Channel passing Edgemoor because an accident could occur, which could halt shipping in the Delaware River.[162] Our colleagues recognize "[t]he more drastic the injury that government action makes more likely, the lesser the increment in probability necessary to establish standing."[163] We also find the risk of serious financial harm from a catastrophic accident in the turning basin drastic enough to constitute an additional injury.

We are also mindful the Philadelphia Port Authority is the sole non-federal sponsor of the Delaware Main Channel Deepening Project under its Project Partnership Agreement with the

Corps.[164] The Philadelphia Port Authority argues it has an ongoing interest in and financial responsibility for the operation and maintenance of the Delaware River Main Channel. Diamond State therefore needed to obtain a Statement of No Objection before the Corps considered Diamond State's section 408 request.[165] The Corps argues Diamond State's failure to obtain a Statement of No Objection and the Corps' failure to require one only deprived the Philadelphia Port Authority of a procedural right devoid of any "actual injury traceable to the alleged violation of the procedural right."[166] But our Supreme Court instructs we use a relaxed standard for procedural injuries: "a person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."[167] We conclude the Philadelphia Port Authority has additionally established harm sufficient to challenge the Corps' failure to obtain a Statement of No Objection because the Corps' failure to require Diamond State to follow the Corps' required procedures (or meet an exception) deprived the Philadelphia Port Authority of the ability to protect its significant investment in the navigability of the Delaware River Main Channel.

### 2.   The Ports demonstrated the Corps' errors caused or will cause harm.

The Ports must next establish the Ports' injury "likely was caused or likely will be caused by" the Corps' conduct.[168] Because the Ports challenge the Corps' "unlawful regulation (or lack of regulation) of someone else, standing is not precluded," but it is more difficult to establish causation.[169] Where the plaintiffs are the unregulated parties, causation "ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well."[170] To prove causation in these circumstances, the Ports "must show that the 'third parties will likely react in predictable ways' that in turn will likely injure" the Ports.[171] This is a "fact-dependent" inquiry.[172] Our Supreme Court instructs our analysis

be informed by comparing the allegations of harm in this case "to those made in prior standing cases[,]" and it is well established "when the government regulates (or under-regulates) a business, the regulation (or lack thereof) may cause . . . economic injuries to others" including "competitors."[173]

The Corps argues the Ports assume pilots and the United States Coast Guard will not act to eliminate whatever risk of delays might be present and the Ports "cannot rely on speculation about the unfettered choices made by independent actors not before the courts."[174] The Ports counter Diamond State cannot operate Edgemoor without using the turning basin and its use will inevitably impact traffic and safety in the Delaware River Main Channel with or without careful piloting, so the presence of third parties in the chain of causation does not defeat standing.[175]

We disagree with the Corps. We find the Ports established risk of economic injury from activities expressly allowed by government permitting. Diamond State submitted the turning basin as an element of its Edgemoor Project design. The Corps issued a permit and approval for the Edgemoor Project, and thus Diamond State will construct a port at Edgemoor with a turning basin obstructing the entirety of the Delaware River Main Channel.[176] The Ports established by public comments and signed declarations the turning basin will impede traffic in the Delaware River Main Channel. Whether the Corps will ultimately decide other benefits outweigh this impact on traffic is not our inquiry and certainly not when determining whether the Ports enjoy standing. The Corps decision impacts the Ports' interests; this is enough.[177]

The Philadelphia Port Authority also established causation as to its procedural harm. It argues: (1) it is a non-federal sponsor of the Delaware River Main Channel Deepening Project; (2) the Corps did not consult the Philadelphia Port Authority about the Edgemoor Project's impact on the Delaware River Main Channel as required by the Corps' own guidance; (3) the Philadelphia

Port Authority had concerns about the impact of the Edgemoor Project turning basin on navigability in the Delaware River Main Channel and would have brought those concerns to bear on the permitting process; (4) the Corps deprived the Philadelphia Port Authority of its right to be consulted it was forced to raise these concerns in the public comment process; (5) the Corps still declined to address those concerns; and (6) Diamond State will construct a port at Edgemoor with a turning basin obstructing the entirety of the Delaware River Main Channel. We agree the Philadelphia Port Authority "connect[ed] th[eir] procedural harm with their concrete injury."[178]

### 3.   The Ports' requested remedy will redress their caused harm for now.

The Ports also established injury and causation. Our Supreme Court instructs "[i]f a defendant's action causes an injury, enjoining the action . . . will typically redress that injury."[179] Here, "[p]etitioners need not prove . . . granting the requested relief is certain to redress their injury, especially where some uncertainty is inevitable."[180] "A remand that would leave the agency free to exercise its discretion in a proper manner, then, could lead to agency action that would redress petitioners' injury, even if it were to require initiation of a new . . . proceeding."[181] The Ports ask us to "[v]acate the Army Corps' Section 10/404 Permit and Section 408 Permission for Edgemoor" and "[e]njoin any activities in furtherance of Edgemoor if and until new and lawful approvals for Edgemoor are issued by the Army Corps[.]"[182]

The Ports seek relief capable of redressing their harms sufficient to meet Article III's case or controversy requirement.[183]

### C.   Our statutory and substantive review of the Corps' challenged decision making compels we vacate the permit and authorization.

We must now analyze the Corps' decision making under the Administrative Procedure Act after determining the Ports have standing to pursue their challenges. Under the Administrative Procedure Act, and as instructed by our Supreme Court, we "decide all relevant questions of law,"

and "interpret . . . statutory provisions."[184] We must analyze the relevant provisions of the Rivers and Harbors Act to determine whether the Corps acted within its statutory authority in declining to review the turning basin. After our determination of scope, we then turn to the merits of the Corps' decision making.[185]

### 1. The Corps' review must consider the turning basin as an element of project design.

The parties disagree as to whether the Corps needed to include the turning basin proposed by Diamond State in its Edgemoor Project application in the Corps' review of the project. We conclude the Corps had an obligation to review the turning basin as an element of the project design under both Rivers and Harbors Act section 10 for the permit and Rivers and Harbors Act section 408 for the authorization. We reach no conclusion as to whether the Corps had an obligation to review the turning basin under the Clean Water Act because the Corps issued the section 404/10 permit under Clean Water Act section 404 and Rivers and Harbors Act section 10 and our conclusion an obligation under the Rivers and Harbors Act section 10 is sufficient.

### a. The Corps must review the turning basin under section 10.

Congress in section 10 of the Rivers and Harbors Act bars obstructions to the navigable capacity of the nation's waterways.[186] The Court of Appeals for the Ninth Circuit explained the structure of Rivers and Harbors Act section 10 includes "contains three distinct proscriptive clauses."[187] "The first clause[,]" which is not at issue here but illuminates the section's purpose, "flatly prohibits the creation of any obstruction to 'the navigable capacity of any of the waters of the United States' unless affirmatively authorized by Congress."[188] The second and third clauses conversely "permit certain activities in navigable waters provided that they proceed on plans 'recommended by the Chief of Engineers and authorized by the Secretary of the Army.'"[189] Congress in the third clause at issue today specifically makes it unlawful "in any manner to alter

or modify the course, location, condition, or capacity of . . . the channel of any navigable water of the United States[.]"[190]

The Corps argues its permitting scope decision is entitled to deference because it relies on the Corps' technical determination within its area of expertise.[191] This pronouncement is belied by our established obligations.[192] We decide questions of law.[193]

The Corps further argues Congress through section 10 of the Rivers and Harbors Act authorizes the Corps to permit or approve the creation of "structures" in navigable waters— otherwise known as physical obstructions to navigation—but the turning basin is not a "structure."[194] The Corps also urges us to consider our colleagues find vessels are only subject to section 10 if they are permanently moored or unable to move.[195] We decline to follow the Corps' logic on this point. We agree with the circuit court's conclusion in *Sierra Club v. Andrus*: there are three independent subdivisions of section 10. The third subdivision of section 10 instructs it is unlawful "in any manner to alter or modify the course, location, condition, or capacity of . . . the channel of any navigable water of the United States" without Corps approval.[196] The proposed turning basin would require exclusive use of the Delaware River Main Channel, which is a federal waterway and a public work. This exclusive use would not be temporary, as the operation of the Port at Edgemoor would require use of the turning basin multiple times a day indefinitely and the turning vessels would obstruct all traffic attempting to pass up and downstream. This is a "modification" to the "capacity of" the channel of "a navigable water of the United States." In line with our reading, the Supreme Court has "consistently found [section 10's] coverage to be broad."[197]

We are further mindful the Corps assesses a project's intended use as part of its public interest review of a permit application under section 10.[198] And the Administrative Record shows

the Corps believed consideration of the turning basin to be within the scope of its review for the 404/10 Permit. For example, the Corps' conclusion on the navigation issue in its Decision Document refers to the turning basin: "Although the tuning [sic] basin for the proposed port is located in the federal navigation channel, navigation in the Delaware River will not be impacted by the proposed project."[199] We "may not accept appellate counsel's post hoc rationalizations for agency action."[200]

We conclude the Corps should have assessed the turning basin as an Edgemoor Project design element under Rivers and Harbors Act section 10.[201]

### b.  The Corps must review the turning basin under section 408.

We also find the Corps had an obligation to review the turning basin as an element of the Edgemoor Project design under Rivers and Harbors Act. Congress in section 408 of the Rivers and Harbors Act prohibits "any person or persons to take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any . . . work built by the United States" except "the Secretary may, on the recommendation of the Chief of Engineers, grant permission for the alteration or permanent occupation or use of any of the aforementioned public works when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work."[202]

The Corps argues it lacked authority to regulate or approve the turning basin under section 408 because the turning basin does not physically alter the congressionally-authorized dimensions of the Delaware River Main Channel, does not impair the Channel's usefulness, and does not impair the Corps' ability to maintain the Channel at its congressionally-authorized dimensions.[203]

The Corps lastly argues the United States Coast Guard is the only agency with authority to regulate transient vessels and vessel traffic in the Channel.[204]

We disagree with the Corps. Congress's plain language prohibits "tak[ing] possession of or mak[ing] use of for any purpose . . . or in any manner whatever impair the usefulness of any . . . work built by the United States" unless allowed by the Corps where it has determined "such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work."[205] Federal courts construe section 408 "broadly to effectuate its goals" and reject attempts to construe the statute narrowly to cover only physical or structural impairments of public works.[206]

There is no dispute the turning basin "make[s] use of" the Channel. As reflected in the Corps' public notice for the Project: Diamond State "requested Corps of Engineers permission under 33 U.S.C. 408 . . . to utilize a portion of the Main Navigation Channel of the Delaware River, Philadelphia to Sea Federal Navigation Project as their ship turning basin."[207] If the turning basin will delay or stop ships traveling along the Channel to the Philadelphia-area ports, then the Edgemoor Project "impairs the usefulness of" the federal project. The Corps needed to consider this potential impact but the Corps determined because the Edgemoor Project does not "physically alter" the Channel, "considering impacts to [the Channel] by vessels using a portion of the [C]hannel as a turning basin was outside the scope of the Section 408 review."[208] The Corps therefore dismissed concerns about the turning basin's impacts to navigation without meaningful inquiry and analysis.

The Corps argued before us it would be usurping the role of the Coast Guard if it reviewed the turning basin. We disagree. Both the plain language of the statutes at issue and the Corps' own regulations requiring the consideration of navigation as a public interest factor required the Corps

assess the use of the turning basin as a design element of the project plan. The Corps is not required to take on new or different roles in so doing, and we agree the Coast Guard would be the federal agency responsible for piloting and traffic management were the turning basin approved for use by the Corps.[209] But this does not relieve the Corps of its responsibility to consider the use of the turning basin as an element of the Edgemoor Project proposal, which could not in fact operate without the use of the main channel for a turning basin because of the proposed Edgemoor port's proximity to the Delaware River Main Channel. The Corps' construction of its authority under section 408 is inconsistent with the statute's language, the Corps' own regulations, and case law interpreting the statute. The Corps erred when it declined review of the turning basin.

### 2.  The Corps erred in its decision making process.

We determined the Ports have standing to challenge the Corps' decision making and the scope of the Corps' review under the applicable statutes included consideration of the turning basin. We now turn to the Ports' challenges to the Corps' adjudicative process.

### a.  The Corps did not reasonably consider the public interest in its Section 404/10 permit review.

The Corps' review of a permit contains two substantive components: (1) the statutory phase where an application is assessed under the regulations and guidance under the specific statute the permit is sought under; and (2) the public interest phase where the project's likely impacts on the public interest are weighed, which is standard for all applications. Here we consider challenges only to the Corps' public interest review.

The Corps' decision whether to recommend the District Commander issue a 404/10 Permit depends on whether the proposed project is "contrary to the public interest."[210] The Corps' decision is "based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest" and the Corps makes its decision as a result of

this balancing process.[211] All relevant factors must be considered, "among those are . . . economics, . . . navigation, . . . safety, . . . and, in general, the needs and welfare of the people."[212] If the foreseeable negative impacts on the public interest are found to outweigh the positive impacts, the project is contrary to the public interest and the permit must be denied.[213]

The Corps is not only required to consider the public interest but must also consider public comments. The Corps' permitting regulations require it must give "full consideration and appropriate weight" to "all comments," including those of "other experts on matters within their expertise."[214] Our colleagues find Corps' decision making arbitrary and capricious where the Corps fails to adequately respond to relevant and significant public comments.[215]

We look at the three public interest factors at the core of the Ports' challenges: navigation, safety, and economics. We review the cumulative impact of the proposed Edgemoor Project and its intended use on the public interest consistent with the Corps' regulations.[216] The parties disagree as to whether the Corps appropriately considered the public interest.

### i.    The Corps must fully evaluate the navigation public interest factor.

The parties disagree as to whether the Corps adequately considered the navigational impacts of the Edgemoor Project and appropriately responded to public comment raising concerns about them. The Corps' regulation on the navigation public interest factor provides: "[p]rotection of navigation in all navigable waters of the United States continues to be a primary concern of the federal government" and "[d]istrict engineers should protect navigational and anchorage interests . . . by recommending . . . a permit be denied unless appropriate conditions can be included to avoid any substantial impairment of navigation and anchorage."[217] The weight the Corps must afford each public interest factor depends on "its importance and relevance to the particular proposal."[218]

40

Diamond State's application relied on the Maritime Institute of Technology and Graduate Studies Full Mission Ship Simulation for Edgemoor Navigation Feasibility Study for navigation considerations.[219] The Feasibility Study looked at the impact of the Edgemoor Port's existence on ships traversing the main channel and the ability of a single ship to use the turning basin and dock at Edgemoor.[220] More specifically: (1) nineteen of the simulation runs involved a single inbound ship coming to Edgemoor, using the turning basin, and docking at Edgemoor; four of the simulation runs involved a single outbound ship leaving Edgemoor and traveling back down the river with no use of the turning basin; and six of the simulation runs involved two ships passing in the Delaware River Main Channel in the vicinity of Edgemoor with no use of the turning basin.[221] The Institute's Feasibility Study did not look at the impact a ship turning in the turning basin might have on traffic in the Delaware River Main Channel.

As the Corps acknowledged in its 404/10 Decision Document, Diamond State situated the Edgemoor Project along a section of the Delaware River "heavily traveled by large commercial vessels."[222] And as the Corps acknowledged in its public notices for the Edgemoor Project, Diamond State sought permission from the Corps under section 408 to use the entire width of the Delaware River Main Channel as a turning basin.[223]

The Corps provided very little information about the navigation factor in its Decision Document despite these public acknowledgements. The Corps' analysis of navigational impacts is a conclusion not an analysis, "[a]lthough the tuning [sic] basin for the proposed port is located in the federal navigation channel, navigation in the Delaware River will not be impacted by the proposed project. Please refer to section 9.8 Effects on Corps Civil Works Projects[.]"[224] The Corps explained in section 9.8 "[o]n 22 June 2022, the Corps granted Section 408 Permission" because the Corps concluded the Edgemoor Project "will not adversely affect the Philadelphia to

the Sea Project because it will not limit the ability of the Philadelphia to the Sea Project to function as authorized, does not impair the Corps' ability to operate and maintain the Philadelphia to the Sea Project to its authorized dimensions, . . . will not increase the Corps' future [operating and maintenance] costs[, . . .] is not injurious to the public interest and will not impair the usefulness of the Philadelphia to the Sea Project."[225] But the Corps in its 408 Decision Document does not provide an additional justification. The Corps instead found "considering potential impacts of the Turning Basin on navigation is outside the scope of the Section 408 review[.]"[226]

The Corps argues its decision is supported by evidence notwithstanding its superficial consideration of the overall navigation factor and its failure to consider the impact the planned turning basin would have on traffic in the Delaware River Main Channel. It argues the evidence shows it relied on the Institute's Feasibility Study, which considered impacts to navigation.[227] The Corps speaks at length about the qualifications of the individuals who ran the simulation and the various scenarios simulated, but the Corps does not and cannot argue the Feasibility Study simulated impacts to navigation in the main Channel resulting from use of the turning basin.[228]

And the Corps knew of these concerns. Commenters noted the failure of the Feasibility Study to simulate ships using the turning basin and the effect on navigation in the main Channel, making the Corps aware of this deficiency before it issued its decision.[229] The Ports' comments included an analysis by Captain Kichner detailing specific concerns with the Feasibility Study.[230] Captain Kichner highlighted international authorities on navigation recommend no turning basin intrude on a deep draft channel and expressed concern the Feasibility Study did not account for the size of various vessels using the main Channel as they pass Edgemoor and did not conduct a simulation assessing the impact of a turning basin across the entirety of the main Channel on traffic in the main Channel.[231]

The Corps argues it provided "robust responses to all substantive comments on navigation and safety" in the face of commenters' concerns.[232] The Corps specifically quotes the comment response below as evidence of its thoughtful consideration:[233]

| Comment | Diamond State's Response | Corps Response |
|---|---|---|
| The Navigation Study does not include any simulations involving a turning ship or use of the turning basin. In connection with safety in the main channel, MITAGS only conducted simulations of two ships passing in the main channel under favorable conditions. A ship that is turning in the main channel would prevent use of this section of the main channel for a significant period of time resulting in potential delays to upbound and downbound traffic, and could force other ships to slow down or have to stop, thereby affecting these other ships' maneuverability and safety. | The navigation study demonstrates that typical activity in the turning basin would occur over a 10 to 15 minute period before berthing occurs in the harbor. The typical shipping traffic in the Delaware River consist of an average of 151 ships (>1600GRT) per month (DEPAWSA, 2018), or 5 per day, or 1 per 5 hours along the entire shipping channel. The risk of turning basin activity (0.2 hours) coinciding with the one vessel every 5 hours is not significant. | The Section 408 review analysis [sic] impacts to the navigation channel on [sic] the proposed activity and determined that the proposed activity would not impacts [sic] the federal navigation channel. |

These comment responses are unreasoned. Diamond State cited outside traffic data which (1) limited its consideration of traffic to only very large vessels and (2) relied on four-year old navigational data, which is likely stale. Diamond State then drew a conclusion from the Feasibility Study the Institute itself did not draw: Diamond State claimed little traffic passed by Edgemoor, relying on stale navigation data and combined this data with its belief the Feasibility Study showed large vessels quickly and easily turned around in the turning basin and ultimately concluded the turning basin could not impact traffic in the main channel. The Corps then relied on and endorsed Diamond State's unfounded inference.

We deal with the Corps' two errors—in relying on unconfirmed data and in relying on a report in a challenged aspect—in turn.

The Corps argues nothing prohibits the Corps from relying on data provided by an applicant.[234] We agree with its argument as a basic premise but "the Corps must undertake some independent effort to verify or discredit . . . challenged material."[235] The Corps knew traffic in the Delaware River Main Channel had been increasing and projected to further grow because Diamond State included this information in its application materials.[236] Diamond State's application admitted "[c]urrent annual vessel traffic on the Delaware River is estimated to be 2,427 ships . . . [and] the new port at Edgemoor will promote vessel traffic increase of 55% over the current annual vessel traffic at the Port of Wilmington[.]"[237] Diamond State further noted "[c]ontainer ship traffic on the Delaware River is expected to increase to an estimated 648 vessels annually from 418 vessels currently; an increase of 230 additional vessels, in part attributable to the additional port capacity being developed in Philadelphia and New Jersey."[238] The Corps never considered (or at least did not publicly advise) whether Diamond State's figure of "one ship every five hours" is (1) accurate, (2) reliable, (3) properly restricted by vessel size, (4) stale due to recent increases in vessel traffic, or (5) inaccurate for reasons such as tidal patterns or seasonality of shipping. The lack of described analysis leads us to find unreasoned decision making.

We next turn to the improper conclusion the Corps drew from the Feasibility Study. The record is "teeming with specific factual challenges to [the Institute's Feasibility Study] tendered to the Corps[.]"[239] "Specific challenges to a report used by the Corps in its public interest review require specific responses or a determination that the report is not being relied upon in its challenged aspects."[240] The Corps, in endorsing Diamond State's unreasoned response to concerns

about the turning basin and navigation, relied on the Feasibility Study to justify its conclusion use of the turning basin would not impact traffic in the main channel.

The Corps argues, despite these infirmities, we must defer to an agency's resolution of a fact dispute in its area of expertise, citing *Friends of Capital Crescent Trail v. Federal Transit Administration*.[241] But the Court of Appeals for the District of Columbia Circuit in *Friends of Capital Crescent Trail* considered an agency's reliance on the findings of its **own experts**, holding "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts[.]"[242] And even where the agency relied on its own expert, the Court of Appeals for the District of Columbia Circuit cautioned we "should not automatically defer to [agency experts]. . . without carefully reviewing the record and satisfying [our]selves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information.'"[243]

Commenters raised concerns to the Corps about traffic resulting from use of the turning basin. The Corps had an independent obligation to ensure the soundness and reliability of studies and data it relied upon through Diamond State in concluding there would be no impacts to navigation.[244] The Corps did not carry out these duties when responding to comments about the deficiencies in the Feasibility Study and further studies which might be required. The Corps either adopted Diamond State's dismissals without explanation or provided a response which simply concluded there were no impacts.[245] We agree with reasoning from the United States Court of Appeals for the Second Circuit "a decision made in reliance on false information, developed without an effort in objective good faith to obtain accurate information, cannot be accepted as a 'reasoned' decision."[246]

The language used by the Corps in responding to public comments is "cryptic and perfunctory[,]" which our colleagues have found can render agency decision making arbitrary and capricious.[247] And our Court of Appeals directs "an agency's order must be upheld on the same basis articulated in the order by the agency itself" so the Corps cannot now remedy its lack of investigation or explanation.[248]

The Corps argues its consideration of the navigation public interest factor is still entitled to "substantial deference."[249] We agree with colleagues "[u]nder the 'public interest' review, the Corps conducts a general balancing of a number of economic and environmental factors and its **ultimate determinations** are entitled to substantial deference."[250] The Corps' overall and ultimate balancing of the public interest factors is entitled to "deference" but the Corps' failure to consider important aspects of the problem on the way to making a decision is not.

The Ports further argue the Corps "failed to consider the significant amount of initial and ongoing [operation and maintenance] dredging that will be required to maintain the Edgemoor Terminal and the impact it will cause considering its proximity to the Channel."[251] The Ports noted in public comments an ongoing dredging operation of the scale anticipated for Edgemoor will lead to congestion at Edgemoor for periods of time each year.[252] The Ports in their comment noted dredging equipment would "require exclusive use of the areas of the river they occupy" and "present an additional hazard to navigation" and the dredge pipes would "creat[e] additional traffic and safety concerns for all commercial vessels[.]"[253] Diamond State told the Corps there would be dredging activities in the main channel and the dredge pipeline might impact traffic in the main channel, but the Corps did not provide further comment on the issue and marked the matter "closed" without "further comment" in its Decision Document.[254] We agree the impact maintenance dredging will have on navigation could be significant, especially where the

46

maintenance dredging is anticipated to be significant and to involve dredging directly next to and with pipelines across the main channel. The Corps "completely failed to consider an important aspect of the problem, or provided an explanation that is contrary to, or implausible in light of, the evidence."[255] The Corps should consider whether these operations will impact navigation in the main channel.

We find the Corps' consideration of the navigation public interest factor arbitrary and capricious.

### ii.    The Corps must consider the safety factor.

The Ports argue the Corps needed to consider the safety impacts of the Edgemoor Project. The Corps disagrees. But its documents confirm the Corps' decision whether to issue a permit is "based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest" and the Corps enumerates "safety" as a factor to be considered.[256]

And the Corps knew of the safety concerns. Commenters raised safety concerns about the Edgemoor Project and its intended use. For example, one expert requested a "simulation to adequately assess the safety of [ship] maneuvers needs to be done under adverse conditions of night transits, sudden squalls, and restricted visibility so as to determine the safe limits of vessel navigation and maneuvering alongside the Terminal."[257] And the Institute pilots in the Feasibility Study relied on by Diamond State and the Corps rated the safety of a single vessel turning in the basin with no traffic in the main channel a 5.4/10, with 10 being the safest.[258] Some pilots even raised specific safety concerns about the single-ship turning maneuver in their Study comments.[259] For example, one pilot noted "I would not make this transit in this vessel in these conditions . . . . I used these tugs to maximize their efficiency and barely controlled the vessel."[260]

But the Corps concluded in its Decision Document the "safety" factor was "Not Applicable" to the Project.[261] The Corps therefore did not weigh or consider this factor in determining whether the Project ran contrary to the public interest. But "[n]onsignificant impact does not equal no impact."[262]

And the Corps never addressed the safety concerns raised by the Study Pilots despite the Corps' reliance on the Feasibility Study in other respects. When an agency "cites (allegedly) favorable evidence and disregards unfavorable evidence" from "the same discrete source," "[s]uch cherry-picking embodies arbitrary and capricious conduct."[263]

The Corps argues the Ports impermissibly conflate their navigation concerns with safety concerns and do not present safety concerns untied to navigation.[264] But it is Corps, not the Ports, who conflates safety with navigation. The Corps argues it considered safety because it considered navigation.[265] The Corps cannot now say it considered an issue it claimed to not consider in its Decision Document with no supporting record evidence.[266] But there is record evidence of commenters raising specific safety concerns. The Corps needed to at least respond to public comments and explain why safety concerns were unwarranted. An agency's decision is arbitrary and capricious when the agency "entirely fail[s] to consider an important aspect of the problem."[267]

We conclude the Corps' largely non-existent consideration of the safety public interest factor is arbitrary and capricious. The Corps must either consider and weigh the safety risks associated with the project or explain why there are none.

iii.   **The Corps properly considered the Project's economics.**

The parties disagree as to whether the Corps appropriately considered the economics of the Edgemoor Project. The Corps' regulations on the "economics" public interest factor provide: "[w]hen private enterprise makes application for a permit, it will generally be assumed that

appropriate economic evaluations have been completed, the proposal is economically viable, and is needed in the market place. However, the district engineer in appropriate cases, may make an independent review of the need for the project from the perspective of the overall public interest."[268]

The parties begin by disagreeing as to whether the Corps needed to find Diamond State is entitled to a presumption of economic viability. The Corps argues it must presume economic viability of the Edgemoor Project because a "private enterprise" submitted the proposal.[269] The Ports argue Diamond State is not a "private enterprise" and is in fact a public corporation, which receives public funds and is an arm of the State.[270] We remind the Corps we must decide all matters of law.[271] The Delaware General Assembly explained in the statute creating Diamond State "[t]here shall be established within the Department of State a body corporate and politic, with corporate succession, **constituting a public instrumentality of the State, and created for the purpose of exercising essential governmental functions which is to be known as the 'Diamond State Port Corporation**.'"[272] Diamond State is tax exempt and is funded by Delaware taxpayers as allocated by its General Assembly.[273] Diamond State is plainly not a private enterprise. The Corps' leap to a presumption based on this misimpression lacks merit.

The Corps argues, presumption or not, it reasonably found the Edgemoor Project would provide economic benefits to Wilmington.[274] The Ports argue the Corps needed to assess the economic impacts of the project on the broader Delaware River region.[275]

Diamond State supplied considerable information about the economic need for and projected impacts of the Edgemoor Project.[276] Many commenters supported the Project for economic reasons including job creation.[277] Others argued the Corps should conduct a full economic analysis demonstrating the Edgemoor Project's need and addressing the economic

impacts to the regional and national economies.[278] Diamond State and the Corps responded to these concerns during the comment period and made clear the Corps' Deep Draft Navigation Center considered regional impacts.[279]

The Corps found, in its Decision Documents, "[e]conomic development opportunities are enhanced through the construction of a 45-ft. berth and access channel as a result of the ability to attract larger container vessels and the associated reduced transportation costs per TEU."[280] The Corps also found "[t]he new port at Edgemoor is expected to increase jobs, wages, and tax revenue opportunities for the City of Wilmington, and the socioeconomic region" and "is expected to support the growth of over 4,000 jobs annually."[281] The Corps concluded "these changes are expected to benefit the quality of life for many residents in the area."[282] The Corps found these economic and general welfare benefits can be realized only by the Edgemoor Project. The Corps also found the Project addressed an "increase in trade shipping to the eastern seaboard is expected to come through the use of new ships that are larger than those currently in service" and, therefore, "[t]o accommodate these new ships entering east coast ports, the Applicant [Diamond State] anticipates that there will be a demand for expansion of east coast port operations."[283]

The Ports argue the Corps needed to consider the potential for Edgemoor to siphon business from other Ports on the Delaware River.[284] But the Ports do not cite authority supporting this competition-based argument. The Corps disagrees, relying on Judge Wolf's analysis thirty-seven years ago in *In Mall Properties, Inc. v. Marsh*.[285] There, Judge Wolf remanded the issues back to the Corps after it denied a Section 404/10 permit for a mall development because of the economic impact it might have on neighboring areas.[286] Judge Wolf explained he would "not attribute to Congress and the President the intention to delegate to the Corps the power to deny Mall Properties a permit because a mall anywhere in North Haven would, in its view, unduly injure the economy

of New Haven while benefitting North Haven."[287] The Philadelphia Port Authority might feel it is unfair to be subjected to competition from a neighboring port benefitting from the public work the Philadelphia Port Authority agreed to fund. But this is not an appropriate factor for our consideration and we decline to do so. The Corps appropriately considered the economic impacts of the project in its Decision Document.

On balance, we find the Corps' consideration of the navigation and safety public interest factors is arbitrary and capricious, but the Corps' consideration of the economic public interest is supported by the record.[288]

### b.  The Corps erred in granting section 408 authorization.

The parties also disagree as to whether the Corps' section 408 authorization is arbitrary and capricious. We concluded the Corps needed to review the turning basin in its section 408 review. And we earlier examined the navigation, safety, and economics determinations for the overall project in depth, so we now focus on those issues specific to the section 408 decision.

The Corps argues Diamond State did not need to obtain a Statement of No Objection from the Philadelphia Port Authority (and the omission was harmless error if the Corps had been obligated).[289] We conclude the Corps' own guidance binds it and the Corps should have required Diamond State to obtain a Statement of No Objection from the Philadelphia Port Authority.

### i.  The Project Partnership Agreement noticed the Corps and Diamond State of the Philadelphia Port Authority's's interest.

The Ports urge we start with their longstanding obligations under the Project Partnership Agreement. We must first decide whether we can consider the Project Partnership Agreement at all. The Corps argues the Philadelphia Port Authority's Statement of No Objection argument relies solely on the Philadelphia Port Authority's Project Partnership Agreement with the Corps for the

Delaware River Main Channel Deepening Project, which is extra record evidence, and therefore the Philadelphia Port Authority cannot support its argument.[290]

The Corps cannot claim it reasonably excluded the Project Partnership Agreement from the administrative record to begin with. The Corps knew about the contract because the Corps is a party to the contract. Even if the Corps somehow forgot about the Project Partnership Agreement for federal work on the Delaware River worth hundreds of millions of dollars, Diamond State reminded the Corps in its application "[t]he [Corps], in partnership with the Philadelphia Port Authority, currently is deepening the main channel from Philadelphia to the Atlantic Ocean from 40 to 45 feet."[291] And the Philadelphia Port Authority raised its status as the non-federal sponsor of the Delaware River Main Channel Deepening Project in its September 17, 2020 public comments.[292]

Our Court of Appeals instructs the administrative record can be supplemented "where the administrative record does not disclose the factors considered by an agency or the agency's construction of the evidence[.]"[293] The Corps had to consider the Project Partnership Agreement in its section 408 decision when it concluded, under the heading "Non-Federal Sponsor," "[t]he Delaware River, Philadelphia to the Sea River Federal Navigation Project is maintained at 100% Federal expense."[294] Because the Corps could not have reached its conclusion without considering the Project Partnership Agreement, we supplement the administrative record to include the Project Partnership Agreement.[295] To exclude it from the record where the Corps necessarily consulted it and drew a conclusion from it would defy logic.

And, if the Corps did fail to consider the Project Partnership Agreement with the sole non-federal sponsor of the Delaware Main Channel Deepening Project when a third party sought to alter the project and reached the above conclusion without referencing the contract, the Corps

"completely failed to consider an important aspect of the problem" and its section 408 decision is arbitrary and capricious on this ground alone.[296]

### ii.   The Corps did not ensure a Statement of No Objection.

The Philadelphia Port Authority is the sole non-federal sponsor of the Delaware Main Channel Deepening Project. The Corps requires applicants, as memorialized in the Corps' POLICY AND PROCEDURAL GUIDANCE FOR PROCESSING REQUESTS TO ALTER US ARMY CORPS OF ENGINEERS CIVIL WORKS PROJECTS PURSUANT TO 33 USC 408, to obtain and Statement of No Objection from the non-federal sponsor of a federal project before considering the section 408 application.[297] The Corps explains the purpose of the Statement of No Objection is to ensure the Non-Federal sponsor "is aware of the scope of the Section 408 request and does not object to the request" before the Corps "initiate[s] the evaluation of the request."[298] The parties disagree as to whether the Corps needed to require Diamond State to obtain a Statement of No Objection from the Philadelphia Port Authority before beginning its section 408 review.

The Corps first argues no commenters raised this issue during the comment period, so the Philadelphia Port Authority waived the argument and it cannot be a basis for overturning the Corps' decision.[299] But our Supreme Court recently rejected a similarly hyper-technical waiver argument.[300] And even if we applied waiver to the power of the Corps to approve a Section 408 request without first obtaining the Statement of No Objection, there are exceptions to the waiver rule. The Philadelphia Port Authority did not waive the issue because it is "obvious" and "otherwise brought to the agency's attention," which are two recognized exceptions to the waiver rule.[301] It is "obvious" to an agency it must follow its own rules and it is "obvious" to an agency a non-federal partner for a project exists where the agency entered into the very Project Partnership Agreement at issue.[302] The Corps signed the Project Partnership Agreement with the Philadelphia

Port Authority. Suggesting the Corps did not know about a contract to which it is a party defies logic. And, even if it weren't already obvious, the Philadelphia Port Authority raised its status as the non-federal sponsor of the Delaware River Main Channel Deepening Project and the impact of the Edgemoor Project to its ongoing responsibilities as a non-federal sponsor in its September 17, 2020 public comments, meaning its status as a non-federal sponsor was "otherwise brought to the agency's attention."[303] As our Court of Appeals explained, "[b]ecause the Corps 'had independent knowledge of the very issue that concerns [the Philadelphia Port Authority] in this case, . . . there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action.'"[304]

The Corps then argues because its obligation to require applicants to obtain a Statement of No Objection stems from guidance and not a statute or regulation, the Corps' noncompliance cannot be a basis for overturning the agency action.[305] We note the Corps represented in its Diamond State section 408 Decision Document it followed its POLICY AND PROCEDURAL GUIDANCE FOR PROCESSING REQUESTS TO ALTER US ARMY CORPS OF ENGINEERS CIVIL WORKS PROJECTS PURSUANT TO 33 USC 408.[306] We conclude agency action is arbitrary and capricious where an agency fails to adhere to its own procedures without explanation, as is the case here.[307] This rule is not conditioned on the source of the procedure in question. The Corps did not attempt to obtain a Statement of No Objection on Diamond State's behalf or require Diamond State to do so itself, nor did it offer an explanation for failing to follow its own procedures other than to say the federal government maintains the Delaware River Main Channel at 100% federal expense.[308]

The Corps further argues even if its compliance with its guidance could be the basis for overturning the 408 Approval, the Corps excepts the requirement "when [the Corps] has all operation and maintenance responsibilities for the portion of the [the Corps] project proposed to

be altered."[309] The Corps claims it would apply this exception in the present suit because only the Corps has operation and maintenance responsibilities for the portion of the Delaware River Main Channel being altered.[310] But the Corps only applies these exceptions where a Statement of No Objection cannot be obtained, and neither Diamond State nor the Corps ever asked the Philadelphia Port Authority in the first instance. We also cannot ignore the Philadelphia Port Authority has ongoing financial obligations under its Project Partnership Agreement with the Corps for construction and maintenance costs for dredge disposal facilities anywhere within the scope of the Delaware River Main Channel Deepening Project.[311] The Corps claims this exception is met because the Edgemoor Project will not increase the Delaware River Main Channel Deepening Project costs. But this theory is not the criteria for the exception. The Philadelphia Port Authority had a right to express concerns regarding Diamond State's Section 408 request and object to modifications because the Philadelphia Port Authority is a contributing non-federal sponsor of the Delaware River Main Channel Deepening Project, which Diamond State requests navigation-altering use of in perpetuity. And we otherwise do not entertain a post-hoc rationalization: "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action."[312]

The Corps lastly argues its failure to require a Statement of No Objection is harmless error.[313] But obtaining a Statement of No Objection from non-federal sponsors is a threshold requirement. The Corps cannot begin a section 408 review without it. We apply the rule of harmless error where the mistake has no bearing on the substantive decision; the Corps here could not make a decision, substantive or otherwise, without the Statement of No Objection. This mistake if fundamental to beginning the process. It is not harmless error. We do not need to rehash here

why the Philadelphia Port Authority had interests worth protecting had it been appropriately consulted.

The Corps' failure to require Diamond State to obtain a Statement of No Objection without explanation is an arbitrary and capricious departure from past practice. The Corps' section 408 decision is arbitrary and capricious.[314]

## IV.   Conclusion

We vacate the section 404/10 permit. We vacate the section 408 authorization. The Corps may now reevaluate Diamond State's applications and take action consistent with their obligations following our conclusions addressing: (1) the scope of the Corps' review under the Clean Water Act and the Rivers and Harbors Act; (2) the need for reconsideration of navigation and safety issues; and, (3) the Corps' obligation to ensure Diamond State obtains a Statement of No Objection from the Philadelphia Port Authority. We do not vacate the decisions to require a longer record. We are instead compelled by the extensive record to find the Corps' decision making arbitrary and capricious.

---

[1]  40410AR-__ is a citation to the administrative record for the 404/10 permit, 408AR-__ is a citation to the administrative record for the 408 approval, and PA__ is an extra-record citation to an exhibit to the Ports' Motion for summary judgment. All cited materials can be found at No. 23-4283, ECFs 28, 29, 35, and 38. Unless there is a specific citation to a different docket, all ECF citations are to the No. 23-4283 docket for ease of reference.

[2]  40410AR-000119 (editorialization in green).

[3]  40410AR-000047.

[4]  40410AR-004831.

[5]  *Id.*

[6]  Water Resources Development Act, Pub. L. No. 102-580, § 101 (6), 106 Stat. 4797 (1992).

[7]  40410AR-000047, -62.

[8] 40410AR-000148; PA0018.

[9] PA0018–61.

[10] 40410AR-000047.

[11] *Id.*

[12] 40410AR-000047–48.

[13] 40410AR-000048.

[14] 40410AR-000008–33; 33 U.S.C. § 403 (section 10); 33 U.S.C. § 1344 (section 404).

[15] 40410AR-000009.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] 40410AR-000074.

[21] 40410AR-004723; 40410AR-000010.

[22] 40410AR-000034–219.

[23] 40410AR-000558–70.

[24] 40410AR-002709–30.

[25] 40410AR-003415–83.

[26] *Id.*

[27] 40410AR-003420. TEU is twenty-foot equivalent units as measurement for cargo capacity.

[28] 40410AR-003440.

[29] 40410AR-003420, -42.

[30] 40410AR-000132–33.

[31] 40410AR-000133, -179.

[32] *See, e.g.*, 40410AR-000075.

[33]  40410AR-000076. Sediment fans use water propulsion to protect dredged areas from sedimentation.

[34] 40410AR-000078; 40410AR-000010.

[35] 40410AR-000181.

[36] 408AR-000001.

[37] 40410AR-004674–83.

[38] 40410AR-004674.

[39] 40410AR-004675.

[40] 40410AR-004676–77.

[41] 40410AR-004681.

[42] *Id.*

[43] 40410AR-004721. This first comment period closed on October 1, 2020. *Id.*

[44] 40410AR-004723.

[45] 40410AR-004724–41.

[46] 40410AR-004725.

[47] 40410AR-004726–30.

[48] 40410AR-004730–34.

[49] 40410AR-004735–37.

[50] 40410AR-004737–39.

[51] 40410AR-004739–40.

[52] 40410AR-004740–41.

[53] 40410AR-004730–31.

[54] 40410AR-004814.

[55] 40410AR-004814–15.

[56] 40410AR-004815.

[57] 40410AR-004723–28.

[58] 40410AR-004832. In their October 1, 2020 comments, Greenwich and Gloucester reference their earlier-submitted August 28, 2020 comments and attach a copy of the same. 40410AR-004837. Here we highlight comments raised in both submissions.

[59] 40410AR-004832.

[60] 40410AR-004832–33.

[61] 40410AR-004833.

[62] 40410AR-004846–50.

[63] 40410AR-004852–60.

[64] 40410AR-004856.

[65] *Id.*

[66] 40410AR-004857–58.

[67] 40410AR-004858.

[68] 40410AR-004858–59.

[69] 40410AR-008189–93.

[70] 40410AR-008190.

[71] *Id.*

[72] 40410AR-008315.

[73] 40410AR-008319–20.

[74] 40410AR-008329; 40410AR-008334.

---

[75]  408AR-007350 (citing CORPS, EC 1165-2-220 POLICY AND PROCEDURAL GUIDANCE FOR PROCESSING REQUESTS TO ALTER US ARMY CORPS OF ENGINEERS CIVIL WORKS PROJECTS PURSUANT TO 33 USC 408, https://www.mvs.usace.army.mil/Portals/54/EC_1165-2-220.pdf).

[76]  408AR-007351.

[77]  408AR-007351–88.

[78]  408AR-007352.

[79]  *Id.*; 408AR-007371–79. A "team from the Philadelphia District and The Coastal Processes Branch, Coastal and Hydraulics Laboratory, U.S. Army Engineer Research and Development Center (ERDC)" conducted an Agency Technical Review as a component of the section 408 review. 408AR-007371–73.

The Agency Technical Review panel flagged the impact to navigation which could accompany the maintenance dredging, but the Corps deemed it unworthy of a responsive comment. 408AR-007380. The ATR Panel was also informed by Diamond State Port Corporation the dredge pipeline for the maintenance dredging operation may be "required to cross the navigation channel," and therefore require the installation of "a submerged pipeline," but the Agency Technical Review Panel stated it had "no further comment" on this point. *Id.*

[80]  408AR-007352.

[81]  408AR-007352–53. USACE stands for the United States Army Corps of Engineers.

[82]  408AR-007355.

[83]  40410AR-010020–84.

[84]  40410AR-010021.

[85]  *Id.*

[86]  40410AR-010021–22.

[87]  40410AR-010029.

[88]  40410AR-010042.

[89]  *Id.*

[90]  40410AR-010042–43.

[91]  40410AR-010043. Confined disposal facilities hold materials dredged from bodies of water.

[92] 33 C.F.R. § 320.4(a).

[93] 40410AR-010054–55.

[94] 40410AR-010054–55.

[95] 40410AR-010055.

[96] 40410AR-010056.

[97] 40410AR-010075–76.

[98] 40410AR-010242–77.

[99] *Id.* Repeat comments have been listed only once for brevity.
[100] 40410AR-010331–48.

[101] 40410AR-010331.

[102] *Id.*

[103] 40410AR-010331.

[104] ECF 1.

[105] *Id.* ¶ 9.

[106] No. 24-1008, ECF 1 ¶ 81.

[107] *Id.* ¶¶ 81–101.

[108] ECF 24.

[109] ECFs 28, 29, 35, 38, 40. The Philadelphia Port Authority alone brings a separate challenge to the Corps' section 204(f) authorization, which will be the subject of a later round of briefing.

[110] Because the standard for summary judgment is different in Administrative Procedure Act appeals, factual determinations are made by the agency. *See, e.g.*, *NVE, Inc. v. Dep't of Health & Hum. Servs.*, 436 F.3d 182, 185 (3d Cir. 2006) (in an Administrative Procedure Act case "the District Court's review is limited to the administrative record"). "[O]ur focus is the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). But there are limited exceptions to this rule. We find one such exception applies in this case and we supplement the administrative record to include the Project Partnership Agreement between the Philadelphia Port Authority in the Corps, as we discuss at length below.

Other than this limited exception, our review of extra-record facts is limited to our standing inquiry. *See Trenton Threatened Skies, Inc v. FAA*, 90 F.4th 122, 130 (3d Cir. 2024) (quoting *Prometheus Radio Project v. Fed. Commc'ns Comm'n*, 939 F.3d 567, 578 (3d Cir. 2019), *rev'd on other grounds*, 592 U.S. 414 (2021)) ("It is well established that petitioners challenging agency action may supplement the administrative record for the purpose of establishing Article III standing, even though judicial review of agency action is usually limited to the administrative record.").

[111] 5 U.S.C. § 702.

[112] *See Uddin v. Mayorkas*, 862 F. Supp .2d 391, 399 (E.D. Pa. 2012) (citations omitted).

[113] *See id.*

[114] 5 U.S.C. § 706(2)(A); *Mirjan v. Attorney Gen. of U.S.*, 494 Fed. App'x 248, 250 (3d Cir. 2012) (citing *Donovan v. Adams Steel Erection, Inc.*, 766 F.2d 804, 807 (3d Cir. 1985)).

[115] *Judulang v. Holder*, 565 U.S. 42, 52–53 (2011).

[116] *CBS Corp. v. Fed. Commc'ns Comm'n*, 663 F.3d 122, 137 (3d Cir. 2011) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

[117] *NVE, Inc.*, 436 F.3d at 190; *see also Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (noting "the requirement that an agency provide reasoned explanation for its action").

[118] *Motor Vehicle Mfrs.*, 463 U.S. at 50.

[119] *Culclasure v. Comm'r of Soc. Sec. Admin.*, 375 F. Supp. 3d 559, 570 (E.D. Pa. 2019) (quoting *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)).

[120] *Ohio v. EPA*, 144 S. Ct. 2040, 2055 (2024) (cleaned up).

[121] *Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*, 869 F.3d 148, 155 (3d Cir. 2017) (citation omitted).

[122] 5 U.S.C. § 706 ("To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."); *see also Natural Res. Council v. EPA*, 755 F.3d 1010, 1022–23 (D.C. Cir. 2014) (no waiver where challenge was to EPA's "key assumption" it had statutory authority to exempt some hazardous-waste-derived fuels from regulation).

[123] *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).

[124] 5 U.S.C. § 706(2)(A).

[125] *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)).

[126] *NVE, Inc.*, 436 F.3d at 190.

[127] 33 U.S.C. § 1311(a).

[128] *Id.* § 1344.

[129] 40 C.F.R. § 230, *et seq.*

[130] *States v. Pa. Indus. Chem. Corp.*, 411 U.S. 655, 663 (1973).

[131] 33 U.S.C. § 403.

[132] 33 C.F.R. § 322, *et seq.*

[133] *Id.* §§ 325.3(a), (a)(13).

[134] *Id.* § 320.4(a); *see also Towns of Norfolk & Walpole v. U.S. Army Corps of Eng'rs*, 772 F. Supp. 680, 683 (D. Mass. 1991), *aff'd sub nom. Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438 (1st Cir. 1992).

[135] 33 C.F.R. § 320.4(a)(1) (emphasis added).

[136] *Id.*; *see also id.* § 320.4(a)(2) (general considerations for all permits).

[137] *Id.* § 320.4(a)(3) (emphasis added).

[138] 33 U.S.C. § 408.

[139] *Id.*

[140] CORPS, EC 1165-2-220 POLICY AND PROCEDURAL GUIDANCE FOR PROCESSING REQUESTS TO ALTER US ARMY CORPS OF ENGINEERS CIVIL WORKS PROJECTS PURSUANT TO 33 USC 408, 408AR-0078718–817, https://www.mvs.usace.army.mil/Portals/54/EC_1165-2-220.pdf.

[141] The Corps reaffirmed and extended the Section 408 Guidance in November 2023. *See* Corps, ACOE Memorandum for Commanders, Major Subordinate Command and Districts entitled Extension of EC 1165-2-220 dated 30 September 2018, Policy and Procedural Guidance for Processing Requests to Alter US Army Corps of Engineers Civil Works Projects Pursuant to 33 U.S.C. 408 (Nov. 14, 2023), https://www.nap.usace.army.mil/Portals/39/docs/regulatory/408/EC-1165-2-220-Extension-14-Nov-2023-Signed.pdf?ver=-9WO4vs44NbVRFweHZ2T0A%3D%3D. In the reaffirmation, the Corps explained it was in the process of promulgating regulations under section 408 and the POLICY AND PROCEDURAL GUIDANCE FOR PROCESSING REQUESTS TO ALTER

US ARMY CORPS OF ENGINEERS CIVIL WORKS PROJECTS PURSUANT TO 33 U.S.C. 408 would govern until such rules were finalized.

[142] CORPS, EC 1165-2-220 POLICY AND PROCEDURAL GUIDANCE FOR PROCESSING REQUESTS TO ALTER US ARMY CORPS OF ENGINEERS CIVIL WORKS PROJECTS PURSUANT TO 33 USC 408, 408AR-0078718–817, at 21, https://www.mvs.usace.army.mil/Portals/54/EC_1165-2-220.pdf.

[143] *Id.* at 16 (emphasis added).

[144] *Id.* at 17.

[145] We apply the zone of interests test to determine whether a "statute grants the plaintiff the cause of action that he asserts," presuming "a statute ordinarily provides a cause of action 'only to plaintiffs whose interests fall within the zone of interests protected by the law invoked.'" *Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189, 196–97 (2017) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 (2014)).

[146] *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 137 (3d Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

[147] *Am. Farm Bureau Fed'n v. EPA*, 792 F.3d 281, 293 (3d Cir. 2015) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007)) (emphases removed).

[148] ECF 35 at 8–16.

[149] *Id.*

[150] ECF 29-2 at 14–18.

[151] "It is well established that petitioners challenging agency action may supplement the administrative record for the purpose of establishing Article III standing, even though judicial review of agency action is usually limited to the administrative record." *Trenton Threatened Skies, Inc*, 90 F.4th at 130 (quoting *Prometheus Radio Project*, 939 F.3d at 578).

[152] *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 244 (3d Cir. 2012) (citation omitted).

[153] *Doe 1 v. Perkiomen Valley Sch. Dist.*, 585 F. Supp. 3d 668, 680 (E.D. Pa. 2022) (citation omitted).

[154] PA0322–23 (citing National Oceanic and Atmospheric Administration, the Bureau of Ocean Energy Management, and the United States Coast Guard Navigation Center).

[155] *See, e.g.*, PA0003; PA0006.

[156] PA0003; *see also* PA0008 ("The scheduling of the ships is done years, months and days ahead of time, being updated as necessary, and the schedule allots each ship a specified window of time to dock at our Terminal.").

[157] *Id.*

[158] PA0003. Counsel confirmed the Ports' pay obligations upon questioning during oral argument.

[159] *Id.*, PA0009.

[160] PA0002–05; *see also* PA0009.

[161] PA0007.

[162] ECF 29-2 at 52–55.

[163] *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996).

[164] ECF 29-2 at 18.

[165] *Id.*

[166] ECF 35 at 15.

[167] *Lujan*, 504 U.S. at 572 n.7. The Court stated more fully:

> There is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years. . . .

*Id.*

[168] *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024).

[169] *Id.* (quoting *Lujan*, 504 U.S. at 562).

[170] *Lujan*, 504 U.S. at 562.

[171] *Food & Drug Admin.*, 602 U.S. at 383 (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)).

[172] *Id.* at 384.

[173] *Id.* at 384–85 (collecting cases).

[174] ECF 35 at 14 (quoting *Food & Drug Admin.*, 602 U.S. at 383).

[175] ECF 38 at 8 n.3 (citing *Mountain States Legal Found.*, 92 F.3d at 1234–35 (finding standing when government error could lead to wildfire); *Sound Action v. U.S. Army Corps of Eng'rs*, No. 18-733, 2019 WL 446614, at *12 (W.D. Wash. Feb. 5, 2019) (plaintiffs claiming aesthetic injury from residents armoring shorelines without a permit had standing to challenge Corps decision leading to the armoring, even though Corps was not "sole source" of injury)).

[176] 40410AR-010035.

[177] *Clean Air Council v. United States*, 362 F. Supp. 3d 237, 246 (E.D. Pa. 2019).

[178] *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1356 (11th Cir. 2024).

[179] *Food & Drug Admin.*, 602 U.S. at 381.

[180] *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 117–18 (D.C. Cir. 1990).

[181] *Id.* at 118.

[182] No. 24-1008, ECF 1 at 45.

[183] *See also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2005) (plaintiffs challenged Corps' approval to extend a dock because it would increase tanker traffic and create a "greater potential for an oil spill" and sufficient for standing because evidence showed the dock "would contribute to the risk of an oil spill"); *Mountain States Legal Found.*, 92 F.3d at 1234–35 (plaintiffs had standing to challenge government plan to harvest timber based on risk error could lead to wildfire); *Kentuckians for Commonwealth v. U.S. Army Corps of Eng'rs*, 963 F. Supp. 2d 670, 672–81 (W.D. Ky. 2013) (plaintiffs had standing to challenge Corps' public interest review of mining permits based on risk of impacts to human health).

[184] 5 U.S.C. § 706; *Loper Bright*, 144 S. Ct. at 2273 ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires.").

[185] In its Notice of Specific Challenges, the Philadelphia Port Authority noticed an intent to challenge the Corps' decision to not hold public hearings, arguing "[t]he Army Corps' statement that 'the Corps determined that issues raised in the request for a public hearing were insubstantial and could be addressed without a public hearing' is not adequately supported." No. 24-1008, ECF 20 at 9. Although the Philadelphia Port Authority submitted comments asking for a public hearing, it did not allege the Section 404/10 Permit should be overturned because the Corps did not hold a

public hearing. The Ports also did not brief this argument in their motion for summary judgment. The argument has been waived.

[186] Congress mandates in full:

> The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

33 U.S.C. § 403.

[187] *Sierra Club v. Andrus*, 610 F.2d 581, 594 (9th Cir. 1979), *rev'd on other grounds sub nom. California v. Sierra Club*, 451 U.S. 287 (1981), *and vacated on other grounds sub nom. Sierra Club v. Watt*, 451 U.S. 965 (1981).

[188] *Id.*

[189] *Id.*

[190] 33 U.S.C. § 403.

[191] ECF 28 at 21 (*citing Town of Norfolk*, 968 F.2d at 1454–55; *Envtl. Coal. of Broward Cnty., Inc. v. Myers*, 831 F.2d 984, 986 (11th Cir. 1987)).

[192] *Loper Bright*, 144 S. Ct. at 2273.

[193] 5 U.S.C. § 706(2)(A).

[194] ECF 35 at 16–17.

[195] *Id.*

[196] 33 U.S.C. § 403.

[197] *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967); *see also United States v. Republic Steel Corp.*, 362 U.S. 482, 488 (1960) (The "broad construction given s 10 of the 1890 Act was carried over to s 10 of the 1899 Act[.]").

[198] 33 C.F.R. § 320.4(a)(1).

[199] 40410AR-010056.

[200] *W.R. Grace & Co. v. EPA*, 261 F.3d 330, 338 (3d Cir. 2001).

[201] Setting the use of the turning basin aside, construction of the turning basin as an element of the Edgemoor Project required dredging itself, which is undoubtably subject to a 404/10 permit and review. The Corps admitted "[t]he ship pilots in the Navigation and Safety Study recommended that the design plans consider deepening an additional area near the Wilmington Port Expansion 'to provide additional maneuvering space as inbound vessels turn in the turning basin.'" ECF 28 at 24 (citing 40410AR-003442). Per the Corps, "Diamond State Port Corporation adopted the ship pilots' design recommendation to deepen those additional areas in the final plans." *Id.* at 25 (citing 40410AR-010243) ("The simulation was performed by Delaware River Pilots, who are responsible for the navigation on the river, and the layout of the basin was adjusted based on the comments received in the simulation by the pilots, tug boat captains and the USACE Representatives."). The Corps has not and cannot argue dredging activities in the waters of the United States are not subject to its review.

[202] 33 U.S.C. § 408.

[203] ECF 35 at 18–19. The Corps further argues Congress prohibits impairing the usefulness of a public works project by "fastening vessels" to it, but because transient vessels in the Turning Basin are not "fastened" they are outside of section 408's scope. The Corps argues the construction rule the "specific governs the general" controls. *Ki Se Lee v. Ashcroft*, 368 F.3d 218, 223 (3d Cir. 2004) (specific governs the general in statutory construction). But "fastening vessels" is an enumerated example posed in the alternative to "take possession of," "or make use of for any purpose, "or in any manner whatever impair the usefulness of." The "or"s in the statute must be given their meaning, and the specific does not govern the general where the terms at issue are phrased in the alternative.

[204] ECF 35 at 19 (citing 46 U.S.C. § 70001(a)).

[205] 33 U.S.C. § 408.

[206] *See United States v. Fed. Barge Lines, Inc*., 573 F.2d 993, 997 (8th Cir. 1978). *Federal Barge Lines* concerned whether a sunken barge "impair[ed] the usefulness" under Section 408 of a nearby dam when the barge did not cause physical damage to the dam, but instead created turbulence below. The United States Court of Appeals for the Eighth Circuit was "convinced that section 408 should be interpreted broadly to cover [such an] impairment to the usefulness of the dam" because the plain language of the statute is not limited to structural impairment. *Id.* This "interpretation," the court explained, "accords with the purpose of the Rivers and Harbors Act," which is "to protect,

preserve, and make safe the Nation's navigable waterways." *Id.*; *see also Russelville Legends LLC v. U.S. Army Corps of Eng'rs*, 24 F. 4th 1192, 1195 (8th Cir. 2022) (stating the breadth of the language "impairing the usefulness" of a work in Section 408 "in any manner whatever" is "significant because someone could undoubtedly impair the usefulness of a Corps project from outside its boundaries.").

[207] 40410AR-004721–22.

[208] 408AR-007352–53.

[209] *See, e.g.*, 46 U.S.C. § 70001.

[210] 33 C.F.R. § 320.4(a)(1).

[211] *Id.*

[212] *Id.*

[213] *Id.*

[214] *Id.* § 320.4(a)(3).

[215] *Ohio Valley Envtl. Coalition v. U.S. Army Corps of Eng'rs*, No. 08-0979, 2013 WL 1305732, at *9 (S.D. W.Va. Mar. 28, 2013).

[216] The parties disagree as to whether the Corps needed to consider the cumulative impacts of the public interest factors. ECF 28 at 31–32; ECF 29-2 at 30–31. But the Corps makes clear in its regulations "[t]he decision whether to issue a permit will be based on an evaluation of the probable impacts, **including cumulative impacts**, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a)(1) (emphasis added).

[217] 33 C.F.R. § 320.4(o).

[218] *Id.* § 320.4(a)(3).

[219] 40410AR-003415–83.

[220] *Id.*

[221] 40410AR-003428–32, 37–39.

[222] 40410AR-010047.

[223] *See, e.g.*, 40410AR-004721–23.

[224] 40410AR-010056.

[225] 40410AR-010075–76.

[226] 408AR-007352–53.

[227] ECF 28 at 23–26; ECF 35 at 24 ("Although the Corps was not required to analyze the navigation and safety impacts of the Turning Basin, it reasonably relied upon the MITAGS Navigation and Safety Study to conclude that the Wilmington Port Expansion and Turning Basin would not impair navigability of the Delaware River Channel." (citing 40410AR-003441-42)).

[228] ECF 28 at 22–23; ECF 35 at 24.

[229] 40410AR-004832.

[230] 40410AR-004852–60.

[231] 40410AR-004856–58.

[232] ECF 28 at 28.

[233] *Id.* (citing 40410AR-010268).

[234] ECF 35 at 26 (citing *Friends of the Earth v. Hintz*, 800 F.2d 822, 834–35 (9th Cir.1986)).

[235] *Van Abbema v. Fornell*, 807 F.2d 633, 639 (7th Cir. 1986). "The Corps certainly may utilize reports and facts derived from outside reports and sources" but the Corps is "responsible for the independent verification of specifically challenged information obtained from applicants or outside consultants." *Id.*

[236] *See, e.g.*, 40410AR-000047 ("According to the DSPC Strategic Master Plan, conservative assumptions forecast that the share of the Asian trade arriving at East Coast ports will expand between 27 to 32 percent above the average volumes experienced over the past five years."); 40410AR-000132 ("[T]he expansion of the Port to Edgemoor will promote vessel traffic to increase 55% over current traffic[.]"; 40410AR-000181 ("Commercial shipping activity is expected to increase in the project area upon completion of the new container port facility."); 40410AR-000161 ("The increase in underwater noise generated from ship traffic will be an insignificant change, given that the Delaware River is frequently traversed by large commercial vessels.").

[237] 40410AR-000191.

[238] *Id.*

[239] *Van Abbema*, 807 F.2d at 643.

[240] *Id.*

[241] ECF 35 at 25 (citing 877 F.3d 1051, 1059 (D.C. Cir. 2017)).

[242] *Friends of Cap. Crescent Trail*, 877 F.3d at 1059 (quoting *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

[243] *Id.* (quoting *Marsh*, 490 U.S. at 378).

[244] *Van Abbema*, 807 F.2d at 643.

[245] *See, e.g.*, *Envtl. Health Trust v. Fed. Commc'ns Comm'n*, 9 F.4th 893, 904–06 (D.C. Cir. 2021) (an agency cannot justify decision making based upon the unreasoned analysis of a third party).

[246] *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1035 (2d Cir. 1983).

[247] *HLI Lordship Industries, Inc. v. Comm. for Purchase from the Blind and other Severely Handicapped*, 791 F.2d 1136, 1141 (4th Cir. 1986); *see also Pub. Emps. for Envtl. Resp. v. Nat'l Park Serv.*, 605 F. Supp. 3d 28, 41 (D.D.C. 2022) ("An agency must do more than merely nod to concerns raised by commenters only to dismiss them in a conclusory manner . . . ." (cleaned up)).

[248] *W.R. Grace & Co.*, 261 F.3d at 338.

[249] ECF 35 at 23 (citing *Town of Norfolk*, 968 F.2d at 1454–55; *Myers*, 831 F.2d at 986*; Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1041–42 (11th Cir. 2011)).

[250] *Town of Norfolk*, 968 F.2d at 1454–55 (emphasis added).

[251] ECF 29-2 at 57 (citing 408AR-007380).

[252] 40410AR-008329.

[253] *Id.*

[254] 408AR-007380.

[255] *NVE, Inc.*, 436 F.3d at 190.

[256] 33 C.F.R. § 320.4(a)(1).

[257] 40410AR-004858.

[258] 40410AR-003440.

[259] *See, e.g.*, 40410AR-003457 (did not complete berthing as "wind was too high directly on the beam").

[260] 40410AR-003462.

[261] 40410AR-010055.

[262] *State of N.C. v. Hudson*, 665 F.Supp. 428, 446 (E.D.N.C. July 7, 1987); *see also Sierra Club v. FERC*, 867 F.3d 1357, 1375 (D.C. Cir. 2017) ("[W]hen an agency thinks the good consequences of a project will outweigh the bad, the agency still needs to discuss both the good and the bad.").

[263] *Sierra Club*, 177 F. Supp. 3d at 540.

[264] ECF 35 at 27–28.

[265] ECF 28 at 22–27.

[266] *W.R. Grace & Co.*, 261 F.3d at 338.

[267] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

[268] 33 C.F.R. § 320.4(q).

[269] ECF 28 at 32–33 and n.17.

[270] ECF 29-2 at 46–47 n.24 (citing 29 Del. Code §§ 8781, 8788).

[271] 5 U.S.C. §706.

[272] 29 Del. Code § 8781 (emphasis added).

[273] *Id.* § 8787 ("[T]he Corporation will be exercising essential governmental functions. To this end, the Corporation shall not be required to pay any taxes or assessments or charges of any character[.]"); *id.* § 8788 ("If the Corporation's final budget for any fiscal year includes a proposal for an appropriation from the General Assembly for operating or capital funds, the budget shall be approved by the Chair of the Corporation before its submission to the General Assembly as part of the Governor's proposed capital or operating budget.").

[274] ECF 35 at 28–31.

[275] ECF 29-2 at 55–57.

[276] 40410AR-000116–33; 40410AR-002709–30.

[277] *See, e.g.*, 40410AR-004799; 40410AR-004805; 40410AR-004807; 40410AR-004809; 40410AR-004811; 40410AR-004819.

[278] *See, e.g.*, 40410AR-004700; 40410AR-004735; 40410AR-004813; 40410AR-004821; 40410AR- 004825.

[279] *See, e.g.*,

> Comment: "The USACE must analyze and give great weight to the reasonably foreseeable detrimental impacts on the economic vitality of other entities in the area, including other regional maritime ports. See 33 C.F.R. §§ 320 and 325. To fulfill this obligation, the USACE has specific guidance on what must be included in an appropriate accounting analysis. As applied to the instant application, the guidance requires that the accounting include an analysis of whether the proposed additional port on the Delaware River is needed or whether this proposed port will pull customers away from other ports on the river and thus undermine the economic viability of the existing ports."

> Applicant Response: "C.F.R. §§ 320 and 325 include language that requires a public interst [sic] but does not imply that USACE should pick favorites between State run Public Ports. However, the independent economic analyis [sic] being performed by the USACE Deep Draft Navigation Center does allocate future growth proportional between regional public ports, and does not reallocate shiping [sic] from ports beyond the existing Port of Wilmington container operations."

> Corps Evaluation: The Corps agrees with DSPC's response.

40410AR-010248.

[280] 40410AR-010055.

[281] 40410AR-010056.

[282] *Id.*

[283] *Id.*

[284] ECF 29-2 at 55–57.

[285] 672 F. Supp. 561 (D. Mass 1987).

[286] *Id.* at 567–69, 575.

[287] *Id.* at 574; *see also id.* at 573 ("[D]ecisions concerning which competing constituency's economic interests ought to be preferred are traditionally made by democratically accountable officials" and not by the Corps, which only has "a central role in this process because of its expertise in matters relating to our nation's waterways" and not economics).

[288] *See, e.g.*, *Friends of the Mahoning River v. U.S. Army Corps of Eng'rs*, No. 19-2771, 2021 WL 4133763, at *6 (N.D. Ohio Sept. 9, 2021) (reversing Corps' public interest review); *Hudson*, 665 F.Supp. at 450 (same); *Van Abbema*, 807 F.2d at 643 (same).

[289] ECF 28 at 43–45.

[290] *Id.* at 43 n.20 (citing ECF 29-13).

[291] 40410AR-000148.

[292] 40410AR-004730–31.

[293] *New Jersey v. U.S. Army Corps of Eng'rs*, No. 09-5591, 2010 WL 2771771, at *4 (D.N.J. July 13, 2010) (citing *Horizons Int'l, Inc. v. Baldrige*, 811 F.2d 154, 161–62 (3d Cir. 1987) and *NVE, Inc.*, 436 F.3d at 195), *aff'd sub nom. Del. Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corps of Eng'rs*, 685 F.3d 259 (3d Cir. 2012).

[294] 408AR-007355.

[295] *Bergen Cnty. v. Dole*, 620 F. Supp. 1009, 1017 (D.N.J. 1985) (quoting *Lloyd v. Illinois Regional Transportation Authority*, 548 F. Supp. 575, 590 (N.D. Ill. 1982)), *aff'd sub nom. Appeal of Bergen Cnty.*, 800 F.2d 1130 (3d Cir. 1986); *State of Del. Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corp of Eng'rs*, 722 F. Supp. 2d 535, 541 (D. Del. 2010) (citing *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006)) ("[T]he record 'before the agency' includes all documents and materials 'directly or indirectly' considered by agency decision-makers.").

[296] *NVE, Inc.*, 436 F.3d at 190.

[297] CORPS, EC 1165-2-220 DISTRICT STANDARD OPERATING PROCEDURE PURSUANT TO 33 U.S.C. § 408, at 16, 408AR-0078718–817, https://www.mvs.usace.army.mil/Portals/54/EC_1165-2-220.pdf.

[298] *Id.* Similarly, the Corps provides in its Process Guide it is required to obtain a written Statement of No Objection from a non-federal sponsor to document awareness of the scope of the request and there are no objections to the request. If a Statement of No Objection cannot be obtained, the District/Division will not proceed with the Section 408 review unless an exception in the Guidance is identified. Corps, *Section 408 Process Guide*, Slide 3, https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll11/id/6569.

[299] ECF 28 at 43 (citing *Kleissler v. U.S. Forest Serv.*, 183 F.3d 196, 201 (3d Cir. 1999); *Camp*, 411 U.S. at 142).

[300] *See Ohio v. EPA*, 144 S. Ct. 2040, 2055 (2024) ("A party need not rehearse the identical argument made before the agency; it need only confirm that the government had notice of the challenge during the public comment period and a chance to consider in substance, if not in form, the same objection now raised in court.") (cleaned up).

The Philadelphia Port Authority further argues the Corps was required to obtain a statement of no objection *before* it began its Section 408 review, so the Philadelphia Port Authority could not object during the comment period because the error had already occurred.

[301] *Del. Riverkeeper Network*, 869 F.3d at 155.

[302] *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 766 (2004) ("[T]he agency bears the primary responsibility to ensure that it complies [with applicable law]" and the flaws in the agency's analysis "might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action.").

[303] 40410AR-004730–31.

[304] *Del. Riverkeeper Network*, 869 F.3d at 156 (quoting *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1093 (9th Cir. 2006)).

[305] ECF 28 at 44 (citing *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980)).

[306] 408AR-007350, -7352–53, -7377.

[307] *Hoosier Envtl. Council v. Nat. Prairie Indiana Farmland Holdings*, 564 F. Supp. 3d 683, 707 (N.D. Ind. 2021) ("[W]hen an agency follows a procedure inconsistent with the [guidance] manuals, an arbitrary and capricious conclusion can only be avoided if the deviation includes a sufficient explanation why."); *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 537 (D.D.C. 2016) (agency's "decision to disregard its own guidance is tantamount to the inconsistent treatment of similar situations," rendering the agency's decision arbitrary and capricious).

[308] *Hoosier*, 564 F. Supp. 3d at 710 (Corps' "[f]ailure to follow" its own guidance and policies, "absent an explanation why, is arbitrary and capricious" (citing *Bourcher v. USDA*, 934 F.3d 530, 547 (7th Cir. 2021)).

[309] CORPS, EC 1165-2-220 DISTRICT STANDARD OPERATING PROCEDURE PURSUANT TO 33 U.S.C. § 408, at 16–17, 408AR-0078718–817, https://www.mvs.usace.army.mil/Portals/54/EC_1165-2-220.pdf.

[310] 408AR-007355 ("USACE-Philadelphia District is 100% responsible for maintaining the Philadelphia to the Sea Project to authorized depths and reporting depths to all stakeholders along the USACE Project."); *id.* ("The Delaware River, Philadelphia to the Sea River Federal Navigation Project is maintained at 100% Federal expense.").

[311] The Philadelphia Port Authority is responsible for the cost of constructing dredge disposal facilities as needed. The Philadelphia Port Authority and the Corps, in Article VII.B of the Project Partnership Agreement, state the Corps is responsible for "all financial obligations" for the operations and maintenance of the Delaware River Main Channel Deepening Project in the first instance. PA0048 (Art. VIII.B). But, as the parties to the agreement detail in Article IV.B.3 of the Project Partnership Agreement, the Philadelphia Port Authority shares financial responsibility with

the Corps for both the construction and the operations and maintenance of dredge disposal facilities on the back end. *Id.* at PA0042 (Art.VI.B.3).

[312] *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (cleaned up).

[313] ECF 35 at 22 (citing *Del. Riverkeeper Network v. Sec'y Pennsylvania Dep't of Envtl. Prot.*, 833 F.3d 360, 377 (3d Cir. 2016)).

[314] We will not consider the Ports' challenge to the Corps' determination a Safety Assurance Review is not required for the section 408 authorization because we conclude the Statement of No Objection omission dispositive.