IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GREENWICH TERMINALS LLC and GLOUCESTER TERMINALS LLC** | : : : | **CIVIL ACTION** |
| v. | : : | NO. 23-4283 |
| **UNITED STATES ARMY CORP OF ENGINEERS,** *et al.* | : : : | |

| | | |
|---|---|---|
| **THE PHILADELPHIA REGIONAL PORT AUTHORITY** | : : : | **CIVIL ACTION** |
| v. | : : | NO. 24-1008 |
| **UNITED STATES ARMY CORPS OF ENGINEERS,** *et al.* | : : : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                                             **November 21, 2024**

Federal judges work to resolve live cases and controversies between parties. We do not typically allow non-parties to closely watch a case to conclusion as a spectator and then jump into the case when they are disappointed with the judgment. But there are exceptions. The Supreme Court almost eighty years ago allowed non-parties to intervene in a case only if they do so timely after learning of potential impact to their rights, can explain their delay in moving to intervene, and demonstrate a lack of prejudice to the parties already before the court.

Two non-parties now move to intervene after our judgment last month. We entered judgment after a year of reviewing an extensive administrative record challenging the District Commander for the Army Corps of Engineers' issuance of permits for the development of a port managed and financed by the two non-parties along the Delaware River. The non-parties offer no explanation for their delay other than they wanted to "preserve resources" while also admitting

they have hundreds of millions of dollars at issue. The non-parties move to intervene so they can appeal last month's judgment resolving a case they chose to sit out. The non-parties seemingly want to tout economic benefits of their project although we explicitly recognized those benefits in finding the Corps properly assessed their project's impact on the economic public interest and found it beneficial.

We deny the non-parties' motion to intervene as untimely without explanation and prejudicial.

I.   **Background**

Congress authorized the Delaware River Main Channel Deepening Project in 1992 with the goal of deepening the Main Channel to forty-five feet.[1] This public work allows large cargo vessels to navigate upriver to deliver products to previously inaccessible ports from the Delaware Bay to Philadelphia. The Philadelphia Port Authority became a non-federal sponsor of the Deepening Project under a Project Partnership Agreement and agreed to pay a percentage of the costs of construction and maintenance.[2]

*Delaware's interest in developing a new port since 2016.*

The Deepening Project inspired Delaware through its corporation Diamond State Port Corporation in 2016 to purchase a site in Edgemoor, Delaware to develop a new port along the Delaware River.[3] The State of Delaware signed a 50-year concession agreement in 2018 committing "to invest approximately $400 million to construct the Edgemoor facility."[4]

But the Edgemoor site is located at a tight turn where the Delaware River Main Channel comes close to the shoreline. This unique location matters because the large vessels need enough deep water and room to turn around at the Edgemoor site to deliver their cargo before heading back downriver. Diamond State planned to overcome this obstacle by using a forty-five-foot-deep

berthing area at Edgemoor plus the Delaware River Main Channel as a turning basin for large vessels delivering products to the Edgemoor port. In other words, Diamond State sought to use the deepened Main Channel as a turnaround location for ships coming to call at Edgemoor, which would halt all traffic in the Main Channel during use.

Congress required Diamond State apply to the United States Army Corps of Engineers to obtain the Corps' District Commander's: (1) approval of a dredging and construction permit under section 404 of the Clean Water Act and section 10 of the Rivers and Harbors Act, and (2) authorization for use of a federal project under section 408 of the Rivers and Harbors Act because of the proposed location of the turning basin. Diamond State applied to the Corps in 2020 for a permit under section 10 and section 404 and a section 408 authorization. The Corps reviewed the applications, sought public comment, and recommended approval. Its District Commander issued the permit and the authorization in August 2022.

### *Ports sue to challenge the permits to Diamond State a year ago.*

Greenwich and Gloucester timely sued in November 2023 under the Administrative Procedure Act challenging the Corps' issuance of the section 404/10 permit and section 408 authorization.[5] The Philadelphia Port Authority sued approximately four months later joining Greenwich and Gloucester's challenges.[6] The three Plaintiffs plainly establish their challenge to Diamond State's permit and approvals in the first sentences of both Complaints.[7]

We held the first pre-trial conference in early 2024.[8] We held another conference on pretrial briefing and consolidation several weeks later.[9] We created a schedule for the certification of the administrative record and summary judgment briefing. We repeatedly granted the parties additional time to gather the extensive record and present their differing views on our summary judgment review.[10]

3

Diamond State did not participate at all. It never asked to be heard notwithstanding the hundreds of millions of dollars it claims it invested in these permits.[11] Diamond State admits to following this suit closely. Diamond State "became aware of the Complaint in Civil Action No. 2:23-cv-04283-MAK, a short period after the Army Corps was served on March 20, 2024."[12] It "became aware of the Complaint in Civil Action No. 2:24-cv-1008 MAK, a short period after the Army Corps was served on November 27, 2023."[13] And Diamond State "has had its outside counsel monitor the dockets for these matters" since then.[14] Its partner Enstructure likewise followed the litigation.[15]

We consolidated the cases for summary judgment briefing on the section 404/10 permit and section 408 authorization by August 2024.[16] The Ports and Corps moved and responded.[17] The Corps devoted large parts of its briefing to the economic benefits the Port at Edgemoor will bring to Delaware.[18] We held oral argument on the cross motions on October 8, 2024, which counsel for Diamond State and its private partner in the Edgemoor Project, Enstructure, attended.[19] Diamond State's and Enstructure's counsel did not ask to be heard.

We vacated the section 404/10 permit and the section 408 authorization a few weeks later.[20] We found the Corps did not engage in reasoned decision making as to the section 404/10 permit because it failed to consider the impact of the turning basin and dredging activities on the public interest in navigation and safety.[21] We also found the Corps arbitrarily and capriciously departed from its own procedures in recommending the section 408 authorization by not requiring Diamond State obtain a Statement of No Objection from the Philadelphia Port Authority as the sole non-federal sponsor of the Deepening Project.[22]

We also found the Corps properly considered the economic impacts of the Edgemoor Project.[23] We found "Diamond State supplied considerable information about the economic need

4

for and projected impacts of the Edgemoor Project" and noted "[m]any commenters supported the Project for economic reasons including job creation."[24] We (1) considered the benefits of the Edgemoor Project Diamond State and Enstructure advance here, (2) found the Corps had appropriately and thoroughly evaluated the economic impacts of the project, (3) noted the many economic benefits projected to come from the Edgemoor Project, and (4) found the Corps was not required to assess the ability of the Port at Wilmington to siphon off customers from the Philadelphia ports.[25] Our reasoning is supported, not negated, by the economic benefits Diamond State and Enstructure now claim are not being heard.[26]

## II.    Analysis

Diamond State and Enstructure now want to intervene after the judgment and after sitting on the sidelines but closely watching the parties and the Court work on the record for almost a year. They want to intervene post-judgment to "preserve the[ir] right to appeal."[27] They do not cite authority in support of their purported "right to appeal." All parties to this suit oppose the motion.[28] We deny their untimely effort to enter a case they admit having an interest in since day one. They wish to challenge the administrative record, which cannot be modified except in rare circumstances—leading to our extensive analysis—so they can tout the same economic benefits to Delaware we found to be properly considered by the Corps. We never disagreed the Edgemoor Project could bring economic benefits to Delaware and her citizens.

### A. Diamond State and Enstructure may not intervene as of right under Rule 24(a).

Diamond State and Enstructure argue we should analyze their intervention as of right relying upon Rule 24(a), through which the Supreme Court provides "[o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties

adequately represent that interest."[29] Those seeking to intervene as of right must establish "(1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation."[30] Whether to grant intervention is an exercise of our discretion.[31] Below we consider only timeliness under factor one and the representation of interests under factor four. We find the untimeliness of this Motion under factor one dispositive, but further consider the representation of interests under factor four because Diamond State and Enstructure's arguments are so plainly contradicted by the record and our October 28, 2024 analysis.

### 1. Diamond State and Enstructure's motion to intervene is untimely.

Diamond State and Enstructure must first establish a timely application to intervene. Our Court of Appeals offers a "useful framework" for assessing timeliness: (1) "[h]ow far the proceedings have gone when the movant seeks to intervene," (2) "prejudice which resultant delay might cause to other parties," and (3) "the reason for the delay."[32] Delay is "measured from the time the proposed intervenor knows or should have known of the alleged risks" to their rights.[33] We deny the request if deemed to be untimely.[34] And our Court of Appeals has instructed a "motion to intervene after entry of a decree should be denied except in extraordinary circumstances."[35]

Our review of the extensive record surrounding these permits progressed to final or near final dispositions.[36] We managed these cases through regular interaction with the parties. We oversaw the certification of the administrative record and consolidated the cases for briefing on the section 404/10 permit and section 408 authorization. We amended our schedules to meet the needs of the parties and allow for additional time.[37] We ruled on dispositive motions for summary judgment, closing one of the cases and mooting the other.[38] Diamond State and Enstructure admit

6

knowing of all of these developments. They never said a word. Their lawyer sat silently in the courtroom during oral argument watching the lawyers and judge work through the issues.

The prejudice factor also weighs in favor of rejecting this tactic. The parties completed the briefing on their cross motions for summary judgment months ago. We held oral argument weeks before issuing our October 28, 2024 Order. Diamond State and Enstructure seemingly hope to appeal our ruling. But the parties spent the past year educating us on the Corps' decision making, submitting thousands of pages of administrative record and hundreds of pages of briefing. Diamond State and Enstructure seek to intervene to add additional gloss to the economic benefits of the Port at Edgemoor, despite the record already supporting those benefits and our finding the Corps appropriately considered and established those benefits. The parties can decide to appeal our Order. Or they can go back to the Corps to re-review Diamond State's applications. They are fully able to do so. But allowing non-parties to attack the record post-judgment is highly prejudicial to the parties and disrespectful of the court's role to resolve issues before it.

Finally, Diamond State and Enstructure do not attempt to explain their delay. They admit they followed the litigation closely since its inception. They do not argue uncertainty as to the rights at issue. They instead argue they decided to conserve their resources and sit out the litigation. Diamond State and Enstructure fully admit to sitting on their hands as a strategic decision. This tactic is blatantly unfair to the diligent parties before us.

And their cited authority does not help them. Diamond State and Enstructure repeatedly cite to the Supreme Court's analysis over fifty years ago in *NAACP v. New York* to argue "[f]ederal Courts have routinely permitted post-judgment intervention for the purpose of appeal."[39] But this cited authority cuts against their argument. In *NAACP*, the Supreme Court affirmed the reasoning of a three-judge district court denying the NAACP's motion to intervene as untimely where the

NAACP sought to join the case four months into the Voting Rights Act's lawsuit and before a final judgment.[40] This case supports our denial. Our Court of Appeals's cases relied upon by Diamond State and Enstructure are also inapplicable. For example, our Court of Appeals in *Wallach* reviewed a motion to intervene to replace a named class representative under a "presumption of timeliness for intervention motions filed by purported class members[.]" This presumption is not applicable here.[41] And our Court of Appeals in *Mountain Top Condominium* found persuasive "while some written discovery and settlement negotiations had occurred between the [parties] prior to the [intervention] motion, there were no depositions taken, dispositive motions filed, or decrees entered[.]"[42] The present case is at a different stage entirely.

Diamond State and Enstructure then go so far to argue our colleagues "routinely permit[] post-judgment intervention[.]"[43] We disagree; they cite no law supporting this premise. And our research confirms intervention post-final judgment is the exception, not the rule.[44]

We remain guided by our Court of Appeals's controlling standard for post-judgment intervention in *In re Fine Paper Antitrust Litigation*.[45] There, class action litigation consisted of two groups of cases: one involved "plaintiff purchasers of fine paper from the manufacturing mills charged that those concerns had engaged in a horizontal conspiracy to fix prices" and the other involved suits alleging both horizontal agreements and vertical agreements that "included certain wholesale paper merchants who had conspired with the mills."[46] Judge McGlynn "denied class action status to the second group" and the plaintiffs in those actions proceeded on their separate ways.[47] The certified case settled and a final judgment was entered.[48] Independent merchant houses sought to intervene to appeal the class definition after Judge McGlynn excluded them from the class.[49] Our Court of Appeals began its analysis noting a "motion to intervene after entry of a decree should be denied except in extraordinary circumstances."[50] Our Court of Appeals held the

independent merchant houses knew their interests were not protected long before they sought intervention and did not have a good explanation for their delay.[51] The Court of Appeals affirmed Judge McGlynn's denial.[52]

A reasonable citizen may expect a State, through its corporate entity, investing hundreds of millions of taxpayer dollars into building a new port, to want to have a say before a federal court deciding whether to vacate the permits required by Congress before the State could begin construction. The State may want to timely explain the benefits supporting the approval of its permits. A reasonable citizen would *not* expect the heavily invested State to "want to conserve resources" and remain uninvolved aside from watching the case for the last year. Despite this State's decision to sit on its hands, the Corps still ably persuaded us to address the touted economic benefits to Delaware leading us to find the Corps properly considered these benefits.

Diamond State and Enstructure do not come close to establishing the "extraordinary circumstances" our Court of Appeals requires for post-judgment intervention.[53] Like the parties seeking intervention in *In re Fine Paper Antitrust Litigation*, Diamond State and Enstructure's "untimeliness is fatal to [their] motion to intervene."[54] We deny their motion to intervene as untimely without explanation (other than "conserving resources") and find prejudice in allowing a non-party to jump into a case after judgment when they had at least a year to speak up.

### 2. The Corps represented Diamond State and Enstructure's economic interests.

The post-judgment timing of this motion is instructive on transparent motives as well as dispositive. But we also find no basis for Diamond State's and Enstructure's suggestion the Corps cannot and did not protect their interests. We start by recalling this argument is inconsistent with their conduct over the last year: despite admitting full knowledge of the suit, Diamond State and Enstructure sat back and trusted the Corps to defend their permit and approval. "Representation is

9

generally considered adequate if no collusion is shown between the representative and an opposing party, if the representative does not represent an interest adverse to the proposed intervenor and if the representative has been diligent in prosecuting the litigation."[55]

There is no allegation the Corps colluded with the Ports. There is no allegation the Corps' interests are adverse to Diamond State and Enstructure's interests. There is no allegation the Corps has not been diligent in this suit. The Corps devoted many pages of their briefing to the benefits the Port at Edgemoor would bring to Delaware while Diamond State and Enstructure sat by and conserved their resources.[56] And we remind Diamond State and Enstructure we found the Corps properly considered the economic impacts of the Edgemoor Project.[57] We found "Diamond State supplied considerable information about the economic need for and projected impacts of the Edgemoor Project," noted "[m]any commenters supported the Project for economic reasons including job creation," found the Corps had thoroughly evaluated the economic impacts of the project, and noted the many projected economic benefits which could come from the Edgemoor Project.[58] To suggest the Corps did not address the economic benefits of the Edgemoor Project is disingenuous.

Diamond State and Enstructure further ignore Diamond State applied to the Corps under section 204(f) of the Water Resources Development Act of 1986 for the Army Corps to assume the future maintenance dredging and associated costs for the approach channel and turning basin and the request was granted.[59] So Diamond State cannot credibly argue the Corps is not financially motivated.[60]

### B. Diamond State and Enstructure are not entitled to permissive intervention under Rule 24(b) because their Motion is untimely.

Diamond State and Enstructure decided to sit on their concerns. They cannot meet the timeliness analysis for intervention as of right under Rule 24(a). They also cannot meet the

10

timeliness analysis for permissive intervention under Rule 24(b).[61] We deny permissive intervention.

## III. Conclusion

Diamond State and Enstructure seek to intervene in response to our October 28, 2024 ruling on cross motions for summary judgment a year after first learning of the litigation in the Ports' Administrative Procedure Act challenge. Diamond State and Enstructure admit knowing and following the suits from day one but chose not to intervene to conserve resources notwithstanding investing hundreds of millions of taxpayer money into the Edgemoor Project. They now seek to intervene after our review of thousands of pages of administrative record and hundreds of pages of summary judgment briefing to note how positive the Port at Edgemoor will be for Delaware.

We deny this untimely post-judgment motion to intervene. Diamond State and Enstructure misapprehend our role under the Administrative Procedure Act. It is not for us to weigh the political, economic, or job-promoting merits or demerits of an application to an agency. We only review the agency's decision making, which we completed with the assistance of the diligent parties before us. If the Corps reconsiders the permit and authorization applications in a manner consistent with its obligations under the Administrative Procedure Act and re-approves them, we have no evidentiary basis to doubt the Port at Edgemoor will bring all the benefits to Delaware now claimed by Diamond State and Enstructure.

Diamond State's and Enstructure's untimely post-judgment Motion with unexplained delay and attendant prejudice is denied.

---

[1] Water Resources Development Act, Pub. L. No. 102-580, § 101 (6), 106 Stat. 4797 (1992).

[2] PA0018–61.

---

40410AR-__ is a citation to the administrative record for the 404/10 permit, 408AR-__ is a citation to the administrative record for the 408 approval, and PA__ is an extra-record citation to an exhibit to the Ports' Motion for summary judgment. All cited materials can be found at No. 23-4283, ECFs 28, 29, 35, and 38. Unless there is a specific citation to a different docket, all ECF citations are to the No. 23-4283 docket for ease of reference.

The Commonwealth established the Philadelphia Port Authority in 1989 to manage and operate Philadelphia's ports. Two ports in Pennsylvania and New Jersey sit north of the Delaware state line on the Delaware River: Greenwich Terminals LLC operates the Packer Avenue Marine Terminal in Philadelphia. 40410AR-004831. Gloucester Terminals LLC operates the Gloucester Marine Terminal in Gloucester City, New Jersey and the Paulsboro Marine Terminal in Paulsboro, New Jersey. *Id.*

[3] The State of Delaware through its General Assembly established Diamond State Port Corporation in 1995 to manage and operate the Port of Wilmington. 40410AR-000047.

[4] 40410AR-000048.

[5] ECF 1.

[6] No. 24-1008, ECF 1.

[7] ECF 1 ¶ 1; No. 24-1008, ECF 1 ¶ 1.

[8] ECF 15.

[9] ECF 22.

[10] ECFs 12, 24, 34.

[11] ECF 46 ¶ 2.

[12] ECF 46-4 ¶ 28.

[13] *Id.* ¶ 29.

[14] *Id.* ¶ 30.

[15] ECF 46-5 ¶¶ 22–25.

[16] ECFs 24, 34.

[17] ECFs 28, 29, 35, 38.

[18] ECF 28 at 37–43; ECF 35 at 28–31. For example, the Corps argued:

> The Corps fully considered the economics, needs, and general welfare impacts of the Wilmington Port Expansion in concluding that neither the Section 404/10 Permit nor the 408 Approval would be contrary the public interest. The Corps reasonably found that the Wilmington Port Expansion would provide economic benefits: "Economic development opportunities are enhanced through the construction of a 45-ft. berth and access channel as a result of the ability to attract larger container vessels and the associated reduced transportation costs per TEU." 40410AR-010055. The Corps also found that "[t]he new port at Edgemoor is expected to increase jobs, wages, and tax revenue opportunities for the City of Wilmington, and the socioeconomic region" and "is expected to support the growth of over 4,000 jobs annually." 40410AR-010056. As a result, "these changes are expected to benefit the quality of life for many residents in the area." 40410AR-010056. **These economic and general welfare benefits can be realized only by the Wilmington Port Expansion.**

ECF 28 at 37 (emphasis added) (footnote omitted).

[19] ECF 40; ECF 46-1 at 11.

[20] ECFs 44, 45.

[21] ECF 44.

[22] *Id.*

[23] ECF 44 at 48–51.

[24] *Id.* at 49.

[25] *Id.* at 48–51.

[26] ECF 46.

[27] *Id.* ¶ 9.

[28] ECF 46-1 at 2; ECF 51.

[29] Fed. R. Civ. P. 24(a).

[30] *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 314 (3d Cir. 2005) (quoting *Harris v. Pernsley*, 820 F.2d 592, 596 (3d Cir. 1987)).

[31] *NCAA v. Governor of New Jersey*, 520 F. App'x 61, 63 (3d Cir. 2013).

[32] *Pennsylvania v. Rizzo*, 530 F.2d 501, 506 (3d Cir. 1976) (collecting cases).

---

[33] *Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pa.*, 701 F.3d 938, 950 (3d Cir. 2012) (citing *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977)).

[34] *NAACP v. New York*, 413 U.S. 345, 369 (1973) ("We therefore conclude that the motion to intervene was untimely and that the District Court did not abuse its discretion in denying the appellants' motion. This makes it unnecessary for us to consider whether other conditions for intervention under Rule 24 were satisfied.").

[35] *In re Fine Paper Antitrust Litig.*, 695 F.2d 494, 500 (3d Cir. 1982) (quoting *Del. Valley Citizens' Council for Clean Air v. Com. of Pa.*, 674 F.2d 970, 974 (3d Cir. 1982)). And we are "not unmindful of the well-established principle that intervention after entry of a final judgment will not be allowed unless a strong showing is made[.]" *Pennsylvania v. Rizzo*, 66 F.R.D. 598, 600 (E.D. Pa. 1975) (cleaned up), *aff'd*, 530 F.2d 501.

[36] Under the first prong of the timeliness test "the critical inquiry is: what proceedings of substance on the merits have occurred?" *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 369 (3d Cir. 1995).

[37] ECFs 12, 24, 34.

[38] Case No. 23-4283 is closed. ECF 45. Case No. 24-1008 is partially closed and otherwise mooted. No. 24-1008; ECFs 41, 42, 43.

[39] ECF 46 ¶ 9 and ECF 46-1 at 12 (both citing *NAACP*, 413 U.S. 345).

[40] *NAACP*, 413 U.S. at 366 ("[W]e readily conclude that the District Court's denial of the appellants' motion to intervene was proper because of the motion's untimeliness, and that the denial was not an abuse of the court's discretion[.]").

[41] *Wallach v. Eaton Corp.*, 837 F.3d 356, 372 (3d Cir. 2016).

[42] *Mountain Top Condo*, 72 F.3d at 370.

[43] ECF 46 ¶ 9.

[44] *See, e.g.*, *Associated Builders & Contractors, Inc. v. Herman*, 166 F.3d 1248, 1257 (D.C. Cir. 1999) (quoting *Dimond v. District of Columbia*, 792 F.2d 179, 193 (D.C. Cir. 1986)) ("A motion for 'intervention after judgment will usually be denied where a clear opportunity for pre-judgment intervention was not taken.'"); *Banco Popular de Puerto Rico v. Greenblatt*, 964 F.2d 1227, 1231 (1st Cir. 1992) ("The more advanced the litigation, the more searching the scrutiny which the motion must withstand."); *Horsham Blair Mill ARCT, LLC v. TFV Invs. Assocs., LP*, No. 23-2745, 2024 WL 841769 (E.D. Pa. Feb. 28, 2024) (post-judgment motion to intervene denied as untimely); *Chevron Env't Mgmt. Co. v. Env't Prot. Corp.*, No. 20-16206, 2022 WL 10966098, at *2 (9th Cir. Oct. 19, 2022) (same); *Michigan Dep't of Env't Quality v. Ford Motor Co.*, 330 F.R.D. 475 (E.D. Mich. 2019) (same); *In re Safeguard Scis.*, 220 F.R.D. 43 (E.D. Pa. 2004) (same); *California Dep't of Toxic Substances Control v. Com. Realty Projects, Inc.*, 309 F.3d 1113 (9th

Cir. 2002) (same); *Richard C. ex rel. Kathy B. v. Houstoun*, 196 F.R.D. 288 (W.D. Pa. 1999) (same); *Patriot Party of Pa. v. Mitchell*, No. 93-2257, 1993 WL 466522 (E.D. Pa. Aug. 17, 1993) (same); *SEC v. Byers*, 109 F.R.D. 299 (W.D. Pa. 1985) (same); *Minersville Coal Co. v. Anthracite Exp. Ass'n*, 58 F.R.D. 612 (M.D. Pa. 1973) (same); *see also* WRIGHT & MILLER, 7C FED. PRAC. & PROC. CIV. § 1916 (3d ed.) (collecting cases) ("There is considerable reluctance on the part of the courts to allow intervention after the action has gone to judgment and a strong showing will be required of the applicant. Motions for intervention after judgment ordinarily fail to meet this exacting standard and are denied.").

[45] 695 F.2d 494 (3d Cir. 1982).

[46] *Id.* at 496.

[47] *Id.* at 497.

[48] *Id.*

[49] *Id.*

[50] *Id.* at 500 (quoting *Del. Valley Citizens' Council for Clean Air*, 674 F.2d at 974).

[51] *Id.* at 500–01.

[52] *Id.* at 501.

[53] Those few cases where post-judgment intervention is granted present vastly different facts. *See, e.g.¸ Rapp v. Cameron*, No. 00-1376, 2001 WL 1295606, at *2 (E.D. Pa. Oct. 18, 2001) ("While Titan could have filed a motion to intervene well before the entry of judgment, it did not do so because of the prejudicial effect upon its insured, Officer Cameron. Had Titan requested intervention earlier, it would have prejudiced Cameron because he would have had to defend against both plaintiff and Titan, at a time when Titan was defending him under a reservation of rights letter.").

[54] *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela Red Tree Invs., LLC*, No. 23-1117, 2024 WL 3342444, at *3 (3d Cir. July 9, 2024).

[55] *Del. Valley Citizens' Council for Clean Air*, 674 F.2d at 973 (first citing *Olden v. Hagerstown Cash Register, Inc.*, 619 F.2d 271, 274–75 (3d Cir. 1980); then citing *Martin v. Kalvar Corp.*, 411 F.2d 552, 553 (5th Cir. 1969)).

[56] *See, e.g.*, ECF 28; ECF 35.

[57] ECF 44 at 48–51.

[58] *Id.*

[59] No. 24-1008, ECF 17 ¶¶ 45–68.

[60] We further note Diamond State and Enstructure suggest we enjoined them in our October 28 Order. Diamond State and Enstructure state "[a]s set forth in the Complaints, Plaintiffs seek to 'enjoin any activities in furtherance' of the DCT Project." ECF 46-1 at 14. Diamond State and Enstructure ignore our October 28, 2024 Order vacating the permit and authorization but dismissing "Plaintiffs' other requested relief concerning the permit and authorization as moot other than granting Plaintiffs leave to petition for reimbursement of their costs[.]" ECF 45.

[61] *Rizzo*, 530 F.2d at 506 ("Whether intervention be claimed of right or as permissive, it is at once apparent, from the initial words of both Rule 24(a) and Rule 24(b), that the application must be 'timely.' If it is untimely, intervention must be denied.") (quoting *NAACP*, 413 U.S. at 365); *Crystallex*, 2024 WL 3342444, at *5 ("Because the District Court correctly concluded that its motion to intervene as of right was untimely, Red Tree's motion for permissive intervention was properly denied as well.").